# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

### WI-LAN USA, INC. and WI-LAN INC.,
*Plaintiffs-Appellants*,

v.

### ERICSSON, INC. and
### TELEFONAKTIEBOLAGET LM ERICSSON,
*Defendants-Appellees.*

═══════════

### No. 2013-1485

═══════════

---

Appeal from the United States District Court for the Southern District of
Florida in Case No. 12-CV-23569, Judge Donald M. Middlebrooks

---

### WI-LAN INC.,
*Plaintiff-Appellee*,

v.

### ALCATEL-LUCENT USA, INC.,
*Defendant,*

and

### TELEFONAKTIEBOLAGET LM ERICSSON, ERICSSON, INC.,
### SONY MOBILE COMMUNICATIONS AB
### (also known as Sony Ericsson Mobile Communications AB),
### and SONY MOBILE COMMUNICATIONS (USA), INC.
### (also known as Sony Ericsson Mobile Communications (USA), Inc.),
*Defendants-Appellants.*

═══════════

### No. 2013-1566

═══════════

---

Appeal from the United States District Court for the Eastern District of
Texas in case no. 10-CV-0521, Chief Judge Leonard Davis.

---

*Continued on Inside Cover*

---

## PRINCIPAL BRIEF OF PLAINTIFFS-APPELLANTS
## WI-LAN INC. AND WI-LAN USA, INC.

---

David B. Weaver
Stephen M. Hash
Avelyn M. Ross
Ajeet P. Pai
VINSON & ELKINS LLP
2801 Via Fortuna Suite 100
Austin, TX 78746-7568
Telephone: 512.542.8400
Fax: 512.542.8612

Constance S. Huttner
Stephanie Donahue
VINSON & ELKINS LLP
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Telephone: 212.237.0000
Fax: 212.237.0100

*Attorneys for Wi-LAN Inc. and Wi-LAN USA, Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellants Wi-LAN Inc. and Wi-LAN USA, Inc. certify the following:

1.    The full name of every party or amicus represented by me is:

Wi-LAN Inc. and Wi-LAN USA, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Wi-LAN USA, Inc. is a wholly owned subsidiary of Wi-LAN Inc. Wi-LAN Inc. is a publicly traded corporation.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

VINSON & ELKINS LLP: David B. Weaver, Stephen M. Hash, Constance S. Huttner, Steve R. Borgman, Hilary L. Preston, Charles P. Ebertin, Gwendolyn J. Samora, Avelyn M. Ross, Stephanie L. Donahue, Ajeet P. Pai, Syed K. Fareed, Jeffrey T. Han, Seth A. Lindner, Janice Le Ta, Andrew J. Allen, David J. Tobin, Efren Garcia, and Purav K. Jesrani. Michael A. Valek, Juliet M. Dirba, David D. Hornberger, and John A. Fedock, all formerly of Vinson & Elkins LLP, previously appeared for Wi-LAN Inc. in the Texas trial court.

WARD & SMITH LAW FIRM: T. Johnny Ward, J. Wesley Hill, and Claire Abernathy Henry.

CARLSON & LEWITTES, PA: Curtis Carlson and Ronald Lewittes.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, PA: Jay Shapiro and Samuel Patmore previously appeared for Wi-LAN USA, Inc. and Wi-LAN Inc. in the Florida trial court.

i

# **<u>TABLE OF CONTENTS</u>**

**PAGE:**

CERTIFICATE OF INTEREST ................................................................i

TABLE OF CONTENTS .................................................................. ii

TABLE OF AUTHORITIES ..............................................................v

TABLE OF ABBREVIATIONS ...................................................... vii

STATEMENT OF RELATED CASES ............................................. viii

STATEMENT OF JURISDICTION....................................................1

STATEMENT OF THE ISSUES ON APPEAL .....................................2

STATEMENT OF THE CASE............................................................3

     A.    Preliminary Statement .........................................................3

     B.    Procedural History...............................................................4

STATEMENT OF FACTS ..................................................................6

     A.    BACKGROUND OF THE CONTRACT DISPUTE............................6

          1.    History of the PCR Agreement ....................................6

          2.    The BelAir License ..................................................10

     B.    THE CONFLICTING DISTRICT COURT OPINIONS ...................11

          1.    The Texas Action....................................................11

          2.    The Texas Order......................................................13

3.     The Florida Action ..................................................14

4.     The Florida Order.....................................................16

SUMMARY OF ARGUMENT ........................................................17

ARGUMENT ...................................................................................19

    STANDARD OF REVIEW ........................................................19

    DISCUSSION ............................................................................19

A.     The MFL Provision Applies Only To UMTS/HSPA Patents That Wi-LAN Owned Or Controlled As Of The PCR Agreements' Effective Date ...............................................20

    1.     The PCR Agreement is governed by New York law................20

    2.     The MFL Provision is part of a carefully negotiated agreement which must be read as a whole................................21

    3.     The language and structure of the PCR Agreement confirm that the present tense language of § 1 of the MFL Provision does not apply to patents acquired after the Agreement's effective date ......................................................22

        a.     In contrast to other sections of the PCR Agreement, § 1 of the MFL Provision omits references to patents owned by Wi-LAN in the future ............................................................................23

        b.     Courts have interpreted present tense language in contractual provisions to exclude future activities .........26

        c.     The use of "in the event" in Article VII, § 1 does not alter the scope of the provision.................................28

    4.     The Florida court incorrectly concluded that "in the event" in Article VII, § 1 must refer to future events ...............31

B.   Even If § 1 of the MFL Provision Applies to After-Acquired Patents, the Florida Court Erred in Applying it Retroactively............34

1.   Section 1 does not apply to the BelAir license because BelAir is not a "future licensee" ................................................34

2.   The purpose of § 1 of the MFL Provision is to put Ericsson on the same footing as its competitors......................36

3.   Ericsson's contrary interpretation of the text of § 1 of the MFL Provision leads to unintended results ..............................37

C.   Even if the MFL Provision Was Triggered By the Texas Action, The Florida Court Erred in Concluding Ericsson Was Entitled to the Terms of the BelAir License ........................................39

1.   By reading § 1 of the MFL Provision in isolation from the provision as a whole, the Florida court rendered "most-favored licensee status" an undefined term ..................39

2.   BelAir and Ericsson are not "similarly situated" companies..................................................................................43

D.   Even If the Terms Of the BelAir License Are Available As the "Most-Favored Licensee Status," Section 1 of the MFL Provision Grants Rights To the Patents Asserted, Not All Patents Licensed By BelAir ..............................................................44

CONCLUSION ....................................................................................................46

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

PAGE(S):

## CASES:

*Acme Supply Co. v. City of N.Y.*,
39 A.D.3d 331 (N.Y. App. Div. 2007) ...............................................31, 32, 39

*Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*,
361 F. Supp. 2d 210 (S.D.N.Y. 2005) ...........................................................26

*Beal Sav. Bank v. Sommer*,
865 N.E.2d 1210 (N.Y. 2007) ................................................................33, 39

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.*,
2013 WL 1890278 (No. 13-Civ-1582 (May 8, 2013) ...................................31

*Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*,
84 F.3d 91 (2d Cir. 1996) .............................................................................25

*Harley C. Loney Co. v. Mills*,
205 F.2d 219 (7th Cir. 1953) ........................................................................37

*JA Apparel Corp. v. Abboud*,
568 F.3d 390 (2d Cir. 2009) ...................................................................20, 31

*Korosh v. Korosh*,
99 A.D.3d 909 (N.Y. App. Div. 2012) ....................................................29, 33

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
595 F.3d 458 (2d Cir. 2010) .........................................................................28

*Lipper Holdings, LLC v. Trident Holdings, LLC*,
1 A.D.3d 170 (N.Y. App. Div. 2003) ......................................................21, 37

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
639 F.3d 63 (2d Cir. 2011) ....................................................................20, 41

*Newmont Mines Ltd. v. Hanover Ins. Co.*,
784 F.2d 127 (2d Cir. 1986) ..................................................................21, 36

*Reda v. Eastman Kodak Co.*,
    233 A.D.2d 914 (N.Y. App. Div. 1996) ........................................................38

*Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*,
    7 F.3d 1091 (2d Cir. 1993) ........................................................23

*South Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*,
    826 N.E.2d 806 (N.Y. 2005) .................................................. 29-30

*Unova, Inc. v. Acer Inc.*,
    363 F.3d 1278 (Fed. Cir. 2004) ..........................................26, 27

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,
    212 F.3d 1377 (Fed. Cir. 2000) ..................................................19

*VKK Corp. v. Nat'l Football League*,
    244 F.3d 114 (2d Cir. 2001) ........................................................27

*Willemijn Houdstermaatschappij, BV v. Std. Microsys. Corp.*,
    103 F.3d 9 (2d Cir. 1997) ........................................................36, 40

## STATUTES:

28 U.S.C. § 1295(a)(1) ................................................................1

28 U.S.C. § 1338(a) ................................................................1

## RULES:

FED. R. APP. P. 4(a)(4) ................................................................1

FED. R. CIV. P. 54(b) ................................................................1, 5

FED. R. CIV. P. 56(a) ................................................................19

## OTHER:

Bryan A. Garner, A Dictionary of Modern Legal Usage (2d ed. 1995) ..................30

# <u>TABLE OF ABBREVIATIONS</u>

*Parties*

| | |
|---|---|
| Wi-LAN | Wi-LAN Inc. with regard to the Texas action, and Wi-LAN Inc. and Wi-LAN USA, Inc. with regard to the Florida action. |
| Ericsson | Unless context indicates otherwise, refers collectively to appellants Telefonaktiebolaget LM Ericsson, Ericsson, Inc., Sony Mobile Communications AB and Sony Mobile Communications (USA), Inc. with regard to the Texas action, and appellees Telefonaktiebolaget LM Ericsson and Ericsson, Inc. with regard to the Florida action. |

*Contract Terms*

| | |
|---|---|
| PCR Agreement | Either of the two substantively identical agreements entitled "PATENT AND CONFLICT RESOLUTION AGREEMENT" between Wi-LAN and each of Ericsson and Sony Mobile, each with an Effective Date of November 1, 2007. |
| CNTS Provision | Article III, § 1 of the PCR Agreement. |
| Damages Provision | Article IV of the PCR Agreement. |
| MFL Provision | Article VII of the PCR Agreement, which is entitled "MOST-FAVOURED LICENSEE PROVISIONS." |
| WI-LAN PATENTS | U.S. Pat. Nos. 5,282,222, RE37,802, 6,192,068, and 6,320,897, together with any continuations, foreign equivalents, etc., if any, as defined by Article I, § 9 of the PCR Agreement. |

*Patents-in-Suit*

| | |
|---|---|
| Texas Patents | U.S. Pat. Nos. 6,088,326, 6,222,819, 6,381,211, and 6,195,327. |
| Florida Patents | U.S. Pat. Nos. 8,027,298, 8,249,014, and 8,229,437. |

## **STATEMENT OF RELATED CASES**

Pursuant to FED. CIR. R. 47.5, Wi-LAN provides as follows:

(a) there have been no previous appeals in the two cases which have been consolidated into this case; and

(b) it is aware of no other case that will be directly affected by the Court's decision in this consolidated case.

## STATEMENT OF JURISDICTION

**Appeal No. 2013-1485.** The U.S. District Court for the Southern District of Florida ("Florida court") had jurisdiction over the underlying action under 28 U.S.C. § 1338(a). Wi-LAN's notices of appeal from judgments entered on June 20 (ordering case closed) and July 8, 2013 (final judgment) were timely filed on June 28 and July 12, 2013. (A9–10; A11–12; A41–43; A44–46.) This court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

**Appeal No. 2013-1566.** The U.S. District Court for the Eastern District of Texas ("Texas court") had jurisdiction over the underlying action under 28 U.S.C. § 1338(a). The Texas court entered final and amended final judgments on July 16 and July 22, 2013, and Ericsson and Sony Mobile filed a timely notice of appeal on August 13, 2013. (A148.) On the same day, Wi-LAN timely filed post-verdict motions regarding its patent claims, tolling the time to appeal. (A138); FED. R. APP. P. 4(a)(4). On September 20, 2013, the Texas court entered an appealable partial final judgment regarding Ericsson's and Sony Mobile's contract claims under FED. R. CIV. P. 54(b). (A56–57.) This court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

1

## STATEMENT OF THE ISSUES ON APPEAL

1.   Whether the Florida court erred by expansively interpreting a most-favored licensee provision ("MFL Provision") in a contract between Wi-LAN and Ericsson by:

    (a)   determining that the MFL Provision applies to after-acquired patents that Wi-LAN undisputedly did not own when the contract was signed;

    (b)   determining that the MFL Provision permits Ericsson to seek the same terms as third-party licenses granted by Wi-LAN *before* Ericsson's request for a license was made; and

    (c)   concluding that § 1 of the MFL Provision should be read in isolation from the provision as a whole, and therefore does not require consideration of whether a future licensee is "similarly situated" to Ericsson to be applicable.

2.   Whether the Florida court further erred by interpreting the MFL Provision to provide Ericsson with a broad license to hundreds of unrelated patents, rather than to the specific patents asserted against Ericsson.

# STATEMENT OF THE CASE

## A.    Preliminary Statement

This is a dispute about the scope of the parties' rights and obligations under a contract known as the Patent Conflict and Resolution Agreement ("PCR Agreement") between Wi-LAN and each of Ericsson and Sony Mobile (formerly Sony Ericsson), effective November 1, 2007. As is relevant here, in each underlying action, Wi-LAN asserted a claim of patent infringement, and Ericsson and Sony Mobile (in Texas) and Ericsson (in Florida) counterclaimed for breach of contract under the PCR Agreement.[1] (A437; A451; A1214; A1250.)

After extensive briefing and oral argument on the contract issues, the Texas court granted summary judgment in favor of Wi-LAN on June 4, 2013, holding that Wi-LAN did not breach either the CNTS Provision or the MFL Provision of the PCR Agreement. (A54; A47–55.) Despite the Texas court's considered resolution of the issue, the Florida court later issued a contrary summary judgment order, on the MFL Provision, in favor of Ericsson on June 20, 2013. (A9; A1–10.) Wi-LAN appeals that erroneous ruling, which misinterpreted the narrow and carefully negotiated provisions of the PCR Agreement and in doing so provided Ericsson with

---

[1] Because Sony Mobile is not a party to the Florida action, the arguments in this brief refer to Ericsson. The PCR Agreement is, for present purposes, substantively the same for Ericsson and Sony Mobile.

expansive rights under the MFL Provision never contemplated by the parties or the PCR Agreement.

### B.    Procedural History

**The Texas Action.** On October 5, 2010, Wi-LAN filed suit against Ericsson, Sony Mobile, and several other defendants[2] in the Eastern District of Texas for infringement of four Wi-LAN patents (the "Texas Patents") relating generally to 3G cellular technology.[3] (A1214–31.) Wi-LAN moved for summary judgment that a covenant not-to-sue provision of the 2007 PCR Agreement did not bar the Texas suit, which involved patents Wi-LAN acquired in 2009. (A646–60.) Ericsson and Sony Mobile cross-moved for summary judgment, arguing that the covenant barred the Texas suit and additionally that they were entitled to a license to the Texas Patents, among others, under the MFL Provision of the PCR Agreement. (A709–35; A949–75.) On June 4, 2013, after full briefing and oral argument, the Texas court (1) granted Wi-LAN's motion for summary judgment that the covenant-not-to-sue provision did not bar the suit and (2) denied the defendants' motions that assertion of the Texas Patents triggered the MFL Provision, effectively eliminating the contract claims from the case. (A53–54; A57.) Following a jury trial on Wi-LAN's claims for patent infringement that resulted in a verdict for Ericsson and Sony Mobile, the

---

[2] All other defendants to the Texas case are now Wi-LAN licensees, and only Ericsson and Sony Mobile are parties to the current consolidated appeal.

[3] In the Texas action, three of the four Texas Patents were asserted against Ericsson, and two of the four were asserted against Sony Mobile. (A1219–22.)

Texas court entered final judgment. (A1355–56; A1357–58.) Ericsson and Sony Mobile appealed on August 13, 2013. (A148.) Because the appeal was tolled by Wi-LAN's timely post-verdict motions regarding its patent claims, the parties moved for entry of partial final judgment pursuant to Fed. R. Civ. P. 54(b) on the contract claims. (A1359–70.) On September 20, 2013, the Texas court entered an immediately appealable partial final judgment regarding defendants' contract claims (which are the subject of this appeal) under FED. R. CIV. P. 54(b). (A56–57.)

**The Florida Action.** On October 1, 2012, several years after the Texas suit was filed, Wi-LAN sued Ericsson in the Southern District of Florida for infringement of three patents relating to 4G LTE technology (the "Florida Patents")—which are different than the Texas Patents. (A437–43.) Ericsson moved for summary judgment that it was entitled to a license to the Florida Patents, among others, under the same MFL Provision of the same PCR Agreement and for the same reasons Ericsson presented in the Texas action. (A150–62.) Despite the Texas court's prior ruling to the contrary, on June 20, 2013, the Florida court concluded that the Texas action had triggered application of the MFL Provision and granted summary judgment in favor of Ericsson. (A8–9.) The court held that Ericsson was entitled to a license to the unrelated Florida Patents based on the prior assertion of the *Texas Patents* in the Texas action. (A9; A1–10.) The Florida court entered judgment in favor of Ericsson (and ordered the case closed) on June 20 and final

judgment on July 8, 2013. (A9; A11–12.) Wi-LAN timely appealed on June 28 and July 12, 2013. (A41–43; A44–45.)

**Consolidation of Appeals.** Because the Texas and Florida appeals present similar (and to a large extent, identical) questions of contract interpretation, the parties moved to consolidate on October 11, 2013. (Case No. 2013-1485, ECF No. 29.) On October 21, 2013, this Court ordered the two appeals consolidated in the nature of cross-appeals. (*Id.*, ECF No. 30.)

## STATEMENT OF FACTS

On October 1, 2012, Wi-LAN filed suit against Ericsson in the Southern District of Florida for infringement of the Florida Patents, which relate to aspects of 4G LTE cellular telephony. (A437–43.) Among other defenses, Ericsson alleged breach of a contract known as the PCR Agreement. (A451–56.) The PCR Agreement was finally executed by Ericsson and Wi-LAN on February 15, 2008, but became effective November 1, 2007. (A2; A47; A663; A665.) This appeal involves a dispute about the meaning of certain terms of the PCR Agreement, and two conflicting district court decisions regarding that agreement.

### A.    BACKGROUND OF THE CONTRACT DISPUTE

#### 1.    History of the PCR Agreement

The PCR Agreement was executed to resolve an alleged conflict of interest involving Wi-LAN, Ericsson, and the law firm of McKool Smith ("McKool").

(A1; A47.) This perceived conflict arose because of licensing discussions that Wi-LAN, through its in-house licensing team, initiated with Ericsson in October 2006. (A650–51; A717–18.) Those discussions related to four specific patents ("the WI-LAN PATENTS"), a small subset of Wi-LAN's wireless portfolio. (A280.) The WI-LAN PATENTS are not at issue in the present cases. Long after those discussions began, Wi-LAN, through its litigation counsel McKool, filed two lawsuits ("the Acer/Westell cases") accusing certain entities—not including Ericsson or Sony Ericsson—of infringing two of the four WI-LAN PATENTS that Wi-LAN was attempting to separately license to Ericsson. (A171–18.)

Even though neither Ericsson nor Sony Ericsson were named as defendants in the Acer/Westell cases, Ericsson nevertheless alleged that by filing the complaint, a conflict of interest arose for McKool, which previously represented Ericsson in unrelated wireless matters. (A152; *see generally* A150-153.) Ericsson (through Sony Ericsson[4]) threatened that it would attempt to disqualify McKool from the Acer/Westell cases on the basis of a supposed positional conflict. (A280.) After Ericsson made its objections known to McKool, McKool suggested that the issue could be resolved if Wi-LAN granted Ericsson a license. (*Id*.) Therefore, to eliminate this perceived conflict and avoid any risk of disqualification, Wi-LAN entered into the PCR Agreement and agreed not to assert any of the WI-LAN

---

[4] Sony Ericsson negotiated the terms of the PCRA on behalf of Sony Ericsson and Ericsson. (A280.)

PATENTS it was then-attempting to license to Ericsson. (A662, reciting that value of agreement includes "resolving any conflicts the McKool Smith law firm may have"; A664.) In addition to each party agreeing not to use McKool against the other, a payment of $100,000 was made to Wi-LAN by McKool on behalf of Ericsson. (A662; A271.)

As a result, the PCR Agreement contains four main provisions tailored to resolve the alleged conflict: (1) a Covenant Not-to-Sue Provision (the "CNTS Provision") in Article III (and the companion Release of Article II); (2) a Limitation on Damages Provision (the "Damages Provision") in Article IV; (3) a Most-Favored Licensee Provision (the "MFL Provision") of Article VII; and (4) an agreement by the parties not to use McKool against each other. (A664–69; 674.)

The first provision, the CNTS Provision, eliminated the perceived conflict by providing Ericsson a covenant not-to-sue on the four WI-LAN PATENTS.[5] That provision reads, in relevant part, as follows:

> [] WI-LAN hereby irrevocably covenants that neither WI-LAN nor its AFFILIATES will, directly or indirectly … cause, induce or authorize … the commencement, maintenance or prosecution of any ACTION seeking or having the tendency to establish any liability on the part of … [Ericsson] … arising from, by reason of, or in connection with making, using, selling, offering to sell or importing LME PRODUCTS which would, but for this Agreement, infringe any WI-LAN PATENTS. (A664-65 (PCRA Art. III, § 1).)

---

[5] "WI-LAN PATENTS" is a defined term in the PCR Agreement that refers specifically to four patents, which are listed in an appendix to the agreement. PCRA Art. I, § 9 (A664, 676).

8

The Damages Provision provided further protection for Ericsson by limiting the accrual of damages in future suits by Wi-LAN against Ericsson's UMTS/HSPA Products. For instance, Article IV of the PCR Agreement provides that:

> With respect to patents other than the WI-LAN PATENTS (to which Article III of this Agreement applies) … WI-LAN hereby agrees that no damages shall accrue against [Ericsson], or its direct or indirect distributors, AFFILIATES and CUSTOMERS for infringement of any patents that, on or after the EFFECTIVE DATE, are owned or controlled by WI-LAN where liability results from making, having made, importing, using, selling, offering to sell or otherwise disposing of UMTS/HSPA PRODUCTS beginning after such time as WI-LAN commences an ACTION against [Ericsson] or its AFFILIATES relating to UMTS/HSPA PRODUCTS and infringement of said WI-LAN patents. (A666.)

Wi-LAN's patent portfolio at the time the PCR Agreement was much larger than just the four WI-LAN PATENTS, though the extent to which any other patents in that portfolio might apply to UMTS/HSPA products was unknown to the parties. (A272; A281.) Therefore, Wi-LAN agreed that should it later determine that other patents existed within Wi-LAN's portfolio as of the Effective Date are infringed by UMTS/HSPA Products, Wi-LAN would provide, upon request by Ericsson, a license to Ericsson that would include most-favored licensee protections, *i.e.*, "most-favored licensee status," when compared to future licensees. (A667–69.) Specifically, § 1 of the MFL Provision reads:

> In the event that Wi-LAN owns or controls the licensing of patents not
> already addressed under this Agreement and which are infringed or
> alleged to be infringed by UMTS/HSPA PRODUCTS, WI-LAN
> hereby agrees that at any time during the TERM of this Agreement, at
> [Ericsson's] request, WI-LAN will grant to [Ericsson] and its
> AFFILIATES a non-exclusive license to make, have made, use, sell,
> offer for sale, lease or otherwise dispose of, and import LME
> PRODUCTS including UMTS/HSPA PRODUCTS and Wi-LAN
> agrees to grant such a license at most-favored licensee status as
> compared to any future licensee of WI-LAN. (A667.)

Finally, because the agreement was intended to "resolv[e] any conflicts the McKool Smith law firm may have in representing WI-LAN," the parties expressly agreed "not to employ, retain or otherwise use the law firm McKool Smith against the other party." (A662); PCRA Art. VIII, § 13 (A674).

## 2. The BelAir License

In November 2012, citing the PCR Agreement's MFL Provision, Ericsson demanded a license on the same terms as a license between Wi-LAN and BelAir Networks Inc. ("BelAir") dated December 30, 2009 ("the BelAir license"). (A216–17.) The BelAir license became effective long after the PCR Agreement was executed. (A204.) The terms of the BelAir license, consistent with Wi-LAN's licensing practices, took into account numerous criteria such as location of sales, volume of sales, and product lines. (A275–76; A284–85; A369.) BelAir was a small Canadian company whose business was limited to Wi-Fi products, whose sales outside Canada were miniscule, and whose annual revenue was over 600 times less than that of Ericsson. (A367–68.) Because, as the Texas court later

confirmed, the MFL Provision did not apply to after-acquired patents, and because Ericsson and BelAir are very different companies—with very different geographic footprints, sales volumes, and product offerings—Wi-LAN did not provide a license to Ericsson on terms identical to those contained in the BelAir license. Instead, it responded to Ericsson's request by explaining its position that the MFL provision had not been triggered and therefore it had no obligation to do so. (A379; A275; *see generally* A271–78.)

### B.    THE CONFLICTING DISTRICT COURT OPINIONS

#### 1.    The Texas Action

On October 5, 2010, Wi-LAN filed suit against Ericsson in the Eastern District of Texas ("the Texas action") alleging that certain Ericsson base stations infringed the Texas Patents, which relate generally to a 3G cellular telephony technology known as HSPA. (A1214-31.) The Texas Patents were acquired by Wi-LAN in 2009, more than eighteen months after the Effective Date of the PCR Agreement. (A8; A49; A649.) In addition to being unrelated to the four WI-LAN PATENTS listed in the PCR Agreement, the Texas Patents are distinct from the three Florida Patents at issue in the Florida action. (A7; A285; *compare* A1214 *with* A440–42.)

In the Texas action, Ericsson asserted an affirmative defense of a covenant-not-to-sue and a counterclaim for breach of contract. (A1245–47, A1250–52.) In

March 2012, Wi-LAN and Ericsson each moved for summary judgment on Ericsson's contract defense and counterclaim. (A646–60; A727–30.) Wi-LAN argued that the CNTS Provision was limited to the four WI-LAN PATENTS and did not preclude later suit against Ericsson on the unrelated Texas Patents. (A652–57.) Ericsson, in contrast, argued that the CNTS Provision prohibited suit on all *products* that would infringe the WI-LAN PATENTS, regardless of what patents were actually asserted against Ericsson. (A709–35.)

In addition, through its counsel, Ericsson stated that the PCR Agreement also required Wi-LAN to grant a license to the Texas Patents at "most-favored licensee status," and requested that Wi-LAN provide the terms of such a license considering "all relevant factors including, but not limited to, nature of license, notice of infringement, volume of sales, types of sales and patent coverage." (A202.) At the time of its request in May 2011, Ericsson did not have a license agreement with Wi-LAN concerning the Texas Patents, and has not subsequently entered into such an agreement.

More than a year later, in November 2012, Ericsson amended its Answer and Counterclaims to allege an additional ground for its breach of contract claim— a breach based upon Wi-LAN's purported refusal to grant a license to Ericsson at most-favored licensee status. (A1232; A1252–53; A1258; A1278.) Shortly thereafter, in December 2012, Ericsson supplemented its motion for summary

judgment to include this purported breach as an alternative ground for relief. (A462–76.) Ericsson argued that, should the Texas court find the covenant did not apply to the Texas Patents, then alternatively Wi-LAN's assertion of the Texas Patents necessarily triggered the MFL Provision. (A467) As a result, Ericsson argued, it was entitled to the best terms Wi-LAN has granted, which according to Ericsson was a *portfolio license* (not merely a license to the patents asserted against Ericsson) on the same terms as the BelAir license. (A473–75.) Wi-LAN opposed Ericsson's arguments, noting that Ericsson proposed an interpretation of the PCR Agreement that was inconsistent with the language in the PCR Agreement, as well as being squarely at odds with the purpose of the agreement. More specifically, Ericsson's argument that the Texas Patents were necessarily either within the scope of the covenant not-to-sue, or within the MFL Provision presented a false dichotomy. (A498–502.) Rather, the covenant not-to-sue was limited to four specific WI-LAN PATENTS (none of which were the Texas Patents) and the MFL provision does not apply to after-acquired patents. (A510–12.) As such, Wi-LAN contended, the Texas Patents were not within the scope of either of those provisions. (*Id.*)

### 2.    The Texas Order

After extensive briefing and oral argument before Chief Judge Davis, the Texas court, in an Order dated June 5, 2013 ("the Texas Order"), ruled in favor of

Wi-LAN. (A47–55.) The court held that no breach occurred and determined as a matter of law that (1) the CNTS Provision applied only to the WI-LAN PATENTS; (2) Wi-LAN was not obligated to license the Texas Patents under the MFL Provision, and (3) the Texas action *did not* trigger the MFL Provision because the Texas Patents, as after-acquired patents, were not within the scope of that Provision. (A53–54.) Specifically, the Texas court explained that:

> By its own terms, the most-favored licensee provision in Article VII applies only "[i]n the event that Wi-Lan owns or controls the licensing of patents not already addressed under this Agreement and which are infringed or alleged to be infringed by UMTS/HSPA products." Dkt. No. 171-1 at 7. As stated above, Article IV of the PCR Agreements specifically address "patents other than the [PCR Patents] . . . that, on or after [November 1, 2007], are owned or controlled by Wi-Lan." *Id.* at 5. Wi-Lan acquired the patents-in-suit on April 29, 2009, thus they are explicitly addressed by Article IV. Since patents "already addressed under [the] Agreement[s]" do not fall under Article VII's most-favored licensee provision, Wi-Lan is not obligated to grant Defendants such a license to the patents-in-suit.

(A54 (alterations in original).) On August 13, 2013, Ericsson appealed the Texas Order to this Court. (A148.)

### 3.    The Florida Action

On October 1, 2012, Wi-LAN filed suit against Ericsson alleging infringement of the three Florida patents. (A437.) Those patents relate to LTE, which is a 4G cellular technology distinct from the 3G HSPA technology at issue in the Texas suit. (A285; A276; A245–45 n.4.) As in the Texas action, Ericsson asserted both defenses and counterclaims for breach of contract based on the

14

CNTS and MFL Provisions of the PCR Agreement. (A449; A451.) In February 2013, Ericsson moved for summary judgment for breach of contract due to Wi-LAN's purported refusal to grant a license to Ericsson at most-favored licensee status.[6] (A150–51.) Specifically, Ericsson alleged that Wi-LAN's assertion of the Texas Patents triggered the MFL Provision, and as a result, Ericsson is entitled to a *portfolio license* on the same terms as the BelAir license—precisely the same issue addressed in the Texas action.[7] (A159–60.) Consistent with its position in the Texas action, Wi-LAN argued the MFL Provision of the PCR Agreement was inapplicable because it did not apply to after-acquired patents, like the *Texas* Patents, and that Ericsson's expansive reading of the MFL Provision was at odds with the contract as a whole. (A254–62.) At the time of summary judgment briefing in the Florida Action, document discovery was not complete and no depositions relating to the PCR Agreement had been taken. (A253.)

---

[6] Ericsson did not move for summary judgment based on the CNTS Provision of the PCR Agreement in the Florida action. (*See* A150–64.)

[7] Notably, Ericsson did not contend in its motion that assertion of the *Florida* patents (which relate to, and were asserted against, Ericsson's LTE products, not UMTS/HSPA functionality) triggered the MFL Provision. Instead, it argued that assertion of the *Texas* Patents (which were asserted against UMTS/HSPA products in the Texas action) did so. This was presumably because § 1 of the MFL Provision is expressly limited to patents "which are infringed or alleged to be infringed by UMTS/HSPA PRODUCTS." (A667.)

15

### 4.    The Florida Order

Despite the prior resolution of the issue by the Texas court, on June 20, 2013, in an order issued *after* Chief Judge Davis' Texas Order and without oral argument, the Florida court granted the relief sought by Ericsson ("Florida Order").[8] (A1–10.) The Florida court found as a matter of law that Ericsson was entitled to a license under the MFL Provision on the same terms as the BelAir license. (A9.) Specifically, the Florida court concluded that "the [Texas Patents] at issue in the [Texas action] were also not addressed by the PCR[A] because they were not acquired by Plaintiffs until 2009." (A8.) Thus, the Florida court held that Wi-LAN's assertion of the *Texas Patents* in the Texas court triggered the MFL Provision and, in essence, obligated Wi-LAN to grant Ericsson a license to nearly the entirety of Wi-LAN's portfolio of patents. (A9.) The Florida court further found that "BelAir is deemed to have the most-favored licensee status," and that "Defendants are entitled to a license on the same terms as BelAir." (A9.) On June 28 and July 12, 2013, Wi-LAN timely appealed the Florida Order to this Court (A41; A44.)

---

[8] Wi-LAN submitted the Texas Order to the Florida court, in a Notice of Supplemental Authority, before the Florida court issued its Order. (A412–13.)

## SUMMARY OF ARGUMENT

The Florida court made four fundamental errors in interpreting the PCR Agreement. First, the plain language of § 1 of the MFL Provision limits its applicability to patents that Wi-LAN "owns or controls" as of the effective date of the PCR Agreement. The Florida court, however, construed it as applying to patents acquired by Wi-LAN *after* that date. Such a reading cannot be reconciled with the structure or language of the agreement as a whole, which expressly uses temporal language in provisions that address after-acquired patents. As a result, the Florida court's determination that the MFL Provision was triggered by the assertion of the Texas Patents—which were undisputedly acquired after the PCR Agreement took effect—must be reversed.

Second, regardless of whether § 1 of the MFL Provision applies to after-acquired patents, the Florida court erred in interpreting the remainder of that provision to apply retroactively. The PCR Agreement requires Ericsson to *first* enter into an initial license with Wi-LAN, at which point the MFL Provision permits comparison with *future* Wi-LAN licenses. As used in § 1 of the MFL Provision, "most-favored licensee status" means that the initial license granted to Ericsson upon request will include, as a mandatory contractual term, an MFL provision protecting Ericsson against better rates offered to similarly situated future licensees after that date. The Florida court, however, interpreted "most-

favored licensee status" to refer to the actual *monetary terms* granted to Ericsson in an initial license, not inclusion of a clause guaranteeing most-favored licensee status as against future licensees. It therefore permitted Ericsson to obtain a license on the same terms as an agreement that Wi-LAN had previously entered into with a small Canadian company, BelAir, even though the BelAir license predated Ericsson's request and BelAir is not in any way "similarly situated" to Ericsson. In addition to being squarely at odds with the text, purpose, and intent of the PCR Agreement, the interpretation proposed by Ericsson—and accepted by the Florida court—leads to absurd and unintended results.

Third, even if Ericsson were correct that the MFL Provision was triggered by the Texas action *and* that "most-favored licensee status" refers to the rates to be used for an initial license to Ericsson, the Florida court erred in concluding that Ericsson was entitled to the terms of the BelAir license. If "most-favored licensee status" refers to rates, then that otherwise undefined term must be interpreted as part of the MFL Provision as a whole. As set forth in §§ 2 and 3 of the MFL Provision, that determination requires evaluation of specific agreed-upon criteria to determine whether a licensee is similarly situated and therefore a valid comparison. No plausible argument can be made that BelAir is similarly situated to Ericsson.

Finally, even assuming the Florida court was otherwise correct in accepting Ericsson's interpretation of the PCR Agreement, the court erred by permitting

Ericsson to obtain a license to hundreds of unrelated patents—including the patents asserted in Florida, which are not UMTS/HSPA patents—rather than to only the Texas UMTS/HSPA patents that the Florida court determined triggered the MFL Provision. Such an expansive reading of § 1 of the MFL Provision, in addition to bearing no relation to the remainder of the PCR Agreement or its purpose, is unsupported by the text of that agreement.

Accordingly, the judgment of the Florida court must be reversed.

## ARGUMENT

### STANDARD OF REVIEW

Summary judgment orders are reviewed *de novo*, reapplying the summary judgment standard of FED. R. CIV. P. 56(a). *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1381 (Fed. Cir. 2000). Summary judgment should be granted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

### DISCUSSION

The result of the Florida court's reasoning is remarkable: because Wi-LAN asserted four UMTS/HSPA patents against Ericsson's UMTS/HSPA products in *the Texas action,* Ericsson is entitled to a license not only to those four patents, but to hundreds of unrelated patents having nothing to do with UMTS/HSPA, in *the Florida action*. The three LTE patents asserted in Florida, like the hundreds of

others that the Florida court ordered licensed, bear no relation to the four patents that were actually at issue in the PCR Agreement, or to the UMTS/HSPA technology at issue in the agreement, or to the alleged conflict of McKool that was the underlying purpose for the agreement. As the Texas court determined in rejecting Ericsson's attempts to distort and dramatically expand the rights it was granted, neither the text nor the purpose of the PCR Agreement supports such an unreasonable and disproportionate result.

### A. The MFL Provision Applies Only To UMTS/HSPA Patents That Wi-LAN Owned Or Controlled As Of The PCR Agreements' Effective Date.

#### 1. The PCR Agreement is governed by New York law.

The parties agree that the PCR Agreement must be interpreted under New York law. PCRA Art. VIII, § 10 (A673). As such, the agreement must be construed in accordance with its plain language and in a manner that gives full effect to the parties' intent when the agreement is read as a whole. *See Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). "In interpreting an unambiguous contract, the court is to consider its particular words not in isolation but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) (internal quotation and modification omitted). "A contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or

contrary to the reasonable expectations of the parties." *Lipper Holdings, LLC v. Trident Holdings, LLC*, 1 A.D.3d 170, 171 (N.Y. App. Div. 2003) (citations omitted); *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (contracts should be interpreted "in light of the business purposes sought to be achieved"). These principles require reversal of the Florida court's decision.

### 2.    The MFL Provision is part of a carefully negotiated agreement which must be read as a whole.

The PCR Agreement was entered into by the parties to resolve a narrow allegation of conflict involving McKool and four specific UMTS/HSPA patents. (A662.) It provides Ericsson with a limited and specifically negotiated set of rights regarding the patents Wi-LAN owned when the agreement was signed, and additional rights concerning patents Wi-LAN might later acquire. Specifically, the agreement provides Ericsson with:

- a narrow covenant not to sue Ericsson on four specific UMTS/HSPA patents (the "WI-LAN PATENTS"), which Wi-LAN owned as of the agreement's 2007 Effective Date (*see* PCRA Art. III, § 1 (A665));

- for any *other* UMTS/HSPA patents that may have existed in Wi-LAN's patent portfolio as of that date, a limited right to request and receive a license to asserted patents and most-favored licensee status (*see id.* Art. VII, § 1 (A667));

- as a broader protection, a limitation on past damages recoverable for infringement of UMTS/HSPA patents, regardless of whether Wi-LAN owned them on the Effective Date of the agreement or acquired them in the future (*see id.* Art. IV (A666).); and

- an agreement that neither Ericsson nor Wi-LAN would use the McKool Smith law firm against the other party (*see id.* Art. VIII, § 13 (A674)).

With these four provisions carefully defining the scope of the parties' rights, the PCR Agreement was intended to address Ericsson's concerns regarding UMTS/HSPA patents.

The fundamental error in the Florida court's decision lies in its wholesale adoption of Ericsson's argument to dramatically expand the second of these protections. Like the CNTS Provision of the agreement, which addresses a limited subset of the wireless patents that Wi-LAN owned at the time the agreement took force, the MFL Provision applies only to UMTS/HSPA patents Wi-LAN owned or controlled *as of the PCR Agreement's Effective Date in 2007*. (A667.) The Texas Patents undisputedly were not owned or controlled by Wi-LAN until 2009, long after the PCR Agreement took effect. (A8; A49; A649.)  Accordingly, as the Texas court had already concluded, Wi-LAN's assertion of the Texas Patents did not trigger the MFL Provision as a matter of law. (A54.)

> **3.    The language and structure of the PCR Agreement confirm that the present tense language of § 1 of the MFL Provision does not apply to patents acquired after the Agreement's effective date.**

The MFL rights contained in Article VII, § 1, begin as follows: "In the event that Wi-LAN *owns or controls* the licensing of patents not already addressed under this Agreement and which are infringed or alleged to be infringed by UMTS/HSPA PRODUCTS . . . ." (A667 (emphasis added).) By its own terms, therefore, the application of § 1 of the MFL Provision is limited to UMTS/HSPA patents that

Wi-LAN "owns or controls" on the Effective Date of the PCR Agreements. And the reason the parties chose to draft the PCR Agreement this way is apparent. As recognized by various provisions of the agreement, Wi-LAN's patent portfolio at the time the agreement was signed extended beyond the four WI-LAN PATENTS. *See, e.g.*, PCRA Art. IV (A666). To account for the possibility that some unanalyzed patent Wi-LAN then owned might in fact apply to UMTS/HSPA products, Ericsson received the right to receive a license upon request should such a patent later be asserted. Moreover, the requirement that the license granted include a provision guaranteeing "most-favored licensee status" ensured that, should such a patent exist and be licensed to others, Ericsson would not later be placed at a competitive disadvantage after initially taking a license to that patent.

### a. In contrast to other sections of the PCR Agreement, § 1 of the MFL Provision omits references to patents owned by Wi-LAN in the future.

That the plain language of Article VII, § 1 refers to patents which Wi-LAN then owned or controlled as of the Effective Date is readily apparent when "read in the context of the entire agreement," as required by New York law. *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993). For example, the present-tense "owns or controls" language of § 1 of the MFL Provision stands in sharp contrast to the language of Article IV of the PCR Agreement, which expressly preserves Wi-LAN's right to sue Ericsson in the

future for infringement of *other* UMTS/HSPA patents, subject to a limitation on

past damages. Because its scope includes patents acquired *after* the Effective Date

of the agreement, Article IV states that "[w]ith respect to patents other than the

WI-LAN PATENTS (to which Article III of this Agreement applies), … no

damages shall accrue against [Ericsson] … for infringement of any patents that, *on

or after the EFFECTIVE DATE, are owned or controlled by WI-LAN*." PCRA

Art. IV, § 1 (A666 (emphasis added)). The lack of specific and parallel language in

§ 1 of the MFL Provision regarding patents that are owned by Wi-LAN "*after* the

EFFECTIVE DATE" is notable, but hardly surprising: unlike Article IV, which

contains that language, § 1 of the MFL provision does not reach after-acquired

patents.

Indeed, even within the MFL Provision itself, the contractual text

distinguishes between patents that Wi-LAN already owned (*e.g.* § 1), and patents

that Wi-LAN might acquire in the future (*e.g.* § 7). For example, § 7 of the MFL

Provision states that Ericsson "is neither admitting nor agreeing that … any

[Ericsson products] … infringe any of the WI-LAN PATENTS, or any other

patents *owned or controlled by WI-LAN*." PCRA Art. VII § 7 (A668 (emphasis

added).) That "any other patents owned or controlled by WI-LAN" refers to Wi-

LAN's then-current portfolio is apparent: Ericsson would have no need (indeed, no

way) to deny infringement of unidentified patents that Wi-LAN did not own. In

contrast, the final sentence of that very same section of Article VII states that Wi-LAN "will never claim … that [Ericsson's] execution of this Agreement constitutes an admission of any kind that [Ericsson products] … infringe any patents *owned or controlled by WI-LAN, now or hereafter.*" PCRA Art. VII, § 7 (A668–69 (emphasis added).) Unlike the denial of infringement, the final sentence of § 7 reaches not only patents owned or controlled by Wi-LAN as of the Effective Date, but also patents acquired by Wi-LAN in the future. It therefore adds "now or hereafter" to the phrase "owned or controlled by WI-LAN." But such qualification is notably absent from § 1, for that section does not relate to patents acquired by Wi-LAN after the Effective Date. Rather, the plain language of § 1 of the MFL Provision refers only to those patents which Wi-LAN "owns or controls" as of the date the agreement became effective.

The PCR Agreement's use of specific terms where future coverage was intended cannot be disregarded. Reading "in the event that Wi-LAN owns or controls" to have the same scope as "owned or controlled, *now or hereafter*" and "*on or after the EFFECTIVE DATE*, are owned or controlled" would effectively render those express temporal terms unnecessary. Because "[c]ontracts should be construed so as to give effect to all provisions," this Court should decline Ericsson's invitation to do otherwise. *See Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 99 (2d Cir. 1996).

### b.    Courts have interpreted present tense language in contractual provisions to exclude future activities.

Courts in previous cases have not hesitated to conclude as a matter of law that contractual provisions written in the present tense do not apply to future activities. For example, in *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 361 F. Supp. 2d 210 (S.D.N.Y. 2005), the defendant moved for partial summary judgment, claiming that Aspex had not acquired any rights to the asserted patents under its exclusive license from its sister company, Chic Optik ("Chic"). *Id.* at 213. The Chic license granted Aspex all of Chic's rights relating to magnetic eyewear, but Chic had not yet acquired rights to the patents-in-suit as of the date of the parties' agreement. *Id.* at 215. The court held that Aspex did not acquire any rights to the patents in suit under the Chic license:

> [t]he Agreement's only description of the "LICENSED PATENTS" owned by Chic is in the present tense, and specifically provides that Chic "*is* the owner of the rights…embodied in various Agreements…" There is, moreover, no reference to the Patents–In–Suit or to any applications that later issued as the Patents–In–Suit, or any language that could in any way be construed as granting, or indicating an intention to grant, any future acquired rights."

*Id.* (alterations in original; internal parentheticals omitted). Similarly, in *Unova, Inc. v. Acer Inc.*, 363 F.3d 1278 (Fed. Cir. 2004), this Court reversed a grant of summary judgment because it concluded that Hewlett-Packard ("HP") had not been released from liability under a settlement agreement between Unova and Compaq, which HP subsequently acquired. *Id.* at 1279. The settlement agreement

released Compaq and its "parents" from liability, but HP did not become

Compaq's "parent" until one year after the agreement was executed. *Id*. at 1279-

80. On these facts, the Court held that the term "parents" could only be interpreted

to mean the parents of Compaq at the time of the agreement:

> The release provision is written in the present tense…; thus, it most
> naturally does not refer to Compaq's future parents. Moreover, Unova
> and Compaq elsewhere referred to future entities, such as "past,
> present, and future officers, directors, shareholders …" when they so
> intended, and the fact that they did not similarly modify the term
> "parents" suggests that they did not seek to release Compaq's future
> parents.

*Id*. at 1282 (examining the language and structure of the agreement as a whole).

*See also VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001)

("The Release's reference to 'affiliates' and the definition of the word are stated in

the present tense. Nothing in this definition indicates the inclusion of future rather

than present members…. Our conclusion that the Release does not cover future

member clubs … is supported by the principle of *expressio unius est exclusio*

*alterius*.")

The reasoning in these cases is equally applicable here. The term "[i]n the

event that WI-LAN owns or controls" is "written in the present tense" and "most

naturally" does not refer to patents that Wi-LAN acquires at some point in the

future. *Unova.*, 363 F.3d at 1282. That this reading is the correct interpretation of

§ 1 of the MFL Provision is confirmed by noticeable absence of the type of temporal language contained in other provisions of the PCR Agreement.

### c. The use of "in the event" in Article VII, § 1 does not alter the scope of the provision.

Ericsson's primary argument before the district court for why the present tense "owns or controls" language in § 1 of the MFL Provision should be dramatically expanded to cover UMTS/HSPA patents acquired by Wi-LAN after the Effective Date was that § 1 includes the introductory phrase "in the event." But Ericsson's strained reading of the provision places undue emphasis on that solitary phrase, and seeks to read it in isolation from the agreement as a whole. *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) ("The court should read the integrated contract as a whole to ensure that undue emphasis is not placed upon particular words and phrases … and to safeguard against adopting an interpretation that would render any individual provision superfluous[.]") (internal quotation omitted).

Specifically, Ericsson argued that "[t]he only common sense interpretation of this phrase, read as a whole, is that it applies to situations that may occur in the future." (A385 (emphasis in original).) But while "in the event" reflects uncertainty about the existence of a condition, Ericsson makes an illogical leap to conclude that the condition must occur *in the future* rather than in the present. And that leap is unsupported by the PCR Agreement's text. Rather, a straight-forward reading of

the present-tense phrase "in the event that Wi-LAN owns or controls" is that it addresses the possibility that Wi-LAN, *at that time*, might "own[] or control[]" other UMTS/HSPA patents (besides the four WI-LAN PATENTS). Had a different result been intended, §1 would have stated—as the PCR Agreement does elsewhere—that it applies to patents Wi-LAN owns or controls "now or hereafter," Art. VII, § 7 (A669), or patents Wi-LAN owns or controls "on or after the EFFECTIVE DATE," Art. IV, § 1 (A666). Tellingly, while those provisions *do* include such expansive qualifiers, § 1 of the MFL Provision does not. And in seeking to interlineate the contract with non-existent terms, Ericsson violates a basic canon of New York law. *See Korosh v. Korosh*, 99 A.D.3d 909, 911 (N.Y. App. Div. 2012) ("A court may not write into a contract conditions the parties did not insert or, under the guise of construction, add or excise terms, and it may not construe the language in such a way as would distort the apparent meaning." (internal quotation omitted)).

The secondary sources cited by Ericsson to the trial court do little to bolster its argument to the contrary.[9] Ericsson cites a legal style guide, for example, for the

---

[9] Ericsson similarly argued before the Texas court that "in the event" is a "predictive conditional sentence" that necessarily relates to a potential condition that is satisfied in the future. (A629–31, *see* A623–37.) But in doing so, Ericsson attempts to shoehorn contractual language into an abstract grammatical rule that, as explained above, is inconsistent with the MFL Provision and agreement as a whole. *See South Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 826 N.E.2d 806,

29

proposition that "'[I]n the event that' is unnecessarily prolix for *if*." (A385 (citing Bryan A. Garner, A Dictionary of Modern Legal Usage (2d ed. 1995), at 465).) Yet when "in the event that" is replaced with "if," as Ericsson appears to suggest, the result remains the same: the most natural reading of the phrase "*If* Wi-LAN owns or controls" in the context of Article VII, § 1 is that it addresses any uncertainty as to whether Wi-LAN "owns or controls" other UMTS/HSPA patents as of the Effective Date.

To avoid this straightforward construction of § 1 of the MFL Provision, Ericsson argued below that the "in the event" language of that section "must be interpreted in the same way as identical language appearing in Article VII, § 6 of the Agreement." (A387.) But Ericsson's argument ignores the obvious and critical difference between the usage of the phrase "in the event" in § 1 and § 6: unlike § 1 of the MFL Provision, § 6 uses "in the event" to expressly discuss events *that can only happen in the future*, not in the present. Specifically, § 6 of Article VII provides a mechanism to select an arbitrator *after* arbitration has been commenced, should certain disputes arise in connection with a "FUTURE AGREEMENT" between Wi-LAN and Ericsson: "In the event the parties are unable to select an arbitrator, the arbitrator shall be selected by the International Centre for Dispute Resolution …." PCRA Art. VII, § 6 (A668.) By definition, a FUTURE

---

809 (N.Y. 2005) (contracts should be read "as a whole to ensure that excessive emphasis is not placed upon particular words or phrases").

AGREEMENT is a UMTS/HSPA agreement Wi-LAN and Ericsson entered into *after* the Effective Date, *see* Art. I, § 5 (A663), and an arbitration regarding a FUTURE AGREEMENT could only be commenced *after* such an agreement came into existence in the future. (A668.) Thus, § 6 must necessarily be construed as applying to future events because no other reasonable interpretation of the provision is possible. *See, e.g., Acme Supply Co. v. City of N.Y.*, 39 A.D.3d 331, 332 (N.Y. App. Div. 2007) ("An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation."); *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.*, 2013 WL 1890278 (No. 13-Civ-1582 (May 8, 2013) (noting canon that a "construction should be commercially reasonable and not absurd"). The very opposite is true with regard to § 1 of the MFL Provision, where the context makes clear that "in the event that Wi-LAN owns or controls" refers to patents presently owned or controlled by Wi-LAN. No conflict exists between § 1 and § 6 when those provisions are read, as they must be, in the context of the agreement as a whole. *JA Apparel Corp.*, 568 F.3d at 397.

### 4. The Florida court incorrectly concluded that "in the event" in Article VII, § 1 must refer to future events.

The totality of the Florida court's analysis of the question of whether § 1 of the MFL Provision applies only to patents owned by Wi-LAN as of the Effective Date is contained in a three-sentence footnote of the Florida Order:

> Plaintiffs argue that Defendants' interpretation of the term "in the event" is incorrect because it does not apply to patents which were acquired after the effective date of the PCR's execution. DE 97-1 at 5. However, they later concede that "[t]he provision necessarily should be construed as referring to future events, as there is no other reasonable interpretation of the provision." *Id.* Thus, Plaintiff's argument is misplaced, and the MFL Provision applies to patents acquired after November 1, 2007.

(A8 at n.8.) The Florida court's sole rationale for this conclusion was its apparent

misperception that Wi-LAN had conceded that the phrase "in the event"

necessarily "should be construed as referring to future events, as there is no other

reasonable interpretation of the provision." (*Id.* (citing Wi-LAN's Sur-Reply,

A407).) Wi-LAN made no such concession. As set forth above, that reading of "in

the event" in the MFL Provision is incorrect. Rather, the language quoted by the

district court was Wi-LAN's response to Ericsson's argument that if the "in the

event" language in Article VII, § 1 did not refer to after-acquired patents, then the

"in the event that" language used in Article VII, § 6 also could not apply to future

events. Specifically, Wi-LAN asserted in its briefing to the trial court that:

> **There is no textual basis for reading Article VII, §6 in this manner. In context, the "in the event" language used in Article VII, §6 relates to circumstances where the parties have commenced arbitration—something that had not happened as of the Effective Date. The provision necessarily should be construed as referring to future events, as there is no other reasonable interpretation of the provision.** *See Acme Supply Co. v. City of New York*, 39 A.D.3d 331, 332 (1st Dep't 2007). In contrast, Wi-LAN did own other patents when the PCRA was signed. If the parties intended for the MFL Provision to apply to after-acquired patents, or for Article VII, §6 to apply to events predating the PCRA, they would have stated

> so, as they did in Article IV. *See Korosh v. Korosh*, 99 A.D.3d 909, 911 (N.Y. App. Div. 2012). They did not and Defendants' arguments to the contrary should be rejected.

(A407 (emphasis added); *see generally* A404–11.) Any fair reading of Wi-LAN's statement is that it was referring to the "in the event" language of § 6 of Article VII, not § 1. The Florida court's clearly erroneous statement that Wi-LAN had conceded that point regarding § 1—which was the apparent basis for its decision—is not supported by the record.

\* \* \*

In short, unlike the portions of the PCR Agreement which expressly relate to after-acquired patents, Article VII, § 1 refers to patents that Wi-LAN "owns or controls" as of the Effective Date of the agreement. The Texas court reached the same conclusion, holding that after-acquired patents did not fall within the scope of § 1 of the MFL Provision. (A54.) When the words of the contract are read with every part "interpreted with reference to the whole," *see Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1214 (N.Y. 2007), it is clear that the Florida court erred in holding that § 1 of the MFL Provision was triggered by the assertion of patents that undisputedly were not owned by Wi-LAN until long after the agreement's Effective Date. For this reason alone, the judgment of the Florida court must be reversed.

**B.     Even If § 1 of the MFL Provision Applies to After-Acquired Patents, the Florida Court Erred in Applying it Retroactively.**

**1.     Section 1 does not apply to the BelAir license because BelAir is not a "future licensee."**

The second reason that the Florida court's Order must be reversed it is that it misinterprets the operation of § 1 of the MFL Provision.[10] Specifically, the district court held that the terms of the BelAir license were available to Ericsson because "BelAir constitutes a future licensee, as it was provided a license in 2009, two years after the PCR's execution." (A9.) But § 1 of the MFL Provision permits Ericsson to modify the terms of an *existing* license to obtain equal treatment, should a *future* licensee obtain more favorable rates. It does not permit Ericsson to demand unequal treatment by retroactively seeking terms granted by Wi-LAN in the past, before Ericsson requests (much less obtains) a license to patents asserted against Ericsson's UMTS/HSPA Products.

In this regard, the rights granted under the § 1 are not automatic (nor could they be). With the exception of the covenant not-to-sue on the four WI-LAN PATENTS addressed by Article III, the PCR Agreement does not provide Ericsson with a license to any UMTS/HSPA patents. (A53; A665.) Should Ericsson desire to obtain a license to specific patents asserted by Wi-LAN against UMTS/HSPA

---

[10] This is so regardless of whether the MFL Provision is limited to patents Wi-LAN owned as of the EFFECTIVE DATE, as Wi-LAN contends and the Texas court determined (A54), or whether it is not so limited.

Products, Ericsson must first "request" a license to those patents, and Wi-LAN must then "grant such a license at most-favored licensee status as compared to any future licensee of Wi-LAN." PCRA Art. VII, § 1 (A667). This language means simply that Wi-LAN agreed to grant Ericsson, upon request, a license to asserted UMTS/HSPA patents, and that any such license must include a "most-favored licensee" provision. The requirement that a mandatory "most-favored licensee" term be included in the contemplated license ensures that Ericsson will receive "most-favored licensee *status* as compared to any *future* licensee of WI-LAN." *Id.* (emphasis added).

The MFL Provision, however, does not give Ericsson the right to obtain an *initial* license from Wi-LAN at the most favorable rates that Wi-LAN has ever extended to other licensees. Indeed, it does not speak to the rates for the initial license at all, but serves to guarantee that any *subsequent* covered licensee will not obtain better rates than the rates Ericsson negotiates when it requests and accepts an initial license. Had a different result been intended, the MFL Provision surely would have referenced the most favorable "rates" defined in Art. VII, §§ 2-3, rather than "most-favored licensee *status*."

The record is clear that Ericsson did not request a license to the Texas Patents under the PCR Agreement's MFL Provision until May 2011, several years *after* Wi-LAN executed the BelAir license. (A202.) Ericsson was not in 2009—and

still is not today—a Wi-LAN licensee with respect to those patents. It therefore cannot seek to adjust the terms of a non-existent initial license to obtain the rates paid by BelAir, because BelAir is not a "future licensee of WI-LAN." PCRA Art. VII, § 1 (A667).

### 2. The purpose of § 1 of the MFL Provision is to put Ericsson on the same footing as its competitors.

Beyond essentially reading "future licensee" out of the contractual text, Ericsson's expansive interpretation of the MFL Provision—which was implicitly adopted by the Florida court—frustrates the basic purpose of § 1 of the MFL Provision. "The purpose of a most-favored-licensee clause is to protect a licensee from a competitive disadvantage resulting from more-favorable terms granted to another licensee." *Willemijn Houdstermaatschappij, BV v. Std. Microsys. Corp.*, 103 F.3d 9, 13 (2d Cir. 1997). This purpose is achieved by reading § 1 as written: Ericsson has the right to request a license; Wi-LAN will grant that license; the license terms will provide that Ericsson will retain most-favored status as compared to any *future* licensee.

Ericsson's contrary reading of § 1 of the MFL Provision instead permits Ericsson to sit idly while avoiding payment of a licensing royalty, only to later demand the terms of an earlier licensee with the benefit of hindsight. Such an interpretation would fail to "protect [Ericsson] from a competitive disadvantage." *Willemijn*, 103 F.3d at 13; *Newmont Mines*, 784 F.2d at 135 (business purposes and

objectives should be examined). Instead, it would put Ericsson in a *preferred* position relative to other licensees. Such commercially unreasonable interpretations of most-favored licensee provisions are disfavored. *See, e.g.*, *Harley C. Loney Co. v. Mills*, 205 F.2d 219, 220–21 (7th Cir. 1953) (noting that purpose of MFL provision was "to preserve a basis of equality amount those licensed to use or sell the patented article" and rejecting defendant's theory, which, "if adopted, would result in preferred, not equality of treatment."); *Lipper Holdings*, 1 A.D.3d at 171 (noting that courts should not interpret a contract in a manner that is "commercially unreasonable" or "contrary to reasonable expectations" of the contracting parties).

### 3. Ericsson's contrary interpretation of the text of § 1 of the MFL Provision leads to unintended results.

Ericsson argued, and the Florida court accepted, that for purposes of providing Ericsson with a license, "most-favored licensee status" was to be determined by looking to a past license—the BelAir license. (A9.) In addition to being discordant with the text of the agreement, Ericsson's interpretation of the MFL Provision—that agreements prior to the date of Ericsson's request set the rate and terms of the license to be provided—leads to absurd results. Consider, for example, the situation where Wi-LAN asserts, and Ericsson requests a license to, a

patent that Wi-LAN has not previously licensed to a third party.[11] Under Ericsson's reading of the MFL Provision, because there is no prior license agreement to match, Wi-LAN cannot grant Ericsson a license at "most-favored licensee status." Given the detailed provisions that follow Article VII, § 1, the PCR Agreement clearly does not intend that result. In contrast, the position Wi-LAN advances offers a principled manner of reconciling the words of the agreement: "most-favored licensee status" refers to a mandatory MFL term to be included in the initial license offered to Ericsson, not the rate terms offered in past agreements. *See Reda v. Eastman Kodak Co.*, 233 A.D.2d 914, 915 (N.Y. App. Div. 1996) (noting that "[e]ffect and meaning must be given to every term of the contract" and that "reasonable effort must be made to harmonize all of its terms").[12]

Ericsson did not request or enter into a license agreement with Wi-LAN covering the Texas Patents before the BelAir license was signed. The Florida Order should be reversed for this reason as well, and this Court should reject Ericson's unwarranted attempt to expand terms and scope of the contract.

---

[11] The BelAir license, for example, excludes dozens of patents and applications from the definition of "Licensed Patents." (A212; A214.)

[12] Ericsson's attempt to read other provisions of the PCR Agreement unduly broadly likewise distorts the agreement as a whole. As one example, Ericsson unsuccessfully argued before the Texas court that the covenant not-to-sue contained in Article III should be read as reaching *all* patents infringed by certain Ericsson products. (A52–53.) Such an expansive reading would, *inter alia*, render the MFL Provision (which provides protection against patents "which are infringed or alleged to be infringed by UMTS/HSPA PRODUCTS") superfluous.

**C.    Even if the MFL Provision Was Triggered By the Texas Action, The Florida Court Erred in Concluding Ericsson Was Entitled to the Terms of the BelAir License.**

Even if Ericsson were correct that the MFL is applicable to the Texas Patents and that the initial license granted to Ericsson must itself be at rates equating to "most-favored licensee status," rather than simply including an MFL term—two points, which as explained above, are incorrect—the Florida court erred in accepting Ericsson's invitation to divorce § 1 of the MFL Provision from the provision as a whole.

**1.    By reading § 1 of the MFL Provision in isolation from the provision as a whole, the Florida court rendered "most-favored licensee status" an undefined term.**

At Ericsson's urging, the Florida Court read § 1 of the MFL Provision in isolation from its companion sections, expressly declining to interpret § 1 in light of the definitions contained in the remainder of the MFL Provision. (A9 at n.9.) This was error. Under New York law a court must construe a contract with every part "interpreted with reference to the whole," so that it does "not render any portion meaningless." *Beal Sav. Bank*, 865 N.E.2d at 1213–14; *see also Acme Supply Co.*, 39 A.D.3d at 332.

The PCR Agreement contains no express definition of "most-favored licensee status" that would enable the Court to determine what licenses (and hence,

rates) are available under § 1.[13] To breathe life and meaning into that otherwise undefined term, therefore, the Court must look to the remaining provisions of Article VII, the *entirety* of which is entitled "MOST-FAVOURED LICENSEE PROVISIONS." And §§ 2 and 3 of the MFL Provision provide the framework required to understand the meaning of "most-favored licensee status" in § 1 without reference to sources beyond the contract itself. As set forth in § 2 of the MFL Provision, Ericsson obtains the right to receive any "more favorable rates" as compared to rates offered to future licensees of Wi-LAN that are "similarly situated."[14] PCRA Art. VII, § 2 (A667–68). Section 3 clarifies that for rates offered to such a licensee to be more favorable, it must "be reasonably apparent that the rates are more favorable after considering all relevant factors including, but not limited to, nature of license, notice of infringement, volume of sales, types of sales and patent coverage."[15] *Id.* § 3 (A668).

---

[13] As set forth above in § 1, "most-favored licensee status" refers to the inclusion of an MFL provision in the initial license granted to Ericsson. If Ericsson is correct, however, that the term refers instead to the rates required in the initial license, then the Court must interpret "most-favored licensee status" to determine what rates and licenses are available for making that comparison.

[14] This assumes, for the sake of argument, that Ericsson is correct and the term "future licensee of Wi-LAN" refers to any licensee after the Effective Date of the PCR Agreement—an interpretation Wi-LAN disputes above.

[15] The PCR Agreement's requirement that comparison points be "similarly situated" furthers the purpose of MFL provisions—"to protect a licensee form a competitive disadvantage." *Willemijn*, 103 F.3d at 13.

Thus, the most reasonable and sensible interpretation of "most-favored licensee status" is that, as with the remainder of the MOST-FAVOURED LICENSEE PROVISIONS, Wi-LAN and Ericsson agreed to use licenses with entities that are "similarly situated" to Ericsson (among other restrictions) as a comparison point to judge what rates are more favorable or, by extension, "most" favorable. *Lockheed*, 639 F.3d at 69 ("If the document as a whole makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the [agreement]." (internal quotation omitted).

Ericsson's contrary argument required the Florida court to simply create a meaning for "most-favored licensee status" from whole cloth, rather than seeking to interpret the PCR Agreement as a whole. And Ericsson's unnatural reading of § 1 cannot be readily reconciled with the remainder of the MFL Provision. In this respect, it would be incongruous for the PCR Agreement to contemplate a "most-favored licensee status" under § 1 using an entirely different (and entirely undefined) set of criteria than those made expressly applicable in the remainder of §§ 2 and 3 of the MFL Provision; the simpler reading is that the inclusion of detailed criteria in §§ 2 and 3 inform the MFL Provision as a whole.

Indeed, leaving aside its litigation-driven arguments of recent vintage, Ericsson has in the past clearly recognized that § 1 may not be read in isolation.

Though Ericsson now adamantly claims that § 3 of the MFL Provision does not inform the scope of the rights granted in § 1, it took a rather different stance in its May 2011 demand that Wi-LAN "provide the details of [a license at most-favored licensee status] for the [Ericsson] products at issue":

> Under Article VII, Section 3, the relevant factors to be considered in determining whether the rate being offered is a most-favored-licensee rate include "**all relevant factors including, but not limited to, nature of license, notice of infringement, volume of sales, types of sales and patent coverage.**"

(A202 (emphasis added).) Ericsson's own prior recognition of the most reasonable interpretation of the text of § 1 of the MFL Provision—that determination of "most-favored licensee status" requires application of the § 3 criteria—is telling.

It is not surprising that Ericsson would now advocate a contrary position and reject the equalizing approach adopted by the parties in § 3 of the MFL Provision. Under Ericsson's new-found interpretation, it would receive a commercially *advantageous* position over BelAir and every other licensee of Wi-LAN by obtaining the most rights for the least amount of consideration, regardless of what the PCR Agreement actually requires. In doing so, Ericsson glosses over the considerable efforts of the parties, reflected in the text of the agreement, to define specific factors for comparison in § 3 of the MFL Provision.

### 2.     BelAir and Ericsson are not "similarly situated" companies.

In light of the MFL Provision's requirement that any comparison occur between "similarly situated" licensees, the Florida Order must be reversed. Ericsson made no effort to demonstrate that BelAir is similarly situated, and the record is clear that it could never do so: by any measure, BelAir and Ericsson are not economically comparable entities. BelAir was a small Canadian company with worldwide revenues from wireless sales of approximately $38 million in 2009 and $42 million in 2010. (A275–76; A367-368.) Ericsson, in contrast, had world-wide wireless revenues *several hundred times larger* than BelAir, with $27–28 billion in revenues in 2009 and 2010. (*Id.*) Ericsson and BelAir were very different businesses and sold different types of products. BelAir sold Wi-Fi hotspots and other carrier-grade Wi-Fi products. (A275–76; A367–68.) Ericsson makes a far wider range of wireless products, including access concentrators, routers, and base stations to support cellular networks. (*Id.*) Indeed, Ericsson itself touted the distinctions between the two companies' product offerings in announcing its acquisition of BelAir in 2012, where it stated the acquisition gave it "a strong carrier grade Wi-Fi portfolio" and new assets that would strengthen its "heterogeneous network (hetnet) offering." (A373; A376; A275–76.)

Clearly, if § 1 of the MFL Provision requires comparison of "similarly situated" licensees—as it must in order to have meaning in the context of the PCR

Agreement—then summary judgment that BelAir represents "most-favored licensee status" was improper. Because the Florida court erred in determining that § 1 of the MFL provision should be read in isolation and that even licenses to companies that are not "similarly situated" are available under the MFL, this Court should reverse.

### D. Even If the Terms Of the BelAir License Are Available As the "Most-Favored Licensee Status," Section 1 of the MFL Provision Grants Rights To the Patents Asserted, Not All Patents Licensed By BelAir.

As a final matter, the Florida court overreached when it concluded, based on the assertion of the *Texas* UMTS/HSPA patents, that "Defendants are entitled to a license on the same terms as BelAir," and so granted Ericsson a license to the *Florida* LTE patents. (A9.) In doing so, the Florida Court granted much broader rights to Ericsson than exist in the narrow license grant of § 1 of the MFL Provision. Ericsson incorrectly argues that § 1 provides a license "in terms of products, not patents, and is without restriction." (A391 (emphasis in original).) But Ericsson entirely ignores that § 1, by its terms, addresses only patents "*which are infringed or alleged to be infringed* by UMTS/HSPA PRODUCTS." PCRA Art. VII, § 1 (A667). Thus, the scope of the license granted for Ericsson's products is not unlimited; it is limited specifically to *patents* that Wi-LAN (a) owns or controls and (b) which are *infringed or alleged to be infringed by UMTS/HSPA PRODUCTS*. Here, the only patents "infringed or alleged to be infringed by

UMTS/HSPA PRODUCTS" are the four Texas Patents, not the three Florida Patents directed to different technology entirely—LTE.

Ericsson's attempt to stretch the contractual language to extremes makes a hash of the PCR Agreement. If Ericsson's argument were accepted, for example, the fact that Ericsson UMTS/HSPA products—cellular base stations—infringe or are alleged to infringe the four Texas Patents would result in a license under Wi-LAN's wholly unrelated digital TV and display patents, *which have nothing to do with UMTS/HSPA*. Ericsson offers no plausible reason why the drafters of the PCR Agreement—or the text of the agreement itself—would contemplate such an disproportionate result. This is especially true given that the interpretation of license for which Ericsson advocates simply bears no relation to the purpose of the PCR Agreement, which was to resolve an alleged conflict of interest on the part of McKool with regard to *four specific UMTS/HSPA patents* not at issue in the Texas action. In this context, Ericsson's argument that the agreement should be read to provide a license to hundreds or thousands of unrelated patents which have nothing to do with cellular telephony or UMTS/HSPA is implausible, and must be rejected.

On the present record, the only patents "infringed or alleged to be infringed by UMTS/HSPA PRODUCTS" are the four Texas Patents, rather than the numerous unrelated patents addressed by the BelAir agreement. And it is to those

patents alone that Ericsson would be entitled to obtain a license if the Florida court's reading of the MFL Provision were otherwise correct.[16]

## CONCLUSION

For the foregoing reasons, Wi-LAN respectfully asks that the Court reverse the Florida summary judgment order and remand to the Florida District Court for further proceedings on Wi-LAN's patent claims.

DATED: December 20, 2013                    Respectfully submitted,

                                            /s/ David B. Weaver
                                            David B. Weaver
                                            Stephen M. Hash
                                            Avelyn M. Ross
                                            Ajeet Pai
                                            Vinson & Elkins LLP
                                            2801 Via Fortuna Suite 100
                                            Austin, TX  78746-7568
                                            Telephone: 512.542.8400
                                            Fax: 512.542.8612

---

[16] In addition, to the extent Ericsson contends that it is entitled to the rate that BelAir paid for those four patents under the BelAir license (as it is those four patents alone to which Ericsson would be entitled to obtain a license, if the Florida court were otherwise correct), Ericsson must put forth evidence as to what portion of the BelAir consideration is attributable to those patents or otherwise provide a basis to determine the *rate* that BelAir has paid for them. It has not done so, but has instead merely demanded that it obtain the same license BelAir obtained for the same total consideration that BelAir paid, regardless of what *rates* BelAir actually paid for any particular patents.

Constance S. Huttner
Stephanie Donahue
Vinson & Elkins LLP
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Telephone: 212.237.0000
Fax:  212.237.0100

*Attorneys for Plaintiffs-Appellants*
*Wi-LAN USA, Inc. and Wi-LAN Inc.*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on December 20, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Joshua C. Krumholz, Esq.
Jacob Kevin Baron, Esq.
HOLLAND & KNIGHT LLP
10 Saint James Avenue, 11th Floor
Boston, MA  02116
Tel: (617) 523-2700
Email: Joshua.krumholz@hklaw.com
Email: jacob.baron@hklaw.com

Jason Lee Romrell, Esq.
Kara F. Stoll, Esq.
FINNEGAN, HENDERSON, FARABOW, GARRETT
  & DUNNER, LLP
901 New York Avenue, N.W.
Washington, DC  20001
Tel: (202) 408-4349
Email: jason.romrell@finnegan.com
Email: kara.stoll@finnegan.com

Justin Scott Cohen, Esq.
James Michael Heinlen, Esq.
Bruce Sostek, Esq.
Richard L. Wynne, Jr., Esq.
THOMPSON & KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, TX  75201
Tel: (214) 969-1211
Email: justin.cohen@tklaw.com
Email: michael.heinlen@tklaw.com
Email: bruce.sostek@tklaw.com
Email: richard.wynne@tklaw.com

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Armands Chagnon
Armands Chagnon
Vinson & Elkins LLP
2801 Via Fortuna Suite 100
Austin, TX  78746-7568
Telephone: 512.542.8400
Fax: 512.542.8612

**CERTIFICATE OF COMPLIANCE**
**With Type-Volume Limitation, Typeface Requirements,**
**And Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains 11,330 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 Times New Roman.

Dated: December 20, 2013                    /s/ David B. Weaver
                                            David B. Weaver


                                            *Counsel for Appellant*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 12-cv-23569-DMM/DLB

WI-LAN USA, INC., *et al.*,

      Plaintiffs,

v.

TELEFONAKTIEBOLAGET LM
ERICSSON, *et al.*,

      Defendants.

_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court upon Defendants Telefonaktiebolaget LM Ericsson and Ericsson Inc. (collectively, "Defendants") Motion for Summary Judgment and Incorporated Memorandum of Law (DE 68) ("Motion"), filed on February 14, 2013. On March 4, 2013, Plaintiffs Wi-LAN, USA, Inc. and Wi-LAN, Inc. (collectively, "Plaintiffs") filed a Response (DE 79) to the Motion; to which Defendants filed a Reply (DE 93) on March 11, 2013. On March 18, 2013, Plaintiffs filed a Motion for Leave to File a Sur-Reply (DE 97), and attached their Sur-Reply (DE 97-1) thereto. Additionally, on June 7, 2013, Plaintiffs filed a Notice of Supplemental Authority (DE 110); and on June 17, 2013, Defendants filed a Response (DE 113) to Plaintiffs' Notice of Supplemental Authority. I have reviewed the Motion and the record on the matter and am otherwise fully advised in the premises.

### I.     Background.

On November 1, 2007, Defendant Telefonaktiebolaget LM Ericsson ("LME") and Plaintiffs entered into a Patent and Conflict Resolution Agreement ("PCR"), to resolve potential conflicts of interest that arose from LME's retention of the McKool Smith law firm. DE 69-1 at 32-46. The PCR provided LME with broad protections in the event of future litigation against

Plaintiffs, and notably a "most-favored" licensee provision. *See* DE 69-1 at 37. The "most-favored" licensee provision or Article VII, Section 1 of the PCR provides in relevant part that:

> [i]n the event that WI-LAN owns or controls the licensing of patents not already addressed under this Agreement which are infringed or alleged to be infringed by UMTS/HSPA PRODUCTS, WI-LAN hereby agrees that at any time during the TERM of this Agreement, at LME's request, WI-LAN will grant to LME and its AFFILIATES a non-exclusive license to make, have made, use, sell, offer for sale, lease or otherwise dispose of, and import LME PRODUCTS including UMTS/HSPA PRODUCTS and Wi-LAN agrees to grant such a license at most-favored licensee status as compared to any future licensee of WI-LAN.

*Id.* (inconsistencies in original).[1] The PCR became effective on November 1, 2007, and its "TERM" expires on September 3, 2019. DE 69-1 at 34. The PCR defines the term "AFFILIATE" as "any person or entity directly or indirectly controlling controlled by, or under common control with, such party."[2] *Id.* at 33. The term "LME PRODUCTS" is defined as "any products which are sold or licensed by LME or its AFFILIATES[,]" under the PCR. *Id.* Additionally, the term "UMTS/HSPA PRODUCTS" is defined by the PCR as "any PRODUCT complying with the 21-35 series of 3GPP agreed protocols." *Id.*

The PCR also provides that "[n]o oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement. No modification, alteration, addition or change in the terms hereof shall be binding by either party unless reduced to writing and duly executed by the parties." *Id.* at 43. Moreover, New York law governs all matters connected with the PCR's performance, construction and interpretation. *Id.*

On October 5, 2010, Plaintiff filed suit against Defendants alleging that Defendants' sale of products that meet the definition of UMTS/HSPA PRODUCTS, as contemplated by the PCR constitutes patent infringement. DEs 69 at ¶ 10; 69-1 at 48; *see Wi-LAN, Inc. v. ALCATEL-*

---

[1] For purposes of this Order the aforementioned provision will be referred to as the "MFL Provision."
[2] There is no question that Defendants are AFFILIATES of LME under the PCR. *See* DE 69-1 at 2 ("LME is the ultimate parent company of Ericsson, Inc.").

*LUCENT USA INC.*, Case No. 6:10-cv-521. Specifically, Plaintiffs asserted that Defendants have been and are now infringing on HSPA Patents by making, using offering for sale, importing and/or selling without authority from Plaintiffs, products compliant with the 3GPP standard. DE 69-1 at 52. On October 1, 2012, Plaintiffs filed the instant action. *See* DE 1.

On May 23, 2011, November 8, 2012 and on February 1, 2013, Defendants notified Plaintiffs of their intent to invoke the MFL Provision by sending them letters requesting a license on the same terms as Plaintiffs' most-favored licensee. DE 69-1 at 8, 22, 23. Specifically, Defendants requested that they be granted a license on the same terms as BelAir Networks, Inc. ("BelAir"). *Id.* The BelAir license with Plaintiffs provides BelAir with "non-exclusive, non-assignable . . . world-wide irrevocable (to the extent allowed hereunder) licenses under the Licensed Patents. . ."[3] DE 69-1 at 10. The "Licensed Patents" include every patent in Plaintiff's portfolio with the exception of certain patents which are included in Exhibit B to the BelAir license agreement.[4] *Id.* at ¶ 21.

## II.     Legal Standard

The standard to be applied in reviewing a summary judgment motion is stated in Federal Rule of Civil Procedure 56(a):

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

---

[3] The license between BelAir and Plaintiffs is contained in Docket Entry 69-1 on pages 10 to 26, and will be referred to as the "BelAir License" for purposes of this Order. *See* DE 69-1 at 10-26.

[4] The patents at issue in this matter are not mentioned in Exhibit B of the BelAir license agreement. *See* DE 69-1 at 20.

3

An issue of material fact is genuine where the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). A district court's central inquiry when determining whether it should grant a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A district court must grant summary judgment against a party who fails to establish the existence of an element essential to his case that he bears the burden of proof on during trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of demonstrating to the court that the record does not contain any genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991). Whether a fact is material or not is a question that requires the moving party to defer to substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 106, 248. Pursuant to Rule 56, a moving party may accompany its motion for summary judgment with supporting affidavits; however, the movant is not required to file any affidavits. *See* Fed. R. Civ. P. 56(a)-(b). A district court may not consider an unsworn statement when "determining the propriety of summary judgment." *Gordon v. Watson*, 622 F.2d 120, 123 (11th Cir. 1980) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159 (1970)).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories,

A000004

and admissions on file, designate specific facts showing that there is a genuine issue for trial."
*Jeffery v. Sarasota White Sox, Inc.*, 64 F. 3d 590, 593-94 (11th Cir. 1995) (per curiam) (internal
citation and quotations omitted).  In addition, the dispute must have a "real basis in the record" in
order to constitute a genuine dispute of fact.  *Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th
Cir. 2002) (quoting *Mize*, 93 F.3d at 742) (internal quotations omitted).  Thus, "mere conclusions
and unsupported factual allegations are legally insufficient to defeat a summary judgment
motion."  *Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir. 2005).  Further, conclusory,
uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of
fact for trial sufficient to defeat a well-supported summary judgment.  *See Earley v. Champion
Intern. Corp.*, 907 F. 2d 1077, 1081 (11th Cir. 1990).   The failure of proof concerning an
essential element of the non-moving party's case necessarily renders all other facts immaterial
and requires the court to grant the motion for summary judgment.  *See Celotex*, 477 U.S. at 322-
23.

  While conclusions and unsupported facts alone are insufficient to oppose a summary
judgment motion, a district court "must view all evidence and make all reasonable inferences in
favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th
Cir. 1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578
(11th Cir. 1994) (per curiam)).

## III. Legal Discussion

  Defendants' Motion provides in relevant part that Defendants are entitled are entitled to a
license on the patents-in-suit pursuant to a "most-favored" licensee provision in a Patent and
Conflict Resolution Agreement. DE 68 at 2. Thus, Defendants argue that because they are

entitled to a license of the patents-in-suit, their conduct cannot constitute infringement on those patents as a matter of law.

As a threshold matter, I must determine whether issue preclusion mandates a denial of the instant Motion. In their Notice of Supplemental authority, Plaintiffs attached an Order on a Motion for Summary Judgment in *Wi-LAN, Inc. v. ALCATEL-LUCENT USA INC.*, Case No. 6:10-cv-521 (DE 110-1), which addresses the MFL Provision of the PCR entitles Defendants to a license on all of Plaintiffs' Patents. DE 110-1 at 1-2. Plaintiffs further argue that the instant Motion should be denied pursuant to the doctrine of issue preclusion. DE 110 at 2.

"[I]ssue preclusion . . . bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 533 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001). In the Eleventh Circuit, issue preclusion precludes successive litigation of previously adjudicated issues when:

> (1) the issue at stake is identical to the one involved in the prior litigation; (2) the issue was actually litigated in the prior suit; (3) the determination of the issue in the prior litigation was a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

*Miller's Ale House v. Boynton Carolina Ale House*, 702 F.3d 1312, 1318 (11th Cir. 2012).

In *Wi-LAN, Inc. v. ALCATEL-LUCENT USA INC.*, Case No. 6:10-cv-521, the Court found that

> [b]y its own terms, the most-favored licensee provision in Article VII applies only '[i]n the event that Wi-Lan owns or controls the licensing of patents not already addressed under this Agreement and which are infringed or alleged to be infringed by UMTS/HSPA products.' As stated above Article IV of the PCR Agreements specifically address 'patents other than the [PCR Patents] . . . that, on or after [November 1, 2007] are owned or controlled by Wi-Lan.' Wi-Lan acquired the patents-in-suit on April 29, 2009, thus they are explicitly addressed by Article IV. Since patents 'already addressed under [the] Agreement[s]' do not fall under

6

Article VII's most-favored licensee provision, Wi-Lan is not obligated to grant Defendants such a license to the patents-in-suit.

DE 110-1 at 8. As in *Wi-LAN, Inc. v. ALCATEL-LUCENT USA INC.*, Case No. 6:10-cv-521, the patents in suit were acquired after November 1, 2007.[5] However, the patents at issue in this matter are not UMTS/HSPA products and Defendants are not seeking to limit liability under Article IV of the PCR.[6] As such, the issue presented by the instant Motion is not identical to the one decided by that Court and issue preclusion does not apply to this matter.[7] *See RF Delaware, Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1261 (Fed. Cir. 2003) (citing *In re McWhorter*, 887 F.2d 1564, 1566 (11th Cir. 1989)) (applying Eleventh Circuit law). I now turn to whether Defendants have demonstrated that they are entitled to a license under the MFL Provision of the PCR.

Because there is no ambiguity in the interpretation of the PCR, the plain language governs. *See New York v. Olshin Woolen Co. Inc.*, 304 A.D.2d 401, 402 (N.Y. App. Div. 2003); *American Express Bank v. Uniroyal, Inc.*, 164 A.D.2d 275, 277 (N.Y. App. Div. 1990) ("Where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law and the case is ripe for summary judgment."). Moreover, the PCR precludes modifications of its terms unless the modification is fully executed between the parties. DE 69-1

---

[5] Specifically, the patents-in-suit were issued at the earliest, in 2011. DE 55 at 4. Thus, they were acquired by Plaintiffs after November 1, 2007.

[6] I also question whether here Article VII of the PCR is limited by Article IV, because Article VII applies to patents not addressed by the PCR, while Article IV explicitly applies to the patents then held by Plaintiffs.

[7] It is possible that the Court in *Wi-LAN, Inc. v. ALCATEL-LUCENT USA INC* addressed the same issues as the ones presented by the instant Motion. However, because the Order at issue in that matter only discusses the applicability of Section IV of the PCR to the MFL Provision, and the motions in relation to that Order were filed under seal, the record is insufficient to make such a determination. Since Defendants did not argue that that that Section IV of the PCR is applicable to this matter, I cannot find that issue preclusion mandates a denial of the Motion.

at 43. As such, my analysis is limited to the terms of the PCR and whether Defendants have demonstrated that there is no issue of fact as to whether they complied with them.

Here, Defendants are entitled to a license on the same terms as BelAir, under the MFL Provision, if they can show that there is no issue of fact as to whether (1) Plaintiffs own or control the licensing of patents not addressed by the PCR; (2) those patents are alleged to be infringed by UMTS/HSPA Products; and (3) Defendants, during the "TERM" of the PCR requested a license; (4) on the same terms a most-favored future licensee. DE 69-1 at 37. Thus, whether Defendants are entitled to a license depends on whether they have complied with the aforementioned prerequisites.

The Patents-in-suit in this matter were acquired in 2011 at the latest and thus are not addressed by the PCR.[8] *See* DE 55 at 4. The patents at issue in *Wi-LAN, Inc. v. ALCATEL-LUCENT USA INC* were also not addressed by the PCR because they were not acquired by Plaintiffs until 2009. DE 110-1 at 8.

Plaintiffs alleged that that UMTS/HSPA Products were infringed by filing suit in *Wi-LAN, Inc. v. ALCATEL-LUCENT USA INC*. DE 69-1 at 48. Specifically, in the Complaint in that matter, Plaintiffs asserted that Defendants have been and are now infringing on HSPA Patents by making, using offering for sale, importing and/or selling without authority from Plaintiffs, products compliant with the 3GPP standard. DE 69-1 at 52.

In 2011, Defendants requested a non-exclusive license to sell and distribute the alleged infringing products. DE 69-1 at 8. Moreover, on November 8, 2012 and February 1, 2013 Defendants requested a license on the same terms as BelAir. DE 69-1 at 22-23. These requests

---

[8] Plaintiffs argue that Defendants' interpretation of the term "in the event" is incorrect because it does not apply to patents which were acquired after the effective date of the PCR's execution. DE 97-1 at 5. However, they later concede that "[t]he provision necessarily should be construed as referring to future events, as there is no other reasonable interpretation of the provision." *Id.* Thus, Plaintiffs' argument is misplaced, and the MFL Provision applies to patents acquired after November 1, 2007.

occurred during the TERM of the PCR, because they were made before September 3, 2019 and after November 1, 2007. DE 69-1 at 8.

Finally, BelAir constitutes a future licensee, as it was provided a license in 2009, two years after the PCR's execution. DE 69-1 at 14. Since Defendants have stipulated to the fact that BelAir had a most favored licensee status, BelAir is deemed to have a most-favored licensee status.[9] Thus, Defendants are entitled to a license on the same terms as BelAir.

Based on the foregoing, and because none of the aforementioned facts are in dispute, Defendants have demonstrated that there is no issue of fact as to whether the conditions of the MFL Provision have been satisfied. As such, their Motion should be granted.

## IV. Conclusion

For the reasons set forth in this Order, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion (DE 68) is **GRANTED.** Summary Judgment is hereby entered on Defendants' behalf and against Plaintiffs on Counts I through III of Plaintiffs' Complaint and as it relates to Counts II and IV of Defendants' Counter-claim. The Clerk of the Court shall **CLOSE THIS CASE.** It is further

**ORDERED AND ADJUDGED** that Defendants are hereby entitled to a license on the same terms as the BelAir License. It is further

---

[9] Plaintiffs argue that the Defendants are not entitled to assume a license on the same terms as BelAir because the BelAir license does not meet the requirements of Article VII Section 3 of the PCR. However, Article VII Section 3 only refers to more favored rates, which relates to Article VII Section 2 of the PCR and future agreements between the Parties. Moreover, despite Plaintiffs' contentions the terms more and most are not synonyms. The term "more" is defined as "1. Greater; 2. Additional, Further" *Merriam Webster's Collegiate Dictionary*, 757 (10th ed. 1996). The term "most" on the other hand is defined as "to the greatest or higher degree." *Id.* at 759. Thus, the plain meaning of those terms demonstrates that the Section 3 of Article VII of the PCR is not applicable to the MFL Provision. This conclusion is consistent with current precedent. Moreover, by stipulating that the BelAir license is Plaintiffs' most favored licensee, Defendants have agreed to forgo the opportunity to request a license which more favorable terms than the BelAir license (if such a license exists), despite being entitled to such a license under the MFL Provision. *See,Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 13 (2d Cir. 1997).

A000009

**ORDERED AND ADJUDGED** that Plaintiffs' Motion for Leave to File a Sur-Reply (DE 97) is **GRANTED.** It is further

**ORDERED AND ADJUDGED** that all pending Motions are **DENIED AS MOOT.**

**DONE AND ORDERED** in Chambers, in West Palm Beach, Florida, this 19 day of June, 2013.

DONALD M MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record

10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **WI-LAN INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:10-CV-521** |
| | § | |
| **ALCATEL-LUCENT USA INC.,** | § | |
| **ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER

Before the Court are Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 171); The Ericsson Defendants' Motion for Summary Judgment (Dkt No. 172); The Sony Mobile Defendants' Cross-Motion for Summary Judgment (Dkt No. 181); and The Ericsson and Sony Mobile Defendants' Motion to Strike Extrinsic Evidence (Dkt No. 352). Having considered the Parties' briefing and oral argument, the Court hereby **GRANTS** Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 171) and **DENIES** the Ericsson Defendants' Motion for Summary Judgment (Dkt No. 172) and the Sony Mobile Defendants' Cross-Motion for Summary Judgment (Dkt No. 181). The Court also **GRANTS** the Ericsson and Sony Mobile Defendants' Motion to Strike Extrinsic Evidence (Dkt No. 352).

## BACKGROUND

On February 15, 2008, Telefonaktiebolaget LM Ericsson ("Ericsson") and Sony Ericsson Mobile Communications (USA) Inc. ("Sony"; collectively, "Defendants") entered into identical Patent and Conflict Resolution Agreements ("PCR Agreements"). *See* Dkt. No. 171-1; Dkt. No. 171-2. The Parties executed the PCR Agreements to resolve a possible conflict of interest involving Wi-Lan, Ericsson, Sony, and the law firm of McKool Smith. Dkt. No. 171-1 at 1.

The PCR Agreements address four specific patents: U.S. Patent Nos. 5,282,222; RE37,802; 6,192,068; and 6,320,897. The Agreements refer to these patents, and their family members or foreign counterparts, as "the Wi-Lan Patents" (hereinafter, "PCR patents"). Dkt. No. 171-1 at 3, 15. Further, the PCR Agreements also address a specific set of products, UMTS/HSPA Products, defined as "any product complying with the 21–35 series of 3GPP agreed protocols and/or protocol standards setting body which include substantially corresponding to the 21–35 series of 3GPP agreed protocols irrespective of the frequency band (by the way of non-limiting example, including the ETSI TS-125 protocols), as well as any new releases or updates of such protocols." *Id.* at 3.

Three Articles in the PCR Agreements are germane to the resolution of the present motions. Article III is titled "Non-Assert and Release" and reads in relevant part:

> "Wi-Lan hereby irrevocably covenants that neither Wi-Lan nor its affiliates will, directly or indirectly, alone or by, with or through others, cause, induce or authorize, or voluntarily assist, participate or cooperate in, the commencement, maintenance or prosecution of any action seeking or having the tendency to establish any liability on the part of, or to exact any sanction or penalty, or any injunctive, equitable, legal, declaratory, administrative or other relief from or against, [Defendants], [their] direct or indirect distributors, affiliates, customers, or any other individual or entity arising from, by reason of, or in connection with making, using, selling, offering to sell or importing [Defendants'] Products which would, but for this Agreement, infringe any Wi-Lan Patents."

*Id.* at 4. Article IV is titled "Patents other than the Wi-Lan Patents" and reads:

> "[w]ith respect to patents other than the Wi-Lan Patents (to which Article III of this Agreement applies), . . . Wi-Lan hereby agrees that no damages shall accrue against [Defendants] . . . for infringement of any patents that, on or after the Effective Date, are owned or controlled by Wi-Lan where liability results from making, having made, importing, using, selling, offering to sell, or otherwise disposing of [Defendants'] UMTS/HSPA Products and damages shall only accrue for such making, having made, importing, using, selling, offering to sell or otherwise disposing of UMTS/HSPA Products beginning after such time as Wi-Lan commences an action against [Defendants] or its Affiliates relating to UMTS/HSPA Products and infringement of said Wi-Lan patents."

*Id.* at 5. Finally, Article VII is titled "Most-Favoured Licensee Provisions" and states:

> "[i]n the event that Wi-Lan owns or controls the licensing of patents not already addressed under this Agreement and which are infringed or alleged to be infringed by UMTS/HSPA Products, Wi-Lan hereby agrees that at any time during the term of this Agreement, at [Defendants'] request, Wi-Lan will grant to [Defendants] and its Affiliates a non-exclusive license to make, have made, use, sell, offer for sale, lease or otherwise dispose of, and import [Defendants'] products including UMTS/HSPA Products and Wi-Lan agrees to grant such a license at most-favored licensee status as compared to any future licensee of Wi-Lan."

*Id.* at 6.

On October 5, 2010, Wi-Lan filed suit against Defendants Ericsson and Sony alleging patent infringement by Defendants' HSPA-compliant products of U.S. Patent Nos. 6,088,326; 6,195,327; 6,222,819; and 6,381,211 (collectively, "patents-in-suit"). Dkt. No. 1. Wi-Lan acquired the patents-in-suit on April 29, 2009, after the effective date of the PCR Agreements, and there is no dispute that the patents-in-suit are not among the four identified PCR Patents. Dkt. No. 171 at 4.

Defendants allege that the PCR Agreements bar the current lawsuit and filed motions for summary judgment to enforce the PCR Agreements' covenant not to sue. Dkt. Nos. 172 and 181. Plaintiff also filed a motion for summary judgment regarding Defendants' affirmative defenses and counterclaims for breach of contract. Dkt. No. 171.

After the Parties completed briefing on the motions for summary judgment, Defendants filed a supplement[1] requesting, in the alternative, partial summary judgment that Wi-Lan breached the PCR Agreements by failing to provide a license to the patents-in-suit on terms consistent with the PCR Agreeements' most-favored licensee provision. Dkt. No. 276.

---

[1] On December 7, 2012, Defendants filed a motion seeking leave to supplement the existing summary judgment briefing. Dkt. No. 275. Plaintiffs originally opposed the motion. Dkt. No. 283. However, after the Court set the motion for hearing, Plaintiff withdrew its opposition (Dkt. No. 328) and the Court granted leave to supplement the briefing. The supplement to Defendants' Motions for summary judgment was deemed filed on February 26, 2013. Dkt. No. 340 at 2.

Defendants also filed a motion to strike extrinsic evidence that Wi-Lan referenced in its opposition to Defendants' supplemental summary-judgment briefing. Dkt. No. 352.

## APPLICABLE LAW

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323—325 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). An issue of material fact is genuine if the evidence could lead a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue for trial exists, the court views all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Id.*; *Matsushita Elec. Indus. Co. v. Zenith* Radio, 475 U.S. 574, 587 (1986).

Under Article VIII, Section 10 of the contract at issue, the parties agreed that the PCR Agreements must be construed in accordance with the laws of the state of New York. Dkt. 171-1 at 12; Dkt. 171-2 at 13. Under New York law "[t]he proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." *Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582*, 305 F.3d 82, 85 (2d Cir. 2002). "[T]he Court must look first to the parties' written agreement to determine the parties' intent and limit its inquiry to the words of the agreement itself if the agreement sets forth the parties intent clearly and unambiguously." *Russo v. Estee Lauder Corp.*, 856 F. Supp. 2d 437, 460 (E.D.N.Y. 2012). When the parties dispute the meaning of specific contract clauses, the Court must "determine whether such clauses are ambiguous when read in the context of the entire agreement." *Sayers v. Rochester Tel. Corp. Supp. Mgmt.*

*Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (internal quotations omitted). While Defendants and Plaintiff offer different interpretations of the Agreements, unambiguous contractual language does not become ambiguous simply because the parties to the litigation offer different interpretations. *Metropolitan Life Ins. Co. v. RJR Nabisco*, 906 F.2d 884, 889 (2nd Cir. 1990). The question of ambiguity is resolved by examining "the four corners of the document" and not through reference to extrinsic sources. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). However, in the case of an apparent ambiguity, "extrinsic evidence as to the parties' intent may properly be considered." *Id.* at 397.

## ANALYSIS

### Covenant not to Sue

Defendants argue that the PCR Agreements prohibit lawsuits against all products that fall within the scope of the four PCR Patents, including the products accused in the present litigation. Dkt. No. 172 at 7. Defendants contend that in Article III of the PCR Agreements, Wi-Lan covenants not to commence or participate in any action against "products which would, but for th[e] Agreement[s], infringe any [PCR Patents]." *Id.* at 14. Defendants point to Wi-Lan's stipulation that "HSPA-compliant products infringe one or more of the PCR Patents." Dkt. No. 403. Therefore, Defendants argue that Article III bars suits against all Defendants' products that support HSPA. Dkt. No. 172 at 17–18. In the instant suit, Wi-Lan accuses HSPA-compliant products, and the patents-in-suit read on the HSPA standard. *Id.* at 18–19. Thus, Defendants argue that the current suit is barred under the PCR Agreements.

Defendants further contend that their reading of the PCR Agreements is consistent with the rest of the Agreements' provisions. *Id.* Defendants argue that HSPA-compliant products are only a subset of products that implement the UMTS standard. *Id.* at 16–17. According to

Defendants then, the PCR Agreements prohibit lawsuits against Defendants' products that support HSPA, and limit pre-suit damages for any future infringement suits against the broader class of Defendants' products that do not support HSPA but do comply with other UMTS requirements. *Id*. at 16–17.

Wi-Lan contends that the PCR Agreements' covenant not to sue only applies to the four PCR Patents. Dkt. No. 186 at 5. Wi-Lan argues that in Article IV, the PCR Agreements expressly contemplate lawsuits accusing HSPA-compliant products based on patents other than the PCR Patents. *Id*. at 8. Such lawsuits are limited to damages accruing from the date of commencement of the action. *Id*. Wi-Lan also argues that the patents-in-suit fall under Article IV's definition of "patents other than the [PCR Patents]," because they were acquired after execution of the PCR Agreements. *Id*. Thus, rather than prohibiting lawsuits such as the instant one, the PCR Agreements expressly permit them. *Id*. Further, Wi-Lan contends that Defendants' interpretation is improperly broad, as it would bar any action by Wi-Lan against Defendants, be it for patent infringement, warranty claims, fraud, or anything else, as long as an HSPA-compliant product is involved. Thus, Wi-Lan argues, Defedants' interpretation of the covenant not to sue is inconsistent with the rest of the PCR Agreements. Dkt. 171 at 11.

Defendants' interpretation contradicts the Parties' agreement. First, Defendants rely on Article III's provision barring suit against "[Defendants'] products which would, but for this Agreement, infringe any [PCR Patents]" to argue that all lawsuits against Defendants' HSPA-compliant products are prohibited. Dkt. No. 172 at 7. Yet, Defendants never concede that the accused products infringe the PCR Patents. *See* Dkt. No. 152, ¶¶22, 27, 38, 70–73; Dkt. No. 151, ¶¶ 22, 27, 38, 70–73.

Second, even if Defendants conceded that their accused products infringe the PCR Patents, Article IV specifically contemplates actions commenced by Wi-Lan against Defendants' UMTS/HSPA Products for infringement of patents, *other* than the PCR Patents. The Agreements define UMTS/HSPA Products as "any product complying with the 21-35 series of 3GPP agreed protocols . . . corresponding to the 21–35 series of 3GPP agreed protocols . . . including the ETSI TS-125 protocols." Dkt. No. 171-1 at 3. Notably, the ETSI TS-125 protocols listed as an example reads on the same series-25 protocol as the PCR Patents. Dkt. No. 190 at 2. Thus, while the Parties' definition of UMTS/HSPA products may include more than HSPA products, reading the Agreements to bar all lawsuits against any HSPA-compliant products would directly contradict the Parties' agreement.

When "read in the context of the entire agreement," it is clear that Article III does not bar all actions brought against Defendants' HSPA-compliant products. *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993). Instead, the PCR Agreements bar actions for infringement of the four specified PCR Patents, and contemplate actions for infringement of other patents, like the patents-in-suit, while limiting damages. Therefore, the current suit is not barred by the PCR Agreements and partial summary judgment in favor of Plaintiff is appropriate.

### *Most-Favored Licensee Provision*

Defendants request, in the alternative, partial summary judgment that Wi-Lan breached the PCR Agreements by failing to comply with the most-favored licensee provision. Dkt No. 276. Defendants argue that if Article III only applies to the four PCR Patents, then under Article VIII, Wi-Lan must grant Defendants most-favored licensee status for other patents not addressed in the Agreements. *Id*. at 3. Defendants contend that when they attempted to invoke their rights

under this provision, however, Wi-Lan refused to provide licenses for the patents-in-suit at most-favored licensee status, in breach of the PCR Agreements. *Id.* at 1.

Wi-Lan responds that the most-favored licensee provision is only triggered by the assertion of "patents not already addressed under th[e] Agreement[s]" that Wi-Lan owned or controlled on the Agreements' effective date of November 1, 2007. Dkt. No. 345 at 3. Wi-Lan argues that the patents-in-suit were not owned or controlled by Wi-Lan until 2009, therefore the patents-in-suit are governed by Article IV, which specifically addresses patents acquired by Wi-Lan after the effective date. *Id.* at 14-15. Wi-Lan contends that as the most-favored licensee provision cannot be triggered by the assertion of the patents-in-suit, Wi-lan has not breached its obligations under the Agreements. *Id.* at 17.

By its own terms, the most-favored licensee provision in Article VII applies only "[i]n the event that Wi-Lan owns or controls the licensing of patents not already addressed under this Agreement and which are infringed or alleged to be infringed by UMTS/HSPA products." Dkt. No. 171-1 at 7. As stated above, Article IV of the PCR Agreements specifically address "patents other than the [PCR Patents] . . . that, on or after [November 1, 2007], are owned or controlled by Wi-Lan." *Id.* at 5. Wi-Lan acquired the patents-in-suit on April 29, 2009, thus they are explicitly addressed by Article IV. Since patents "already addressed under [the] Agreement[s]" do not fall under Article VII's most-favored licensee provision, Wi-Lan is not obligated to grant Defendants such a license to the patents-in-suit.

As there is no breach of the PCR Agreements, Defendants' Motions for Summary Judgment are **DENIED** and Plaintiff's Motion for Partial Summary Judgment is **GRANTED**.

*Motion to Strike Extrinsic Evidence*

The Parties agree that the PCR Agreements are unambiguous. Defendants argue that extrinsic evidence may not be considered to devise the Parties' intentions in drafting an unambiguous contract and move to strike Plaintiff's proffered extrinsic evidence. Dkt. No. 352 at 2. Wi-Lan counters that, despite the Parties' stipulations that the PCR Agreements are unambiguous, the question of ambiguity is a question of law for the Court to determine. Dkt. No. 377 at 2. Wi-Lan also contends that the extrinsic evidence will be useful if the Court decides the PCR Agreements are, in fact, ambiguous. *Id.*

Extrinsic evidence may not be considered in the interpretation of an agreement that is undisputedly unambiguous. *Chimart Associates v. Paul*, 66 N.Y.2d 570, 572, 498 N.Y.S.2d 344, 489 N.E.2d 231 (N.Y. 1986); *TI v. Hyundai Elec. Indus., Co*., 42 F. Supp. 2d 660, 673 (E.D. Tex. 1999). As the Parties note, the PCR Agreements are fully integrated and unambiguous. Accordingly, extrinsic evidence may not be considered and Defendants' Motion to Strike Extrinsic Evidence is **GRANTED**.

## CONCLUSION

For the above-mentioned reasons, the Court hereby **GRANTS** Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 171) and **DENIES** the Ericsson Defendants' Motion for Summary Judgment (Dkt No. 172) and the Sony Mobile Defendants' Cross-Motion for Summary Judgment (Dkt No. 181). The Court also **GRANTS** the Ericsson and Sony Mobile Defendants' Motion to Strike Extrinsic Evidence (Dkt No. 352).

**So ORDERED and SIGNED this 4th day of June, 2013.**



**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**