2013-1485, -1566

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

2013-1485

---

## WI-LAN USA INC. and WI-LAN INC.,
*Plaintiffs-Appellants*

v.

## ERICSSON INC. and
## TELEFONAKTIEBOLAGET LM ERICSSON,
*Defendants-Appellees*

---

Appeal from the United States District Court for the
Southern District of Florida in Case No. 12-CV-23569,
Judge Donald M. Middlebrooks.

---

2013-1566

---

## WI-LAN, INC.,
*Plaintiff-Appellee,*

v.

## ALCATEL-LUCENT USA, INC.
*Defendant,*

AND

## TELEFONAKTIEBOLAGET LM ERICSSON,
## ERICSSON INC., SONY MOBILE
## COMMUNICATIONS AB (also known as Sony Ericsson

*(continued on inside cover)*

Mobile Communications AB), AND SONY
MOBILE COMMUNICATIONS (USA) INC. (also
known as Sony Ericsson Mobile Communications
(USA) Inc.),

*Defendants-Appellants*

_____

Appeal from the United States District Court for the
Eastern District of Texas in Case No. 10-CV-0521,
Chief Judge Leonard Davis.

---

**BRIEF OF DEFENDANTS-APPELLANTS
TELEFONAKTIEBOLAGET LM ERICSSON,
ERICSSON INC., SONY MOBILE
COMMUNICATIONS AB and
SONY MOBILE COMMUNICATIONS (USA) INC.**

and

**DEFENDANTS-APPELLEES ERICSSON INC. and
TELEFONAKTIEBOLAGET LM ERICSSON**

---

Joshua C. Krumholz
Jacob K. Baron
Holland & Knight LLP
10 St. James Avenue
11th Floor
Boston, MA 02116
(617) 523-2700

Bruce S. Sostek
Richard L. Wynne, Jr.
J. Michael Heinlen
Justin S. Cohen
Thompson & Knight LLP
1722 Routh Street
Suite 1500
Dallas, Texas 75201
(214) 969-1700

*Attorneys for Telefonaktiebolaget
LM Ericsson and Ericsson Inc.*

*Attorneys for
Telefonaktiebolaget LM
Ericsson, Ericsson Inc., Sony
Mobile Communications AB and
Sony Mobile Communications
(USA) Inc.*

*(counsel continued on next page)*

Kara F. Stoll
Jason L. Romrell
Finnegan, Henderson, Farabow,
Garrett & Dunner, LLP
901 New York Avenue, N.W.
Washington, DC 20001
(202) 408-4000

*Attorneys for Sony Mobile
Communications AB and Sony
Mobile Communications (USA)
Inc.*

February 3, 2014

## CERTIFICATE OF INTEREST

Counsel for Telefonaktiebolaget LM Ericsson, Ericsson Inc., Sony Mobile Communications AB and Sony Mobile Communications (USA) Inc. certify the following:

1.     The full names of every party represented by us are Telefonaktiebolaget LM Ericsson, Ericsson Inc. (collectively "Ericsson"), Sony Mobile Communications AB and Sony Mobile Communications (USA) Inc. (collectively "Sony").

2.     The names of the real parties in interest are Telefonaktiebolaget LM Ericsson, Ericsson Inc., Sony Mobile Communications AB and Sony Mobile Communications (USA) Inc.

3a.     Ericsson Inc. is a non-governmental corporate party and identifies Ericsson Holding II Inc., a Delaware Corporation, and Telefonaktiebolaget LM Ericsson, a Swedish Corporation, as its parent corporations.  Ericsson Inc. is wholly-owned by Ericsson Holding II Inc., which is in turn wholly-owned by Telefonaktiebolaget LM Ericsson. Telefonaktiebolaget LM Ericsson is publicly held and trades in the United States through American Depository Receipts under the name LM Ericsson Telephone Company.

i

3b.    Sony Mobile Communications AB and Sony Mobile Communications (USA) Inc. are both non-governmental corporations. On February 15, 2012, Sony Ericsson Communications AB became a wholly-owned subsidiary of Sony Corporation, a Japanese entity. Sony Ericsson Mobile Communications (USA) Inc. remained a wholly-owned subsidiary of Sony Ericsson Mobile Communications AB. On February 24, 2012, Sony Ericsson Mobile Communications AB changed its name to Sony Mobile Communications AB. On February 29, 2012, Sony Ericsson Mobile Communications (USA) Inc. changed its name to Sony Mobile Communications (USA) Inc. Sony Corporation's stock is publicly traded on the Tokyo Stock Exchange. American Depository Receipts related to its common stock are traded on the New York Stock Exchange.

4.    The names of all law firms and the partners or associates that appeared for Telefonaktiebolaget LM Ericsson, Ericsson Inc., Sony Mobile Communications AB and/or Sony Mobile Communications (USA) Inc. in the trial court or agency or are expected to appear in this Court are:

**Holland & Knight, LLP**
Joshua C. Krumholz
Jacob K. Baron
Benjamin M. McGovern
Jacob W. S. Schneider
Nash Zogaib
George E. Schultz
Beau Alan Baker

**Wilson Robertson &
Cornelius PC**
William Joseph Cornelius, Jr.
Jennifer Parker Ainsworth

**Finnegan, Henderson, Farabow,
Garrett & Dunner, LLP**
Kara F. Stoll
Jason L. Romrell

**Thompson & Knight**
Bruce S. Sostek
Richard L. Wynne, Jr.
Adrienne Elizabeth Dominguez
Justin S. Cohen
J. Michael Heinlen
Timothy E. Hudson

**Dentons US LLP**
Matthew Paul Harper

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ vi

TABLES OF ABBREVIATIONS AND CITATION FORMS .................... x

STATEMENT OF RELATED CASES ..................................................... 1

STATEMENT OF JURISDICTION ......................................................... 2

STATEMENT OF THE ISSUES .............................................................. 4

STATEMENT OF THE CASE ................................................................. 5

STATEMENT OF THE FACTS ............................................................... 9

SUMMARY OF THE ARGUMENT ...................................................... 22

STANDARD OF REVIEW ..................................................................... 29

ARGUMENT ........................................................................................... 31

    I.    THE CLAIMS IN THE TEXAS LITIGATION ARE
    BARRED BY THE UNAMBIGUOUS LANGUAGE IN
    THE COVENANT NOT TO SUE .......................................... 32

        A.    The PCRA Applies to the Texas Products ................... 33

        B.    Wi-LAN Breached the Covenant Not to Sue
            Provision by Initiating the Texas Litigation ............... 41

    II.   PURSUANT TO THE UNAMBIGUOUS LANGUAGE
    OF THE MFL PROVISION, ERICSSON AND SONY
    ARE ENTITLED TO THE TERMS OF THE BELAIR
    LICENSE ................................................................................ 42

        A.    The Clear and Unambiguous Terms of the MFL
            Provision Entitle Ericsson and Sony to a License
            on the Same Terms as Wi-LAN's Most-Favored
            Licensee ........................................................................ 43

            1.    The MFL Provision Is Clear and
                Unambiguous .................................................... 43

            2.    Present-Tense Verbs in a Conditional
                Statement Refer to Both Present and
                Future Events ................................................... 47

3.    Ericsson's and Sony's Reading of the MFL
      Provision Is Harmonious With Other
      Portions of the PCRA............................................50
4.    The Texas Patents Are Not "Addressed" in
      the Limitation of Damages Provision.................53

B.    Ericsson and Sony Are Entitled to the Terms of
      the BelAir License...........................................................58

1.    Ericsson and Sony Requested a License
      With Most-Favored Licensee Terms During
      the  Term of the PCRA .......................................58
2.    Ericsson and Sony Stipulate That BelAir Is
      Wi-LAN's Most-Favored Licensee.......................60
3.    A "Similarly Situated Licensee" Analysis Is
      Not Required Under the MFL Provision ............62
4.    The License Granted Under the MFL
      Provision Is Not Limited to the Texas
      Patents ...............................................................67

CONCLUSION .........................................................................69

CERTIFICATE OF SERVICE....................................................1

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
      LIMITATION, TYPEFACE AND TYPE STYLE
      REQUIREMENTS..........................................................3

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.,*
99 A.D.3d 1, 948 N.Y.S.2d 292 (2012) ................................................. 68

*Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*
361 F. Supp. 2d 210 (S.D.N.Y. 2005) ........................................... 48, 49

*Brown v. Chevy Chase Bank, FSB,*
137 Fed. Appx. 278 (11th Cir. 2005) ................................................... 29

*Corhill Corp. v. S.D. Plants, Inc.,*
9 N.Y.2d 595 (N.Y. 1961) ............................................................ 57, 66

*Epic Sys. Corp. v. Allcare Health Mgmt. Sys., Inc.,*
No. 4:02-CV-161-A, 2002 WL 31051023
(N.D. Tex. September 11, 2002) ......................................................... 58

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,*
748 F.2d 729 (2d Cir. 1984) ............................................................... 68

*In the Matter of El-Roh Realty Corp.,*
74 A.D.3d 1796 (N.Y. App. Div. 2010) ......................................... 49, 54

*In re Airadigm Comms., Inc.,*
616 F.3d 642 (7th Cir. 2010) ............................................................. 48

*In re Enron Creditors Recovery Corp.,*
30 B.R. 307 (S.D.N.Y. 2008) ............................................................. 48

*Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp.,*
690 F. Supp. 1339 (S.D.N.Y. 1988) .............................................. 29, 30

*Korosh v. Korosh,*
99 A.D. 3d 909 (N.Y. App. Div. 2012) ........................................ *passim*

*Lexion Medical LLC v. Northgate Techs Inc.,*
641 F.3d 1352 (Fed. Cir. 2011) .......................................................... 29

*Mazzola v. County of Suffolk,*
    143 A.D.2d 734 (N.Y. App. Div. 1988)................................................45

*Nicaj v. City of New York,*
    2009 WL 513941 (S.D.N.Y. 2009)............................................46, 48

*Patsy's Italian Rest., Inc. v. Banas,*
    658 F.3d 254 (2d Cir. 2011) ................................................54

*Pfizer, Inc. v. Elan Pharm.,*
    812 F. Supp. 1352 (D. Del. 1993)........................................45

*Ramirez v. Knowlton,*
    542 F.3d 124 (5th Cir. 2008)................................................29

*Republic Nat'l Bank of New York v. Olshin Woolen Co. Inc.,*
    304 A.D.2d 401 (N.Y. App. Div. 2003)................................64

*Sage Prods., Inc. v. Devon Indus., Inc.,*
    126 F.3d 1420 (Fed. Cir. 1997) ..........................................67

*Schwartz v. Million Air, Inc.,*
    341 F.3d 1220 (11th Cir. 2003)..........................................41

*State Farm Fire & Cas. Co. v. LeBlanc,*
    No. 12-11637, 2012 WL 5199253 (11th Cir. 2012) ............................44

*Studiengesellschaft Kohle, MBH v. Hercules,*
    105 F.3d 629 (Fed. Cir. 1997) ............................................59

*Unova, Inc. v. Acer Inc.,*
    363 F.3d 1278 (Fed. Cir. 2004) ..........................................49

*VKK Corp. v. Nat'l Football League*
    244 F.3d 114 (2d Cir. 2001) ................................................49

*Western Publishing Co., Inc. v. Midgames, Inc.,*
    995 F. Supp. 949 (E.D. Wis. 1998) ....................................44

*Wi-LAN, Inc. v. Acer, Inc. et. al.,*
    No. 2:07-CV-473 (E.D. Tex.) ................................................10

*Wi-LAN, Inc. v. Alcatel-Lucent USA, Inc.,*
    C.A. No. 6-10-CV-521-LED (E.D.Tex.) ...................................... *passim*

*Wi-LAN, Inc. v. Ericsson Inc.,*
    C.A. No. 12-CV-23569-DMM ...................................................... *passim*

*Wi-LAN, Inc. v. Westell Techs., Inc. et. al.,*
    No. 2:07-CV-474 (E.D. Tex.) ......................................... 10, 11

*Willemijn Houdstermaatschappij, BV v. Standard
    Microsystems Corp.,*
    103 F.3d 9 (2d Cir. 1997) ...................................................... 59

*Zhou v. LaGrange Academy, Inc.,*
    266 Ga. App. 445 (2004)............................................... 46, 48

STATUTES

28 U.S.C. § 1295(a)(1)......................................................... 3

28 U.S.C. § 1331.............................................................. 2, 3

RULES

Fed. R. Civ. P. 54(b) ............................................................ 2, 6

Fed. R. Civ. P. 56(a) ............................................................ 29

OTHER AUTHORITIES

Diana Hacker and Nancy Sommers, THE BEDFORD HANDBOOK (8th
    ed. 2010) ..................................................................... 47

Brian A. Garner, DICTIONARY OF MODERN LEGAL USAGE (2d ed.
    1995) ......................................................................... 45

The University of North Carolina at Chapel Hill, The Writing
    Center, Conditionals:  Verb Tense in "If" Clauses,
    http://writingcenter.unc.edu/handouts/conditionals-verb-tense-
    in-if-clauses. ................................................................ 47

Oxford Dictionary, Event,
    http://www.oxforddictionaries.com/us/definition/american_engli
    sh/event ............................................................................................. 45

WEBSTER'S NEW WORLD DICTIONARY (College ed. 1988) ......................... 45

# TABLES OF ABBREVIATIONS AND CITATION FORMS

<u>Abbreviations</u>

**Parties**

| | |
|---|---|
| Ericsson | Defendants-Appellees and Cross-Appellants Ericsson Inc. and Telefonaktiebolaget LM Ericsson |
| Sony | Defendants-Cross-Appellants Sony Mobile Communications AB and Sony Mobile Communications (USA) Inc. |
| Wi-LAN | Plaintiffs-Appellants and Cross-Appellees Wi-LAN USA, Inc. and Wi-LAN, Inc. |
| Parties | Ericsson, Sony and Wi-LAN |

**Defined Terms**

| | |
|---|---|
| 3GPP | 3rd Generation Partnership Project |
| BelAir | BelAir Networks, Inc. |
| BelAir License | December 30, 2009 Patent License Agreement between BelAir and Wi-LAN |
| Florida Court | United States District Court for the Southern District of Florida |
| Florida Decision | Order on Motion for Summary Judgment in Florida Litigation |
| Florida Litigation | *Wi-LAN, Inc. v. Ericsson Inc.*, Case No. 12-CV-23569-DMM (S.D. Fla.) |
| Florida Patents | U.S. Patent Nos. 8,027,298; 8,249,014; and 8,229,437 |
| Florida Products | Ericsson RBS-6000 series wireless base stations |

| | |
|---|---|
| HSPA | High Speed Packet Access |
| LTE | Long Term Evolution wireless communications protocol |
| McKool Smith | McKool Smith PC |
| PCRA | Patent and Conflict Resolution Agreement |
| PCRA Patents | U.S. Patent Nos. 5,282,222; RE37,802; 6,192,068; and 6,320,897 |
| RBS | Radio base station |
| Texas Court | United States District Court for the Eastern District of Texas |
| Texas Decision | Order on Motion for Partial Summary Judgment in Texas Litigation |
| Texas Litigation | Wi-LAN, Inc. v. Alcatel-Lucent USA, Inc., Case No. 6-10-CV-521-LED (E.D. Tex.) |
| Texas Patents | U.S. Patent Nos. 6,088,326; 6,195,327; 6,222,819; and 6,381,211 |
| Texas Products | Ericsson:  RBS-3000 and RBS-6000 series wireless base stations; W30 and W35 mobile broadband routers |
| | Sony:  Vivaz, Xperia X10, Equinox, W518a, Satio, Xperia X2a, Xperia Pureness, Aino Naite smartphones |
| UMTS | Universal Mobile Telecommunications System |

## Citation Forms

The following citation forms are used in this brief:

| | |
|---|---|
| A__ | Citation to the Appendix at the page number identified. |
| A__ (__:__-__:__) A__ at ¶ __ | Citation to transcript testimony, to a line and column of a patent, or to a specific numbered paragraph. |
| | Specific transcript lines or patent cites are cited immediately after each Appendix page reference, *e.g.*, A1 (1:15-2:5) refers to an excerpt from a transcript beginning on Appendix page 1 starting at transcript page 1, line 15 and continuing through transcript page 2, line 5.  Specific numbered paragraphs are cited immediately after each Appendix page, *e.g.*, A1 at ¶ 1 refers to numbered paragraph 1 on Appendix page 1. |
| WL at __ | Citation to Wi-LAN's Principal Brief at the page number identified. |

## STATEMENT OF RELATED CASES

Appellees Telefonaktiebolaget LM Ericsson, Ericsson Inc., Sony Mobile Communications AB and Sony Mobile Communications (USA) Inc. are unaware of any other case that might be directly affected by the Court's decision in this combined appeal.

## STATEMENT OF JURISDICTION

This combined appeal is made from a final judgment of the District Court for the Eastern District of Texas (the "Texas Court") pursuant to Fed. R. Civ. P. 54(b) in *Wi-LAN, Inc. v. Alcatel-Lucent USA, Inc.,* C.A. No. 6-10-CV-521-LED (the "Texas Litigation"), A56-57,[1] and from a case dispositive final judgment on a motion for summary judgment of the United States District Court for the Southern District of Florida (the "Florida Court") in *Wi-LAN, Inc. v. Ericsson Inc.,* C.A. No. 12-CV-23569-DMM (the "Florida Litigation").  A11-12.

Ericsson Inc. and Telefonaktiebolaget LM Ericsson (collectively, "Ericsson"), and Sony Mobile Communications AB and Sony Mobile Communications (USA) Inc. (collectively, "Sony"), appeal from the final judgment entered by the Texas Court (the "Texas Decision").  A56-57. The district court's judgment was based on a decision and order denying Ericsson's and Sony's motion for summary judgment and granting Wi-LAN's motion for partial summary judgment on June 4, 2013.  A47-55. The district court's subject-matter jurisdiction over that matter is pursuant to 28 U.S.C. § 1331, as the action arises under the patent laws

---

[1] "A__" refers to the cited page in the Appendix.

of the United States.  Ericsson and Sony filed a timely notice of appeal on August 13, 2013.  A148-49.  The basis for this Court's jurisdiction is pursuant to 28 U.S.C. § 1295(a)(1).

Appellants Wi-LAN USA, Inc. and Wi-LAN, Inc. (collectively, "Wi-LAN") (Wi-LAN, Ericsson and Sony collectively, "Parties") appeal from the final judgment entered by the Florida Court (the "Florida Decision").  A11-12.  The district court's judgment was based on a decision and order granting summary judgment to Ericsson on June 19, 2013.  A1-10.  The district court's subject-matter jurisdiction over that matter is pursuant to 28 U.S.C. § 1331, as that action arises under the patent laws of the United States, and the basis for this Court's jurisdiction is pursuant to 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether the Texas Court erred in concluding that the covenants not to sue ("Covenants Not to Sue") in the Parties' Patent and Conflict Resolution Agreements (the "PCRAs") do not bar Wi-LAN from bringing the Texas Litigation, where the plain language of the covenants applies to the products that are the subject of that litigation.

2.      Whether the Florida Court correctly concluded that Ericsson is entitled to the benefit of the most-favored licensee provision (the "MFL Provision") in the PCRAs, where the conditions required to trigger that provision — that Wi-LAN owns or controls patents that it alleges are infringed by UMTS/HSPA PRODUCTS, as that term is defined in the PCRAs — have been met.

3.      Whether the Texas Court erred in concluding that the same MFL Provision considered by the Florida Court was not triggered by the same conditions held by the Florida Court to trigger that provision, where the Texas Court's interpretation of the PCRAs would render the MFL Provision a nullity.

4

## STATEMENT OF THE CASE

**A.    The Texas Litigation**

On October 5, 2010, Wi-LAN filed suit against Ericsson and Sony in the Eastern District of Texas, alleging infringement of U.S. Patent Nos. 6,088,326; 6,195,327; 6,222,819; and 6,381,211 (the "Texas Patents") by Ericsson's RBS-3000 and RBS-6000 series wireless base stations, Ericsson's W30 and W35 mobile broadband routers, and Sony's Vivaz, Xperia X10, Equinox, W518a, Satio, Xperia X2a, Xperia Pureness, Aino and Naite smartphones (the "Texas Products").  A1214-31 at ¶¶ 19-22, 27, 35-42, 54-57.  In their answer, Ericsson and Sony asserted counterclaims that Wi-LAN breached the Covenants Not to Sue and MFL Provisions in the Parties' PCRAs, and they asserted Wi-LAN's breaches of the Covenants Not to Sue as affirmative defenses.[2] A1245-49 at ¶¶ 84-90, 100-03, A1250-53 at ¶¶ 4-15; A1271-78 at ¶¶ 84-90, 100-03, A1276-78 at ¶¶ 4-15; A1297-99 at ¶¶ 78-85, A1301-04 at ¶¶ 4-16; A1320-22 at ¶¶ 78-85, A1324-27 at ¶¶ 4-16.  Wi-LAN moved for summary judgment on each of those counterclaims and defenses.  A646-

_____

[2] While the Parties executed separate PCRAs for Ericsson and Sony, they agree that the agreements are identical with regard to the issues raised in this combined appeal.  WL at 3 n.1.  For ease of reference, this brief will refer to the PCRAs in the singular.

58.  Ericsson and Sony Mobile moved for summary judgment on:
(1) their breach of contract counterclaims related to the MFL Provision;
and (2) their affirmative defenses related to the Covenant Not to Sue.
A709-34; A949-74.  On June 4, 2013, the Texas Court denied Ericsson's
and Sony's motions for summary judgment and granted Wi-LAN's
motion for partial summary judgment on both defenses.  A47-55; A1204.

On July 15, 2013, after a trial on the merits, the jury returned a
verdict of non-infringement on all patents, and found the two patents
against which Ericsson and Sony brought invalidity claims to be
invalid.  A1355-56.  On August 13, 2013, Ericsson and Sony filed a
notice of appeal on the Texas Court's summary judgment decision.
A148-49.  An unopposed motion to stay that appeal was filed in this
Court on August 30, 2013, pending a request to the district court to
issue a separate and final judgment relating to its summary judgment
ruling.  The Texas Court issued a separate and final judgment pursuant
to Fed. R. Civ. P. 54(b) on September 20, 2013.  A56-57.  On January 28,
2014, after the Appendix was assembled, the Texas Court denied all
post-trial motions.  Order Denying Motion for Attorneys' Fees, Motion
for New Trial, Motion for Judgment as a Matter of Law, *Wi-LAN Inc. v.*

*Alcatel-Lucent USA Inc. et al*, 6:10-CV-00521-LED (E.D. Tex. Jan. 28, 2014), ECF No. 529.

**B.    The Florida Litigation**

On October 1, 2012, Wi-LAN sued Ericsson in the Southern District of Florida, alleging infringement of U.S. Patent Nos. 8,027,298; 8,249,014 and 8,229,437 (the "Florida Patents") by Ericsson's RBS-6101, RBS-6102, RBS-6201, RBS-6301 and RBS-6601 Radio Base Station products (the "Florida Products").  A437-43 at ¶¶ 19-20, 23, 27, 31.  On February 13, 2013, Ericsson moved for summary judgment on the basis that it was entitled to, and was willing to accept, a most-favored license pursuant to the MFL Provision in the PCRA.  A150.  That motion invoked the same MFL Provision that Ericsson and Sony invoked in the Texas Litigation.  A462.  On June 19, 2013, the Florida Court granted Ericsson's motion, concluding that Ericsson was entitled to the benefits of the MFL Provision.  A1-10.  The Florida Court also concluded that Ericsson was entitled to the terms of a deal executed between Wi-LAN and BelAir Networks, Inc. ("BelAir") (the "BelAir License") as the most-favored license.  A9-10.

On June 28, 2013, Wi-LAN filed a Notice of Appeal. A41-43. On July 8, 2013, the Florida Court entered final judgment in favor of Ericsson. A11-12. Ericsson has tendered payment under the terms of the BelAir License, but Wi-LAN has refused to accept that tender.[3]

---

[3] The tender was made after the Florida Court awarded Ericsson with summary judgment, so is not part of the Court record.

## STATEMENT OF THE FACTS

### A.    Wi-LAN's 2006 Demand and McKool Smith's Conflict of Interest

In October 2006, Wi-LAN contacted Ericsson and Sony,[4] accusing the companies of infringing four patents (the "PCRA Patents") through the sale of certain HSPA-compliant products.  A749 at ¶¶ 4-6; A755-56; A778-79; A995-96; A1019-20.  The HSPA, or High Speed Packet Access, telecommunications standard is a subset of a larger UMTS, or Universal Mobile Telecommunications System, standard.  A739-40 at ¶¶ 5-8.  The UMTS standard is made up of a series of specifications, Series 21 through 35, issued by the 3rd Generation Partnership Project, and applies to both voice and data transmissions.  A739-40 at ¶¶ 5-8. The HSPA standard comprises a subset of that standard and only covers particular aspects of data transmissions.  A739-40 at ¶¶ 7-8.

Wi-LAN claimed that its PCRA Patents covered the HSPA standard, such that any product compliant with that standard necessarily infringed the PCRA Patents.  A749 at ¶¶ 5-6; A755-56;

---

[4] This contact was with Sony Ericsson Mobile Communications, a joint venture between Ericsson and Sony.  A1019-20.  Subsequent to that communication, Sony purchased Ericsson's interest in the joint venture and changed the company's name to "Sony Mobile Communications" to reflect the divestment of Ericsson's interest.  A778-79; A749 at ¶ 4.

A778-79; A781-811; A813-29.  Because certain Ericsson and Sony products complied with that HSPA standard, Wi-LAN alleged, those products also infringed the PCRA Patents.  *Id.*

Beyond the issues raised by Wi-LAN's claims, Ericsson and Sony faced another significant issue.  Prior to Wi-LAN's demand, the law firm of McKool Smith PC ("McKool Smith") had represented the two companies in a number of highly technical matters involving UMTS and related technologies.  A742-46 at ¶¶ 4-6.  In connection with that work, Ericsson in particular had invested significant time and money educating McKool Smith's attorneys with regard to its products and the complex technology associated with those products.  A746 at ¶ 6.  As such, both Ericsson and Sony logically would have turned to McKool Smith to help them with the dispute brewing with Wi-LAN.  *See* A742-46 at ¶¶ 4-6.

As Ericsson and Sony soon discovered, however, Wi-LAN already had retained McKool Smith to assert the same PCRA Patents against other companies.  *See Wi-LAN, Inc. v. Acer, Inc. et. al.*, No. 2:07-CV-473 (E.D. Tex.); *Wi-LAN, Inc. v. Westell Techs., Inc. et. al.*, No. 2:07-CV-474 (E.D. Tex.).  As a result, neither Ericsson nor Sony could retain its

10

preferred counsel in responding to Wi-LAN's claims. *See* A742-46 at ¶¶ 4-6. Worse still, that same law firm, using in part the technical knowledge obtained at Ericsson's and Sony's expense, would be taking positions adverse to Ericsson and Sony in those other litigations, whether in claim construction, formulating validity and infringement positions or otherwise. *See id.* As such, the Parties not only faced a conflict over the PCRA Patents, they faced an equally serious conflict with Wi-LAN over the use of McKool Smith.

## B.   The Patent and Conflict Resolution Agreement (PCRA)

To resolve both the patent dispute and the underlying conflict of interest dispute, in 2008, the Parties entered into the PCRA. A775; A845. The consideration received by Wi-LAN under the PCRA included two main components: (1) Wi-LAN could continue to use McKool Smith in connection with litigation involving the PCRA Patents; and (2) Wi-LAN received payment of $100,000 on behalf of Ericsson and $100,000 on behalf of Sony. A762; A831.

In return, Ericsson and Sony needed, as a starting point, protection from the PCRA Patents. A764 (Art. II, § 1); A834 (Art. II, § 1). In addition, however, Ericsson and Sony demanded and received

11

much broader protections to compensate them for the loss of McKool

Smith as their counsel.[5]  A764-69; A834-38.  Wi-LAN agreed to broadly

protect Ericsson and Sony in three distinct ways:

> i.    <u>Covenant Not to Sue</u>.  The PCRA included a Covenant Not to
>       Sue "in connection with making, using, selling, offering to
>       sell or importing [Ericsson/Sony] Products which would, but
>       for [the PCRA], infringe any [PCRA Patents]" (A764-65 (Art.
>       III, § 1); A834-35 (Art. III, § 1));
>
> ii.   <u>MFL Provision</u>.  The PCRA also included the right, upon the
>       triggering of certain events, for Ericsson and Sony to take a
>       license at the terms of Wi-LAN's most-favored licensee (A767
>       (Art. VII, § 1); A837 (Art. VII, § 1)); and
>
> iii.  <u>Limitation of Damages Provision</u>.  The PCRA protected
>       Ericsson and Sony in the event that Wi-LAN filed litigation
>       against one or both of them, limiting Wi-LAN's claim to post-
>       filing damages, should Wi-LAN successfully prosecute an
>       action for infringement against any Ericsson or Sony

---

[5] As part of the agreement, neither party could use McKool Smith against the other.  A774 (Art. VIII, § 13); A844 (Art. VIII, § 13).

"UMTS/HSPA Product" (the "Limitation of Damages

Provision") (A766 (Art. IV, § 1); A836 (Art. IV, § 1)).

Each protection is discussed below.

### 1.    The Covenant Not to Sue

In the Covenant Not to Sue, Wi-LAN agreed not to sue Ericsson or

Sony with respect to any *products* that would, but for the PCRA,

infringe any claim of a PCRA Patent:

> Subject to the provisions of ARTICLE V hereof, **WI-LAN hereby irrevocably covenants that neither WI-LAN nor its AFFILIATES will**, directly or indirectly, alone or by, with or through others, **cause**, induce or authorize, or voluntarily assist, participate or cooperate in, the commencement, maintenance or prosecution of **any ACTION** seeking or having the tendency to establish any liability on the part of, or to exact any sanction or penalty, or any injunctive, equitable, legal, declaratory, administrative or other relief from or **against, [ERICSSON / SONY]**, its direct or indirect distributors, AFFILIATES, CUSTOMERS or any other individual or entity **arising from, by reason of, or in connection with making, using, selling, offering to sell or importing [ERICSSON/SONY]** *Products which would, but for this Agreement, infringe any [PCRA Patents]*.

A764-65 (Art. III, § 1) (emphasis added); A834-35 (Art. III, § 1)

(emphasis added).  "Ericsson Products" and "Sony Products" are defined

13

broadly in the PCRA to encompass any products that those companies make or sell.[6]  A763-64 (Art. I, § 6); A833 (Art. I, § 7).

As the language of that provision makes clear, the Covenant Not to Sue is a product-based protection, as opposed to a patent-based protection.  Specifically, the Covenant Not to Sue applies to any Ericsson or Sony *product* that, but for the PCRA, would infringe any PCRA Patent.  As such, the provision is broader than a covenant not to sue on the PCRA Patents alone.  If a product (but for the PCRA) infringes a PCRA Patent, Wi-LAN cannot bring a claim against that product for infringement of *any* patent.  A764-65 (Art. III, § 1); A834-35 (Art. III, § 1).  In this way, Ericsson and Sony were compensated, in part, for the loss of their main litigation counsel on issues that bore directly on that counsel's experience, education and training.  *See* A762; A831.

---

[6] The PCRA refers to Ericsson's products as "LME Products."  A763-64 (Art. I, § 6).  "LME" refers to the company's full name, Telefonaktiebolaget LM Ericsson. *See, e.g.,* A478.

2.    The Most-Favored Licensee Provision

In addition to the Covenant Not to Sue, the PCRA also granted

Ericsson and Sony the right to a license, if they so chose and certain

conditions were met, on terms given to Wi-LAN's most-favored licensee:

> **In the event that Wi-LAN owns or controls the licensing of patents not already addressed under this Agreement and which are infringed or alleged to be infringed by UMTS/HSPA PRODUCTS,** WI-LAN hereby agrees that at any time during the TERM of this Agreement, at [Ericsson/Sony's] request, **WI-LAN will grant** to [Ericsson/Sony] and its AFFILIATES **a non-exclusive license** to make, have made, use, sell, offer for sale, lease or otherwise dispose of, and import [Ericsson/Sony] PRODUCTS including UMTS/HSPA PRODUCTS and Wi-LAN agrees to grant such a license **at most-favored licensee status as compared to any future licensee of WI-LAN.**

A767 (Art. VII, § 1) (emphasis added); A837 (Art. VII, § 1) (emphasis

added).

For Ericsson's and Sony's rights under the MFL Provision to

trigger, two conditions needed to be met:  (i) "[i]n the event that Wi-

LAN owns or controls the licensing of patents not already addressed

under the Agreement"; and (ii) those patents were "infringed or alleged

to be infringed by UMTS/HSPA PRODUCTS." *Id.*  UMTS/HSPA

PRODUCTS is broadly defined in the PCRA to include any product

complying with the UMTS standard, which includes within it the HSPA standard.  A764 (Art. I, § 8); A833 (Art. I, § 10).

Once those conditions were met, Ericsson and/or Sony had the right to invoke the MFL Provision.  Once they did so, Wi-LAN was obliged to grant Ericsson and/or Sony a license on terms at least as favorable as its most-favored licensee.  A767 (Art. VII, § 1); A837 (Art. VII, § 1).  Ericsson's and Sony's right, however, was limited to the terms of a license into which Wi-LAN entered *after* entering into the PCRA. *Id.*  In this way, the terms of any such agreement were entirely within Wi-LAN's control.

### 3.    The Limitation of Damages Provision

Article IV of the PCRA provides a third, and entirely different, form of protection for Ericsson and Sony.  That article provides for a limitation of damages in the event that Wi-LAN successfully prosecutes a patent infringement lawsuit against Ericsson or Sony involving UMTS/HSPA PRODUCTS.  A766 (Art. IV, § 1); A836 (Art. IV, § 1). Specifically, in the event that "liability results" from infringement by Ericsson's or Sony's UMTS/HSPA PRODUCTS of patents other than the

16

PCRA Patents, Wi-LAN's claims would be limited only to post-filing

damages:

> With respect to patents other than the [PCRA Patents] (to which Article III of this Agreement applies), and subject to the provisions of ARTICLE V hereof, **WI-LAN hereby agrees that no damages shall accrue against [Ericsson/Sony],** or its direct or indirect distributors, AFFILIATES and CUSTOMERS for infringement of any patents that, on or after the EFFECTIVE DATE, are owned or controlled by WI-LAN **where liability results from** making, having made, importing, using, selling, offering to sell or otherwise disposing of **[Ericsson's/Sony's] UMTS/HSPA PRODUCTS** and **damages shall only accrue** for such making, having made, importing, using, selling, offering to sell or otherwise disposing of UMTS/HSPA PRODUCTS **beginning after such time as WI-LAN commences an ACTION** against [ERICSSON / SONY] or its AFFILIATES relating to UMTS/HSPA PRODUCTS and infringement of said Wi-LAN patents.

A766 (Art. IV, § 1) (emphasis added); A836 (Art. IV, § 1) (emphasis

added).

Such a finding of liability may arise from a judgment on a

UMTS/HSPA PRODUCT that is not covered by the Covenant Not to

Sue.  Further, while the underlying claim of infringement may invoke

Ericsson's and Sony's rights under the MFL Provision, either company

may have chosen not to invoke its rights under that provision because

the proposed MFL terms were not acceptable, or because there was no

most-favored license to accept.  *See* A767 (Art. VII, § 1); A836 (Art. VII,

§ 1).  In any event, under the PCRA, Ericsson and Sony received multiple levels of protections and options to protect it from potential claims from Wi-LAN.

## C.    Wi-LAN Breached Its Covenant Not to Sue Under the PCRA

On October 5, 2010, Wi-LAN breached the Covenant Not to Sue by initiating the Texas Litigation.  *See* A1214-31.  In that litigation, Wi-LAN alleged that:  (1) the Texas Patents read on the HSPA standard; (2) the Texas Products comply with that standard; and (3) the Texas Products therefore infringe the Texas Patents.  A1217-31 at ¶¶ 19-22, 27, 35-42, 54-57; A851; A857-59; A1173, A1175; A1180-97.  Wi-LAN applied this same logic in alleging infringement of the PCRA Patents, claiming that any product that complied with the HSPA standard infringed at least one claim of the PCRA Patents.  A749 at ¶¶ 5-6; A755-56; A778-79; A752-881; A813-29.  Based on Wi-LAN's own allegations, therefore, but for the PCRA, the Texas Products infringe the PCRA Patents.  *See* A764-65 (Art. III, § 1); A834-35 (Art. III, § 1). As such, those products are covered by the Covenant Not to Sue.

On January 18, 2011, Ericsson and Sony requested that Wi-LAN dismiss its claims against the Texas Products based on the Covenant Not to Sue.  A752.  Wi-LAN refused to do so.  *Id.*; *see* A199-200.

## D.    Wi-LAN Breached Its Duties Under the MFL Provision

Wi-LAN's initiation of the Texas Litigation had an additional consequence.  That lawsuit also satisfied the conditions that allowed Ericsson and Sony to invoke the MFL Provision.  Specifically, Wi-LAN "owns" the Texas Patents, those patents were "not already addressed under the [PCRA]," and Wi-LAN alleged infringement of those patents by UMTS/HSPA PRODUCTS.  A764 (Art. I, § 8), A767 (Art. VII, § 1); A833 (Art. I, § 10), A837 (Art. VII, § 1); A1217-27 at ¶¶ 10-13, 19-22, 27, 35-42, 54-57.

Accordingly, on May 23, 2011, Ericsson and Sony placed Wi-LAN on notice that they were invoking their rights under the MFL Provision to receive, on their behalf and on behalf of their affiliates, a license on the same terms as Wi-LAN's most-favored licensee.  A478; A479.  At that time, neither Ericsson nor Sony knew if such a deal existed, the terms of a deal if one indeed did exist, or whether those terms would be

acceptable to either company.  A176 at ¶ 10.  Regardless, Wi-LAN

simply ignored Ericsson's and Sony's demands.  A176 at ¶ 9.

Over a year later, Ericsson came to learn that, almost two years

after entering into the PCRA, Wi-LAN had entered into the BelAir

License.  *See* A176 at ¶ 11; A204.  That agreement granted BelAir a

worldwide license to nearly all of the patents in Wi-LAN's portfolio.

A204 (Art. I, § 1.1), A212-13 (Schedule A), A214 (Schedule B).

Specifically, Wi-LAN granted BelAir the following license:

> [D]uring the **Term**, non-exclusive, non-assignable . . . world-wide,
> irrevocable (to the extent allowed hereunder) **licenses** under the
> **Licensed Patents** to make, have made, import, use, lease, offer for
> sale, sell, transfer and/or otherwise dispose of **Subject Products**, in
> each case with no right to grant sublicenses.

A204 (Art. I, § 1.1).  The "Term" of the BelAir License was for ten years,

through December 30, 2019, with an option for BelAir to extend the

term for another ten years to December 30, 2029.  A205-06 (Art III, §

3.1), A213 (Schedule A).  "Licensed Patents" included every patent in

Wi-LAN's portfolio except certain patents not asserted in either lawsuit,

and the "Subject Products" included any and all "products, components

or devices" sold by BelAir "that in any way whatsoever infringes any

invention(s) claimed in any Licensed Patent," with the exception of

certain digital subscriber line products not relevant to either case. A212 (Schedule A), A214 (Schedule B).

When Ericsson became aware of the BelAir License, it sent a second demand letter to Wi-LAN on November 8, 2012.  A216-17.  That letter reiterated Ericsson's decision to exercise its rights under the MFL Provision and requested that Wi-LAN grant Ericsson a license on the same terms as the BelAir License.  *Id.*  When Wi-LAN denied that request, Ericsson sent a third demand to Wi-LAN on February 1, 2013 requesting compliance with the MFL Provision.  A219-20.  Wi-LAN again refused, unwilling to comply with its obligations as set forth in the MFL Provision.  A177 at ¶ 13.

## SUMMARY OF THE ARGUMENT

Both summary judgment decisions arise from contractual defenses raised by Ericsson and Sony. In the PCRA, Ericsson and Sony negotiated three protections — a Covenant Not to Sue, a Limitation of Damages Provision and an MFL Provision. Of the three protections, the Covenant Not to Sue and MFL Provision form the basis of the defenses and counterclaims asserted by Ericsson and Sony in their motions and are the subject of this combined appeal.

For purposes of this appeal, the Covenant Not to Sue is applicable only to the Texas Litigation. The Covenant Not to Sue bars Wi-LAN from bringing that action. The plain language of that section bars any lawsuits against any Ericsson or Sony "PRODUCTS which would, but for this Agreement, infringe any [PCRA Patents]." Wi-LAN previously asserted that any product that complies with the HSPA standard infringes at least one claim of a PCRA Patent. Wi-LAN has asserted in the Texas Litigation that the Texas Products comply with that same HSPA standard. Therefore, according to Wi-LAN's own allegations, but for the PCRA, the Texas Products infringe the PCRA Patents. As a result, the Covenant Not to Sue bars the Texas Litigation.

In rejecting that argument, the Texas Court misinterpreted the Covenant Not to Sue. Despite its clear wording, the Texas Court interpreted the covenant to apply only to the PCRA Patents themselves, effectively reading out the "products" language from the covenant. The Texas Court apparently feared that Ericsson's and Sony's plain reading of the Covenant Not to Sue was at odds with the Limitation of Damages Provision, which contemplates the possibility of lawsuits on UMTS/HSPA PRODUCTS. Specifically, the Texas Court was concerned that Ericsson's and Sony's plain reading eliminated the possibility of any such lawsuit.

As detailed herein, however, a plain reading of the Covenant Not to Sue is entirely consonant with the Limitation of Damages Provision. Products that infringe the PCRA Patents are only a *subset* of UMTS/HSPA PRODUCTS. The Limitation of Damages Provision therefore covers a *broader* universe of products. As such, any number of products could, under a plain reading of both sections, fall outside the Covenant Not to Sue but within the Limitation of Damages Provision.

In addition to the Covenant Not to Sue, this appeal raises issues regarding the MFL Provision in the PCRA. The Florida Court correctly

ruled that the clear and unambiguous language of the MFL Provision requires Wi-LAN to grant a license on the same terms as the BelAir License.

Ericsson's and Sony's rights under the MFL Provision are triggered by two conditions: (1) "[i]n the event that Wi-LAN owns or controls the licensing of patents not already addressed under [the PCRA]"; and (2) those patents "are infringed or alleged to be infringed by UMTS/HSPA PRODUCTS." The first trigger has been satisfied because Wi-LAN owns the Texas Patents and those patents are not addressed by any other provision in the PCRA. The second trigger has been satisfied because, in the Texas Litigation, Wi-LAN accused Ericsson and Sony of infringing the Texas Patents by selling products that meet the PCRA's definition of "UMTS/HSPA PRODUCTS."

Wi-LAN does not dispute that the second trigger has been satisfied. Rather, Wi-LAN argues that the first trigger was not satisfied because, in its view, the MFL Provision applies only to patents Wi-LAN owned or controlled at the time the Parties signed the PCRA. In so arguing, however, Wi-LAN violates three basic tenets of contract interpretation. First, it attempts to read into the provision a non-

24

existent temporal limitation. A court may not, however, read non-existent terms into an agreement. Second, Wi-LAN ignores words that *do* exist. The relevant sentence begins: "*In the event that* Wi-LAN owns or controls . . . ." On its face, the language "[i]n the event that" expresses a condition contemplating both a present *and* future event. The PCRA's use of the present tense "owns or controls" is grammatically consistent with this interpretation. Third, whenever possible, contracts should be interpreted in a way that reconciles all provisions. Wi-LAN concedes that identical "in the event" language in other provisions contemplates a future event, but refuses to give that language the same (or, indeed, any) meaning in the MFL Provision. The other language in the PCRA cited by Wi-LAN in its Principal Brief, meanwhile, is entirely consistent with Ericsson's and Sony's plain reading of the provision. As such, the Florida Decision was correct.

In rejecting Ericsson's and Sony's arguments on the MFL Provision, the Texas Court relied upon reasoning neither party raised. According to the Texas Court, the Covenant Not to Sue "addresses" the PCRA Patents and the Limitation of Damages Provision "addresses" *all* other patents. The Texas Court thus reasoned that the Limitation of

25

Damages Provision necessarily must "address" the Texas Patents. Because the MFL Provision applies only to "patents not already addressed by the PCRA," the Texas Court concluded that Ericsson and Sony had failed to establish that their rights under the MFL Provision had been triggered by Wi-LAN's ownership of the Texas Patents.

The problem with this reasoning, of course, is that it renders the MFL Provision a nullity. If all patents are "addressed" either by the Covenant Not to Sue or the Limitation of Damages Provision, nothing remains for the MFL Provision. Wi-LAN not only ignores this problem in its Principal Brief, it implicitly adopts this flawed reasoning. As detailed herein, however, the MFL Provision and Limitation of Damages Provisions are entirely reconcilable. Indeed, the two provisions cover entirely different scenarios. As such, as the Florida Court ruled, Ericsson's and Sony's plain reading of the MFL Provision is correct.

Wi-LAN's remaining arguments are even less credible. Wi-LAN argues, for instance, that the MFL Provision provides only a right to a future, undefined license that itself contains a most-favored licensee provision. That argument, however, ignores the clear language of the

MFL Provision. That provision provides Ericsson and Sony with the right to a license "*at* most-favored licensee status," not a license "*with* a most-favored licensee clause," as Wi-LAN would now prefer the provision to read. Indeed, as discussed herein, Wi-LAN's strained interpretation again renders the MFL Provision meaningless, since that provision would, under Wi-LAN's reasoning, provide Ericsson and Sony with nothing more than the rights granted elsewhere in the PCRA.

Wi-LAN's efforts to re-write the MFL Provision to require a "similarly situated licensee" analysis are similarly misplaced. Article VII, which contains the MFL Provision, is clear. Once the conditions in the MFL Provision are satisfied, Ericsson and/or Sony may choose to enter into a license with Wi-LAN on terms offered to Wi-LAN's most-favored licensee. *Thereafter,* pursuant to Sections 2 and 3 of Article VII, Ericsson and/or Sony may elect to enter into another license on better terms, to the extent that Wi-LAN enters into a later, better license. In that instance, however, Ericsson and/or Sony may do so only if the licensee of that license is "similarly situated," based on the factors set forth in Section 3. Article VII is clear and entirely unambiguous.

Finally, Wi-LAN's efforts to limit the scope of the MFL Provision are the most absurd of all.  On its face, the provision grants a license to all Ericsson and Sony products, including but not limited to UMTS/HSPA PRODUCTS.  Wi-LAN's transparent effort to conflate a condition that triggers the MFL Provision with Ericsson's and Sony's rights once the provision is triggered is baseless.  Wi-LAN desperately wants to avoid granting Ericsson and Sony the terms granted to BelAir. It perceives such a result as unjust.  The reality, however, is that Wi-LAN's present situation is entirely of its own doing.  It controlled whether the conditions triggering the MFL Provision could be invoked, and it decided on the terms of the licenses it granted after executing the PCRA.  It initiated the Texas Lawsuit and it signed the BelAir License. It cannot now be heard to complain about circumstances arising from its own conduct.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment under the law of the regional circuit.  *See Lexion Medical LLC v. Northgate Techs. Inc.*, 641 F.3d 1352, 1358 (Fed. Cir. 2011) (affirming district court grant of summary judgment).  The Eleventh Circuit reviews a grant of summary judgment *de novo*.  *See Brown v. Chevy Chase Bank, FSB*, 137 Fed. Appx. 278, 278-79 (11th Cir. 2005) (affirming district court grant of summary judgment).  The Fifth Circuit, too, reviews a grant of summary judgment *de novo*.  *See Ramirez v. Knowlton*, 542 F.3d 124, 128 (5th Cir. 2008) (reversing a denial of summary judgment).

Summary judgment is appropriate if a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under New York law,[7] "[w]hen the construction of a contract is at issue, summary judgment is proper 'when the language is unambiguous and reasonable persons could not differ on its meaning.'"  *Kabushiki Kaisha Hattori*

---

[7] New York contract law controls interpretation of the PCRA.  A773 (Art. VIII, § 10); A843 (Art. VIII, § 10) ("This Agreement and matters connected with the performance thereof shall be construed, interpreted, applied and governed in all respects in accordance with the laws of the state of New York, USA.").

*Seiko v. Refac Tech. Dev. Corp.*, 690 F. Supp. 1339, 1342 (S.D.N.Y. 1988)  (internal citations omitted).  Both sides agree that the PCRA is unambiguous.  A652; A727.  As such, disposition on summary judgment is appropriate.  *See id.*

# ARGUMENT

The Texas Court erred in concluding that the Covenant Not to Sue did not apply to the Texas Litigation. *See* A51-53. Based on a plain reading, the parties did not limit the Covenant Not to Sue to suits on just the four PCRA patents, as the Texas Court concluded. *See* A53. Rather, the Parties drafted the Covenant Not to Sue to cover all ***products*** that fell within the scope of any claim of a PCRA Patent. *See* A764-65 (Art. III, § 1); A834-35 (Art. III, § 1). Because Wi-LAN previously alleged that any product compliant with the HSPA standard necessarily reads on the PCRA Patents, and it further alleged in the Texas Litigation that the Texas Products are compliant with that same HSPA standard, the accused Texas Products fall squarely within the PCRA's Covenant Not to Sue.

The Florida Court, meanwhile, was correct in concluding that Ericsson had the right to invoke the MFL Provision and accept the terms of the BelAir License. *See* A8-9. Ericsson and Sony may invoke their rights under the MFL Provision: (1) "[i]n the event that Wi-LAN owns or controls the licensing of patents not already addressed under the [PCRA];" and (2) Wi-LAN alleges that UMTS/HSPA PRODUCTS, as

31

that term is used in the PCRA, infringe at least one of those patents.

A767 (Art. VII, § 1); A837 (Art. VII, § 1).  Both of those conditions were

met when Wi-LAN filed the Texas Lawsuit.  In that lawsuit, Wi-LAN

alleged that Ericsson and Sony infringed patents owned by Wi-LAN

through Ericsson's and Sony's sale of products that meet the definition

of UMTS/HSPA PRODUCTS under the PCRA.  A764 (Art. I, § 8), A767

(Art. VII, § 1); A833 (Art. I, §10), A837 (Art. VII, § 1); A1217-27 at ¶¶

10-13, 19-22, 27, 35-42, 54-57.  Those patents are not otherwise

addressed in the PCRA.  As such, Ericsson is entitled to invoke its

rights under the MFL Provision, and the Florida Court properly ruled

that BelAir was Wi-LAN's most-favored licensee.

## I.   THE CLAIMS IN THE TEXAS LITIGATION ARE BARRED BY THE UNAMBIGUOUS LANGUAGE IN THE COVENANT NOT TO SUE

Under the unambiguous language of the Covenant Not to Sue, any

product that would infringe the PCRA Patents but for the protections of

the PCRA is covered.  Wi-LAN has asserted that the PCRA Patents

cover any product that complies with the HSPA standard.  A749 at ¶¶

5-6; A755-56; A778-79; A781-811; A813-29.  The Texas Products are

compliant with that standard, as Wi-LAN alleged in the Texas

Litigation.  A1217-31 at ¶¶ 19-22, 27, 35-42, 54-57; A851; A857-59;

A1173, A1175; A1180-97.  Accordingly, Ericsson and Sony are entitled

to summary judgment that the Covenant Not to Sue bars the Texas

Litigation.

### A.    The PCRA Applies to the Texas Products

The Covenant Not to Sue applies to claims brought by Wi-LAN

that are made "in connection with making, using, selling, offering to sell

or importing [Ericsson/Sony] PRODUCTS which would, but for this

Agreement, infringe any [PCRA Patents]."  A764-65 (Art. III, § 1);

A834-35 (Art. III, § 1).  Wi-LAN asserts, and the Texas Court agreed,

that the above language protects Ericsson and Sony only from suits

brought on the PCRA Patents themselves.  WL at 8, 12-13, 21; A52-53.[8]

In other words, Wi-LAN claims that, in the Covenant Not to Sue, it

agreed only not to sue Ericsson or Sony for infringement of the four

PCRA Patents.  WL at 8, 12-13, 21.  The Texas Court adopted this

reasoning, concluding that "the PCRA Agreements bar actions for

infringement of the four specified PCRA Patents."  A53.

---

[8] "WL at __" refers to Wi-LAN's Principal Brief.

That interpretation, however, is contrary to the plain language of the Covenant.  On its face, the Covenant Not to Sue bars Wi-LAN from pursuing a cause of action against any of Ericsson's and Sony's "***PRODUCTS*** which would, but for this Agreement, infringe any [PCRA Patents]."  A764-65 (Art. III, § 1); A834-35 (Art. III, § 1) (emphasis added).  This language clearly and unambiguously provides Ericsson and Sony with protection for all *products* that, but for the PCRA, would infringe the PCRA Patents.  Put differently, under the Covenant Not to Sue, Wi-LAN may not assert an infringement claim under *any* patent, if that claim is brought against a *product* that would infringe a PCRA Patent.  Any other interpretation does violence to the clear language and grammatical structure of the provision.

Indeed, by trying to limit the Covenant Not to Sue only to the PCRA Patents, Wi-LAN seeks to re-write the provision, effectively removing the crossed-out language and adding the bracketed language below:

> Subject to the provisions of ARTICLE V hereof, WI-LAN hereby irrevocably covenants that neither WI-LAN nor its AFFILIATES will, directly or indirectly, alone or by, with or through others, cause, induce or authorize, or voluntarily assist, participate or cooperate in, the commencement, maintenance or prosecution of any ACTION seeking or having the tendency to establish any

34

> liability on the part of, or to exact any sanction or penalty, or any injunctive, equitable, legal, declaratory, administrative or other relief from or against, LME, its direct or indirect distributors, AFFILIATES, CUSTOMERS or any other individual or entity arising from, by reason of, or in connection with ~~making, using, selling, offering to sell or importing LME PRODUCTS which would, but for this Agreement,~~ the infringe[ment of] any WI-LAN PATENTS.[9]

*Id.* To comport with Wi-LAN's interpretation, therefore, this Court would have to remove any reference to "PRODUCTS" in the Covenant Not to Sue. Such an approach to contract interpretation is improper. *See Korosh v. Korosh*, 99 A.D.3d 909, 911 (N.Y. App. Div. 2012) ("A court may not . . . under the guise of construction, add or excise terms . . ."). Indeed, had the Parties wanted to limit the Covenant Not to Sue only to the PCRA Patents, they could have done so by using plain language in the agreement. While they did so in other agreements, A728 n.50; A861-66, they did not do so here.

In ruling as it did, the Texas Court was concerned that Ericsson's and Sony's plain-language interpretation made the Covenant Not to Sue inconsistent with the Limitation of Damages Provision. A52-53.

---

[9] WI-LAN PATENTS are the same as the PCRA Patents. The quoted provision is from Ericsson's PCRA. Sony's PCRA contains identical language except that it relates to Sony's products rather than Ericsson's (or "LME's") products.

Specifically, the Texas Court first observed that the Limitation of Damages Provision "contemplates actions commenced by Wi-LAN against Defendants' UMTS/HSPA Products for infringement of patents, *other* than the PCRA Patents." A53 (emphasis in original). Based on that provision and the definition of UMTS/HSPA PRODUCTS, the Texas Court then concluded that "reading the Agreements to bar all lawsuits against any HSPA-compliant products would directly contradict the Parties' Agreement." A53. In other words, the Texas Court believed that, if it adopted Ericsson's and Sony's plain reading of the Covenant Not to Sue, no litigation contemplated in the Limitation of Damages Provision could ever arise. *See* A52-53.

Ericsson's and Sony's reading of the Covenant Not to Sue, however, is entirely consistent with the Limitation of Damages Provision. The Limitation of Damages Provision provides Ericsson and Sony with a limitation of damages defense if Wi-LAN brings a successful infringement suit against Ericsson's or Sony's "UMTS/HSPA PRODUCTS":

> With respect to patents other than the [PCRA Patents] (to which Article III of this Agreement applies), and subject to the provisions of ARTICLE V hereof, **WI-LAN hereby agrees that no damages shall accrue against [Ericsson/Sony]**, or its direct or indirect

36

distributors, AFFILIATES and CUSTOMERS **for infringement of any patents** that, on or after the EFFECTIVE DATE, are owned or controlled by WI-LAN **where liability results from making, having made, importing, using, selling, offering to sell or otherwise disposing of [Ericsson or Sony's] UMTS/HSPA PRODUCTS and damages shall only accrue** for such making, having made, importing, using, selling, offering to sell or otherwise disposing of UMTS/HSPA PRODUCTS beginning **after such time as WI-LAN commences an ACTION against [Ericsson/Sony]** or its AFFILIATES relating to **[Ericsson/Sony]** UMTS/HSPA PRODUCTS and infringement of said WI-LAN patents.

A766 (Art. IV, § 1); A836 (Art. IV, § 1) (emphasis added). This protection is narrower than the Covenant Not to Sue in that only one event triggers the provision: a successful patent suit against either Ericsson's or Sony's UMTS/HSPA PRODUCTS. *Id.* In that instance, Ericsson and Sony may invoke their right to a limitation on damages. *Id.*

On the other hand, the Limitation of Damages Provision provides broader protection than the Covenant Not to Sue in that it covers patents and products that the Covenant Not to Sue does not. Specifically, covered products under the Limitation of Damages Provision are "UMTS/HSPA PRODUCTS," while covered products under the Covenant Not to Sue are only those products that infringe the PCRA Patents. *See id.*; A764-65 (Art. III, § 1); A834-35 (Art. III, § 1).

37

Under the PCRA, "UMTS/HSPA PRODUCTS" is defined as:

> any PRODUCT complying with the **21 - 35 series of 3GPP agreed protocols** and/or protocol standards issued by other relevant telecommunications standards setting body which include substantially corresponding to the 21- 35 series of 3GPP agreed protocols irrespective of the frequency band (by way of non-limiting example, including the ETSI TS-125 protocols), as well as any new releases or updates of such protocols.

A764 (Art. I, § 10); A833 (Art. I, § 10).  The PCRA Patents, according to Wi-LAN, cover products compliant with the HSPA standard.  A749 at ¶¶ 5-6; A755-56; A778-79; A781-811; A813-29.  The HSPA standard, which deals with the transmission of data (not voice), is a subset of the broader UMTS standard.  A739-40 at ¶¶ 7-8.  The provisions governing HSPA are found in Series 25 of the standard, while the broader UMTS standard covers Series 21 through 35.  A739-40 at ¶¶ 5-8.  So, for example, Wi-LAN could not bring a suit pursuant to the Covenant Not to Sue on HSPA products compliant with the Series 25 specifications, but could, for example, sue on UMTS/HSPA PRODUCTS compliant with only the Series 21 specifications.  In that latter example, pursuant to the Limitation of Damages Provision, a successful lawsuit would be limited to post-filing damages.

An example of a product that is subject to the Limitation of Damages Provision but not the Covenant Not to Sue is Ericsson's Media Gateway for Mobile Networks (M-MGw R6.0). A740 at ¶ 10. That product does not comply with the HSPA standard. A740 at ¶ 10. As such, it is not subject to the Covenant Not to Sue. *See* A764-65 (Art. III, § 1); A834-35 (Art. III, § 1); *see also* A766 (Art. IV, § 1); A836 (Art. IV, § 1). That product is, however, subject to the Limitation of Damages Provision as a UMTS/HSPA PRODUCT, to the extent that Wi-LAN could establish infringement of some other Wi-LAN patent. In this way, Ericsson's and Sony's plain-reading of the Covenant Not to Sue is entirely compatible with the Limitation of Damages Provision. *Id.*

The Texas Court did not recognize this distinction, however. A52-53. The court misinterpreted Ericsson's and Sony's reading of the Covenant Not to Sue to cover all UMTS/HSPA PRODUCTS which, in its view, rendered the Limitation of Damages Provision a nullity. *Id.* The two provisions in fact apply to different sets of products and circumstances and therefore are harmonious under Ericsson's and Sony's plain reading of the Covenant Not to Sue.

\*  \*  \*  \*

39

Ultimately, Ericsson and Sony sought protection for *products* under the Covenant Not to Sue because of the McKool Smith conflict of interest. Both Ericsson and Sony had expended significant time and money teaching complicated technology – technology contained in the very products covered by the Covenant Not to Sue – to McKool Smith's attorneys. A746 at ¶ 6. When McKool Smith began representing Wi-LAN, Ericsson and Sony lost the counsel best suited to defend Wi-LAN's present and potentially future claims of infringement. *See* A742-46 at ¶¶ 4-6. They also understood that McKool Smith was working at cross-purposes to their interests in other Wi-LAN litigation. *See id*.

Before they were willing to concede to Wi-LAN's continuing use of McKool Smith, Ericsson and Sony demanded and received broad protections that made future litigation against Wi-LAN unlikely. They also made sure by the PCRA that neither Ericsson nor Sony would have to, in any future dispute with Wi-LAN, pay another firm to learn the technology that both companies had already paid McKool Smith to learn. The Covenant Not to Sue reflected part of their effort to achieve those goals. A764-65 (Art. III, § 1); A834-35 (Art. III, § 1).

**B.    Wi-LAN Breached the Covenant Not to Sue Provision by Initiating the Texas Litigation**

Wi-LAN does not dispute that any product that complies with the HSPA standard necessarily infringes at least one claim of the PCRA Patents.  A749 at ¶¶ 5-6; A755-56; A778-79; A781-811; A813-29.  In fact, Wi-LAN's original allegations against Sony mapped the HSPA standard — not any Sony product — to the PCRA Patents' claims.  *Id.*

Wi-LAN also does not dispute that, in the Texas Litigation, it alleged that the Texas Products infringed the Texas Patents because they were compliant with that same HSPA standard.  *See* A1217-31 at ¶¶ 19-22, 27, 35-42, 54-57; A851; A857-59; A1173, A1175; A1180-97.  By averring that the Texas Products were compliant with the HSPA standard, Wi-LAN's claims establish, for purposes of invoking the Covenant Not to Sue, that the Texas Products necessarily infringe at least one of PCRA Patents.  *See id.*

Although it does not rely on it, the Texas Court observed that neither Ericsson nor Sony "concede that the accused products infringe the PCR[A] Patents."  A52.  While such a concession should not be necessary, Ericsson and Sony are prepared to stipulate for purposes of the Texas Litigation and for the limited purpose of invoking the

Covenant Not to Sue that the Texas Products infringe at least one claim of one of the PCRA Patents.  *See Schwartz v. Million Air, Inc.*, 341 F.3d 1220, 1223-26 (11th Cir. 2003) (describing Court of Appeals' "equitable power" to supplement record).  In any event, pursuant to Wi-LAN's own claims, the Covenant Not to Sue applies, and summary judgment in the Texas Litigation in favor of Ericsson and Sony is appropriate.

## II.    PURSUANT TO THE UNAMBIGUOUS LANGUAGE OF THE MFL PROVISION, ERICSSON AND SONY ARE ENTITLED TO THE TERMS OF THE BELAIR LICENSE

In the MFL Provision, the Parties agreed that Ericsson and Sony would have the right to acquire a license from Wi-LAN under most-favored terms if certain conditions were met.  A767 (Art. VII, § 1); A837 (Art. VII, § 1).  When Wi-LAN sued Ericsson and Sony in Texas, those conditions were met.  *See* A1217-31 at ¶¶ 19-22, 27, 35-42, 54-57; A851, A857-59; A1173, A1175; A1180-97.  Ericsson and Sony thereafter invoked their rights under the MFL Provision and are prepared to accept BelAir as Wi-LAN's most-favored licensee.  *See* A478; A479; A216-17; A219-20.  Ericsson and Sony therefore are entitled to a license on the same terms as the BelAir License.

A.    **The Clear and Unambiguous Terms of the MFL Provision Entitle Ericsson and Sony to a License on the Same Terms as Wi-LAN's Most-Favored Licensee**

1.    **The MFL Provision Is Clear and Unambiguous**

The MFL Provision entitles Ericsson and Sony to a license "at most-favored licensee status as compared to any future licensee of Wi-LAN," once Ericsson's and Sony's rights under the MFL Provision are triggered.  A767 (Art. VII, § 1); A837 (Art. VII, § 1).  The MFL Provision provides:

> **In the event that Wi-LAN owns or controls the licensing of patents not already addressed under this Agreement and which are infringed or alleged to be infringed by UMTS/HSPA PRODUCTS**, WI-LAN hereby agrees that at any time during the TERM of this Agreement, at [ERICSSON/SONY]'s request, **WI-LAN will grant** to [ERICSSON/SONY] and its AFFILIATES a non-exclusive license to make, have made, use, sell, offer for sale, lease or otherwise dispose of, and import [ERICSSON/SONY] PRODUCTS including UMTS/HSPA PRODUCTS and Wi-LAN agrees to grant such **a license at most-favored licensee status as compared to any future licensee of WI-LAN**.

*Id.* (emphasis added).

Two conditions must be met to trigger Ericsson's and Sony's rights under the MFL Provision:  (i) "[i]n the event that Wi-LAN owns or controls the licensing of patents not already addressed under [the PCRA]"; and (ii) those patents "are infringed or alleged to be infringed by UMTS/HSPA PRODUCTS."  *Id.*  Wi-LAN does not dispute that it

43

satisfied the second condition when it accused Ericsson and Sony of infringing the Texas Patents by selling UMTS/HSPA PRODUCTS. A1217-31 at ¶¶ 19-22, 27, 35-42, 54-57; A851; A857-59; A1173, A1175; A1180-97; s*ee* WL at 21-33; A252-57; A406-09; A639-43.  Rather, Wi-LAN claims that the first condition — "[i]n the event Wi-LAN owns or controls the licensing of patents not already addressed under [the PCRA]" — has not been met.  *See* WL at 21-33.  Specifically, while Wi-LAN does not dispute that it owns the Texas Patents (which it acquired in 2009), Wi-LAN claims that the MFL Provision applies only to patents that Wi-LAN owned or controlled on the Effective Date of the PCRA. *Id.*; A639-41.  Patents acquired after that date, Wi-LAN argues, are not covered by the MFL Provision.  *Id.*

A plain reading of the MFL Provision, however, contradicts Wi-LAN's strained interpretation.  The MFL Provision begins:  "[i]n the event that Wi-LAN owns or controls the licensing of patents not already addressed under this Agreement . . . ."  A767 (Art. VII, § 1); A837 (Art. VII, § 1) (emphasis added).  The common sense interpretation of that phrase, read as a whole, is that it is conditional in nature.  *See Western Publishing Co., Inc. v. Midgames, Inc.*, 995 F. Supp. 949, 955 (E.D. Wis.

1998) ("The words 'in the event' create a condition"); *State Farm Fire &*

*Cas. Co. v. LeBlanc*, No. 12-11637, 2012 WL 5199253, at *3 (11th Cir.

2012) (holding that phrase "Duties in the Event of . . . Claim or Suit" in

insurance policy "clearly expresses the intention that the notice

provisions be treated as conditions precedent to coverage"); *Pfizer Inc. v.*

*Elan Pharm.*, 812 F. Supp. 1352, 1363 (D. Del. 1993) ("'In the event

that' is commonly defined to mean 'if it should happen that'"), citing

Webster's New World Dictionary 471 (College ed. 1988); Bryan A.

Garner, A Dictionary of Modern Legal Usage 465 (2d ed. 1995) ("'[I]n

the event that' is unnecessarily prolix for *if*."); Oxford Dictionary, Event,

http://www.oxforddictionaries.com/us/definition/american_english/event

(last visited November 7, 2013) ("in the event that" means "if; should it

happen that").[10]

Nothing in that conditional statement, however, contains a

temporal limitation, as Wi-LAN suggests. *See* WL at 22-33. Certainly,

had the Parties wanted the condition to be limited to patents that Wi-

---

[10] New York courts commonly refer to dictionaries when interpreting
contracts. *See Mazzola v. County of Suffolk*, 143 A.D.2d 734, 735 (N.Y.
App. Div. 1988) ("[I]t is common practice for the courts of this State to
refer to the dictionary to determine the plain and ordinary meaning of
words to a contract.").

LAN owned as of the Effective Date, they could have done so.  For

example, the Parties could have drafted the MFL Provision to include

an adverb (italicized) that expresses a temporal limitation:  "[i]n the

event that Wi-LAN *currently* owns or controls the licensing of patents . .

. ."  Because the Parties did not do so, this Court should not entertain

Wi-LAN's invitation to add a temporal limitation itself.  *See Korosh*, 99

A.D.3d at 911 ("A court may not write into a contract conditions the

parties did not insert or, under the guise of construction, add or excise

terms, and it may not construe the language in such a way as would

distort the apparent meaning."); *see also Nicaj v. City of New York*,

2009 WL 513941, at *1-2 (S.D.N.Y. 2009) ("Because no time period is

specified, the agreement does not provide a basis upon which to award

interest based on delayed payment."); *Zhou v. LaGrange Academy, Inc.*,

266 Ga. App. 445, 450-51 (2004) ("[T]he parties are bound by the terms

of the contract, and there was no time limitation imposed on the

Academy's right to terminate the contract.  Therefore, we reject . . .

attempts to impose additional terms in the contract." (footnote

omitted)).

As such, the Court need look no further than Ericsson's and Sony's common sense reading of a conditional statement in deciding this issue. On its face, the MFL Provision applies to patents owned or controlled by Wi-LAN, whether at the time of the signing of the PCRA or thereafter.

### 2. Present-Tense Verbs in a Conditional Statement Refer to Both Present and Future Events

Wi-LAN claims that, because the MFL Provision uses "owns or controls," the MFL Provision is limited to patents "that Wi-LAN 'owns or controls' on the Effective Date of the PCR Agreements." WL at 22-23. As a matter of grammatical construction, however, Wi-LAN is wrong. Under accepted rules of grammar, conditional phrases that use present-tense verbs contemplate both present *and* future events to satisfy that condition.[11] This type of conditional statement is referred to as a "predictive conditional." Diana Hacker and Nancy Sommers, THE BEDFORD HANDBOOK 321 (8th ed. 2010). "To form a predictive sentence, use a present-tense verb in the subordinate clause; in the independent

---

[11] *See* The University of North Carolina at Chapel Hill, The Writing Center, Conditionals: Verb Tense in "If" Clauses, http://writingcenter.unc.edu/handouts/conditionals-verb-tense-in-if-clauses (last visited Jan. 7, 2014).

clause, use the modal *will*, *can*, *may*, *should*, or *might* plus the base

form of the verb." *Id.* (emphasis in original).

For example, the opening clause of, "If the Red Sox *win* the World

Series, then Bostonians will be happy," uses the present-tense verb of

"win." No rational reading of that clause, however, would limit its

applicability to present events alone. Instead, a normal reading applies

the condition to both present and future events. The same analysis

applies to the condition contained in the MFL Provision.

Courts regularly rely upon grammatical rules to interpret

agreements. *See In re Airadigm Comms., Inc.*, 616 F.3d 642, 655 n.8

(7th Cir. 2010) ("Courts frequently turn to rules of grammar to aid

interpretation."); *In re Enron Creditors Recovery Corp.*, 30 B.R. 307,

322 (S.D.N.Y. 2008) ("under ordinary contract construction rules, the

rules of English grammar apply"). Where, as here, the rules of English

usage define the proper scope of an unambiguous provision, this Court

should not entertain Wi-LAN's request to modify it to impose a present-

only temporal limitation. *See Korosh*, 99 A.D.3d at 911; *see also Nicaj*,

2009 WL 513941 at *1-2; *Zhou*, 266 Ga. App. at 450-51.

Moreover, the cases that Wi-LAN cites do not challenge this grammatical rule. WL at 26-28. Those cases interpret present-tense factual statements or promises, not usage in the context of a conditional clause. For example, the district court in *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.* found that a factual statement did not extend into the future: "WHEREAS, LICENSOR [Chic] is the owner of the rights . . . ." 361 F. Supp. 2d 210, 213 (S.D.N.Y. 2005). In that sentence, no conditional statement prefaced the present-tense verb "is." Likewise, in *Unova, Inc. v. Acer Inc.*, this Court found that a release applied only to the present: "[Unova] hereby releases Compaq, its parents, and its Subsidiaries . . . ." 363 F.3d 1278, 1282 (Fed. Cir. 2004).[12] Again, no conditional statement prefaced the present-tense verb "releases." None of these cases, therefore, discusses the use of the present tense in a conditional clause, which is precisely the language at issue in this litigation, and none stand for the proposition that the use of the present tense in a conditional statement somehow excludes future events from meeting that condition.

---

[12] Wi-LAN also cites to *VKK Corp. v. National Football League*, which also interprets a release written in the present tense. 244 F.3d 114, 130 (2d Cir. 2001).

### 3. Ericsson's and Sony's Reading of the MFL Provision Is Harmonious With Other Portions of the PCRA

Ericsson's and Sony's straightforward reading of the MFL Provision's conditional statement is harmonious with other portions of the PCRA as well.  *See In the Matter of El-Roh Realty Corp.*, 74 A.D.3d 1796, 1799 (N.Y. App. Div. 2010) (contracts "should be interpreted in a way [that] reconciles all its provisions, if possible.") (citation omitted).  As the Florida Court noted, this same "in the event" language is used in Article VII, Section 6, which "necessarily should be construed as referring to future events."  A8 n.8.  In fact, Wi-LAN itself agrees that, in that section of the PCRA, the phrase "[i]n the event the parties *are* unable to select an arbitrator . . ." refers to a future event, notwithstanding the use of the present tense "are" in that condition.  WL at 30-31 (emphasis added).

Similar language appears in the Covenant Not to Sue, and again refers to an event that may occur in the future:  "In the event that Wi-LAN *asserts* any rights that it may have against a LME supplier or an

AFFILIATE supplier . . . .”[13]  A764-65 (Art. III, § 1); A834-35 (Art. III, § 1) (emphasis added).  By its plain language, the phrase “[i]n the event that,” as used in the Covenant Not to Sue, applies to events that have not yet occurred as of the Effective Date of the PCRA, notwithstanding the use of the present tense “asserts.”  The only way to harmonize these contractual provisions is to interpret the MFL Provision the same way, as contemplating the possibility of an event that may occur in the future.

Other language cited by Wi-LAN does not change that conclusion.  According to Wi-LAN, the phrase “. . . any other patents owned or controlled by Wi-LAN . . .” found in Art. VII, § 7 refers to the present tense even though framed in the past tense.  WL at 23-25; A768 (Art. VII, §7); A838 (Art. VII, § 7).  Further, Wi-LAN takes the position that, to make “owned or controlled” mean more than the present (*i.e.* the future as well), more words must be added.  WL at 23-25.  The words used in the PCRA, however, are not consistent.  They include “now or hereinafter” (Art. VII, § 7) in one instance, and “on or after the

_____

[13] Notably, Wi-LAN does not address the use of “[i]n the event that” found in Art. III, §1 in its Brief.  *See* WL at 21-34; A764-65 (Art. III, §1), A834-35 (Art. III, §1).

EFFECTIVE DATE" (Art. IV) in another.  WL at 23-25; A768 (Art. VII, § 7); A838 (Art. VII, § 7); A766 (Art. IV, § 1); A836 (Art. IV, § 1).

In those instances, Wi-LAN provides meaning to those terms as modifiers for "owned or controlled."  *See* WL at 22-33.  Wi-LAN is not willing, on the other hand, to provide meaning to the phrase "in the event that."  *See* WL at 21-34.  As the use of that term in other sections reveals, "in the event that" is a conditional phrase that covers both present and future events.  Yet, Wi-LAN assigns no meaning to the phrase at all.  *See id.*

Further, by Wi-LAN's own reasoning, to be consistent with the rest of the PCRA, the MFL Provision should read:  "For any patents *owned or controlled* by Wi-LAN that are not already addressed under this Agreement . . . ."  *See* WL at 23-25.  That is the only language in the PCRA that, according to Wi-LAN, connotes present tense.  *See id.*  The Parties did not choose that language, however.  Instead, they agreed to a conditional statement that applies to patents that Wi-LAN owned or controlled as of the PCRA's Effective Date, as well as patents that Wi-LAN owns or controls in the future.  As such, the Florida Court

correctly ruled that Ericsson's and Sony's rights under the MFL Provision had been triggered.

Moreover, Wi-LAN's improper assertion that only one phrase in the PCRA is capable of communicating the present tense, WL at 23-25, is undermined by its recognition that at least two different phrases in the PCRA signify that a condition may apply to both the present and the future. *See* WL at 25, 29. Specifically, Wi-LAN states that two different phrases, "now or hereafter" and "on or after the EFFECTIVE DATE," equally indicate both the present and future. *See id.*; A768 (Art. VII, § 7); A838 (Art. VII, § 7); A766 (Art. IV, § 1); A836 (Art. IV, § 1). Wi-LAN cites to no authority that contracts cannot use different language to communicate the same meaning. *See* WL at 23-25. "[I]n the event that" is merely an additional way to signify both the present and the future.

### 4.    The Texas Patents Are Not "Addressed" in the Limitation of Damages Provision

Wi-LAN claims that the Texas Court held that "the Texas action *did not* trigger the MFL Provision because the Texas Patents, as after-acquired patents, were not within the scope of that Provision." WL at 14 (emphasis in original). As the ensuing quote in Wi-LAN's Principal

Brief makes clear, however, Wi-LAN's characterization of the Texas Decision is not accurate. In reality, the Texas Decision relied on flawed reasoning, not advanced by either party in their papers, in denying Ericsson's and Sony's motion. That reasoning would, if adopted by this Court, render the MFL Provision a nullity.

In its decision, the Texas Court focused on the condition in the MFL Provision that the section applies only to "patents not already addressed under [the PCRA]." A53-54. With that language in mind, the Texas Court first concluded that the Covenant Not to Sue "addressed" the four PCRA Patents. A53-55. It then concluded that the Limitation of Damages Provision "addressed" all other patents because that provision begins with the phrase: "[w]ith respect to patents other than the [PCRA Patents] (to which Article III of this Agreement applies) . . . ." A54. Relying upon this language, the Texas Court concluded that (1) because the Limitations of Damages Provision addressed all patents except those addressed by the Covenant Not to Sue, and (2) the Texas Patents were not addressed by the Covenant Not to Sue, then (3) the Texas Patents must be addressed by the Limitation of Damages Provision. A54-55. As such, because the Texas Patents

were, under the Texas Court's reasoning, "already addressed" under the PCRA, they could not be subject to the MFL Provision. *Id.*

The problem with this reasoning, of course, is that no patents could ever be "addressed" in the MFL Provision. In the Texas Court's eyes, the Covenant Not to Sue and Limitation of Damages Provision combine to "address" *all* patents. *See* A54. Such an interpretation would render the MFL Provision superfluous, in clear violation of accepted principles of contract interpretation. *See, e.g., Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 263 (2d Cir. 2011) ("[a] contract should be construed so as to give full meaning and effect to all of its provisions.") (citation omitted); *In the Matter of El-Roh Realty Corp.*, 74 A.D.3d at 1799 (explaining that contract "should be interpreted in a way [that] reconciles all its provisions, if possible") (citation omitted).

In fact, however, the Limitation of Damages Provision addresses only a narrow set of patents. Specifically, the Limitation of Damages Provision addresses only those patents that Wi-LAN has successfully proven, in court, were infringed by Ericsson's and/or Sony's UMTS/HSPA PRODUCTS. A766 (Art. IV, § 1); A836 (Art. IV, § 1). When Wi-LAN filed the Texas Litigation, the Texas Patents had not

been adjudicated as infringed by either Ericsson's or Sony's UMTS/HSPA PRODUCTS.  *See* A1214-31.  Indeed, even after submitting the question to the jury, the jury did not find Ericsson or Sony liable for infringing any of the Texas Patents.  Jury Verdict, *Wi-LAN Inc. v. Alcatel-Lucent USA Inc. et al*, 6:10-cv-00521-LED (E.D. Tex. Jan. 28, 2014), ECF No. 465.  As a result, the conditions for the Limitation of Damages Provision were never satisfied, and that provision therefore never "addressed" the Texas Patents.[14]  As such, at least until such time as Ericsson's and/or Sony's UMTS/HSPA PRODUCTS were adjudicated to have infringed the Texas Patents, Ericsson and Sony had the right (but not the obligation) to invoke the MFL Provision.  *See* A766 (Art. IV, § 1); A836 (Art. IV, § 1).

Wi-LAN, meanwhile, not only ignores the Texas Court's nullity problem, but implicitly adopts it.  In Wi-LAN's Principal Brief, it seeks to reconcile the three applicable provisions.  WL at 21.  It begins by improperly limiting the Covenant Not to Sue to the four PCRA Patents, and then broadly claims that the Limitation of Damages Provision

---

[14] In contrast, had Ericsson or Sony lost that trial, the Limitation of Damages Provision would have triggered, at which point the Texas Patents would have been "addressed" by that provision.

covers all other "UMTS/HSPA patents, regardless of whether Wi-LAN owned them on the Effective Date of the Agreement or acquired them in the future." *Id.* Finally, the MFL Provision, according to Wi-LAN, also covers UMTS/HSPA patents, but only those owned or controlled by Wi-LAN as of the Effective Date. *Id.* Wi-LAN's improper interpretation of the PCRA's various provisions is illustrated below:



Under this construction, the MFL Provision, like under the Texas Court's rationale, could never be invoked. Because the patents addressed in the MFL Provision are a subset of the patents addressed by the Limitation of Damages Provision, any patents potentially addressed in the MFL Provision will, by definition, *always* be addressed by the Limitation of Damages Provision. Such an interpretation renders the MFL Provision a legal nullity and is, therefore, legally

improper. *See Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 599 (N.Y. 1961) ("It is a cardinal rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract . . . without force and effect." (alteration in original) (internal quotations marks omitted)).

### B. Ericsson and Sony Are Entitled to the Terms of the BelAir License

#### 1. Ericsson and Sony Requested a License With Most-Favored Licensee Terms During the Term of the PCRA

To invoke their rights to a license with terms at least as favorable as Wi-LAN's most-favored licensee, Ericsson and Sony were obligated to do only one thing — request a license during the term of the PCRA. A767 (Art. VII, § 1); A837 (Art. VII, § 1). Ericsson and Sony have satisfied that condition. *See* A478; A479; A216-17; A219-20.

The PCRA runs from November 1, 2007 through September 3, 2019. A763-64 (Art. I, §§ 4, 7); A832-33 (Art. I, §§ 4, 9). Within that time frame, Ericsson and Sony demanded a license under the same terms as Wi-LAN's most-favored licensee. *See* A478, A479, A216-17, A219-20. First, through correspondence to Wi-LAN dated May 23, 2011, both Ericsson and Sony invoked their rights under the MFL Provision

and requested information regarding the patent licenses granted by Wi-LAN to third parties.  A478; A479.  As a consequence of that correspondence, Ericsson and Sony became entitled to the benefits of the MFL Provision.  *See Epic Sys. Corp. v. Allcare Health Mgmt. Sys., Inc.*, No. 4:02-CV-161-A, 2002 WL 31051023, at *6 (N.D. Tex. September 11, 2002) ("Although the license agreement does not specifically provide that defendant must notify plaintiff upon entering into a license agreement with a third party upon more favorable financial terms, such an obligation is implicit.").

Although nothing further was required under the PCRA, Ericsson nonetheless provided Wi-LAN with a second opportunity to satisfy its contractual obligations on November 8, 2012.  A216-17.  At that time, Ericsson sent a second letter to Wi-LAN, in which it again expressly invoked its rights under the MFL Provision.  *Id.*  In that letter, having recently become aware of the BelAir License, Ericsson specifically requested that Wi-LAN grant a license on terms at least as favorable as those granted to BelAir.  *Id.*  Ericsson then asserted its rights a third time, on February 1, 2013.  A219-20.

59

Finally, after receiving summary judgment in the Florida Action, Ericsson tendered payment to Wi-LAN pursuant to the terms of the BelAir License.  Despite Ericsson's repeated demands and its tender of payment, Wi-LAN has refused to grant Ericsson a license pursuant to the MFL Provision.  A177 at ¶ 13.

### 2.    Ericsson and Sony Stipulate That BelAir Is Wi-LAN's Most-Favored Licensee

The MFL Provision requires that Ericsson and Sony be granted "most-favored licensee status as compared to any future licensee of Wi-LAN."  A767 (Art. VII, § 1); A837 (Art. VII, § 1).[15]  Once the MFL Provision is invoked, it became Ericsson's and Sony's right to determine which of Wi-LAN's future licenses is most-favorable.  *See Studiengesellschaft Kohle, MBH v. Hercules*, 105 F.3d 629, 633 (Fed. Cir. 1997) (under most-favored licensee provision, licensee, not licensor, has "the right to decide which terms were more favorable").

---

[15] Wi-LAN's arguments notwithstanding (WL at 36-37), Ericsson and Sony interpret the MFL provision in a manner that comports with its basic purpose.  *See Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 13 (2d Cir. 1997) ("The purpose of a most-favored-licensee clause is to protect a licensee from a competitive disadvantage resulting from more favorable terms granted to another licensee.").  The MFL Provision puts Ericsson and Sony in a position to obtain a license on the terms that Wi-LAN negotiated with its most-favored licensee and nothing more.

60

It is undisputed that BelAir is a licensee of Wi-LAN and that the BelAir License post-dates the PCRA. *Compare* A763 (Art. I, § 4), and A832 (Art. 1, § 4), with A204. Under the clear terms of the MFL Provision, BelAir qualifies as a "future" Wi-LAN licensee.[16] Wi-LAN therefore is obligated to grant both Ericsson and Sony licenses on, at a minimum, the same terms that Wi-LAN granted BelAir under the BelAir License.

While there remains the possibility that Wi-LAN has entered into a more favorable license, Ericsson and Sony have stipulated that BelAir qualifies as a "most-favored licensee." *See* A156; A474-75. Because the BelAir License covers the Florida Patents and the Texas Patents, that license disposes of all claims brought in the Florida Litigation and the Texas Litigation. *See* A204; A212-14.

---

[16] Wi-LAN argues that the term "future licensee" applies only to licenses entered into by Wi-LAN after Ericsson or Sony made its first request for a most-favored license on May 23, 2011. WL at 34-35. Nothing in the PCRA, however, suggests that a request for a license must precede the creation of a most-favored license. Indeed, if Wi-LAN is correct that a "future licensee" must be defined relative to the date of a request for a most-favored license, Ericsson or Sony would have been required to request a most-favored license from Wi-LAN blindly, and then wait for an appropriate license to appear some time in the future.

### 3.  A "Similarly Situated Licensee" Analysis Is Not Required Under the MFL Provision

Wi-LAN argues that the terms of the BelAir License are not applicable, and that the Florida Court was required instead to apply a variety of factors to determine whether Wi-LAN extended "more favorable rates" to a "similarly situated licensee."  WL at 39-43; A408-09.  This argument is wholly without merit because, while Section 2 of Article VII contains such a requirement, the MFL Provision — found in Section 1 — does not.  *See* A767 (Art. VII, § 2); A837 (Art. VII, § 2).

In pertinent part, Section 2 of the PCRA states that:

> **If a FUTURE AGREEMENT is entered into by the parties**, and during the TERM WI-LAN has signed or signs any subsequent license with **a similarly situated licensee** that contemplates **more favorable rates** than the rates being paid in respect of UMTS/HSPA PRODUCTS by LME, then WI-LAN shall . . . .

*Id.* (emphasis added).  Section 3 then sets forth a list of factors that must be evaluated "[i]n order for a license to be considered to be at more favorable rates for a similarly situated licensee."  A768 (Art. VII, § 3); A838 (Art. VII, § 3).  The use of the identical terms "more favorable rates" and "similarly situated licensee" in those two sections demonstrates a clear intent that the sections should be read together.

62

Those sections, however, are independent of Section 1 (the MFL Provision). Read properly, Section 1 provides Ericsson and Sony with the right to a most-favored license. A767 (Art. VII, § 1); A837 (Art. VII, § 1). Thereafter, under Sections 2 and 3, Ericsson and Sony may elect to enter into a second, potentially better, license than the first. A767-68 (Art. VII, §§ 2, 3); A837-38 (Art. VII, §§ 2, 3). In that situation, however, the "similarly situated" analysis set forth in Sections 2 and 3 applies.

Indeed, Section 2 unambiguously applies only "[i]f a FUTURE AGREEMENT is entered into by the parties" and Wi-LAN thereafter "signs any subsequent license with a similarly situated licensee that contemplates more favorable rates." A767 (Art. VII, § 2); A837 (Art. VII, § 2). Section 1, however, gives Ericsson a right to a most-favored license before a FUTURE AGREEMENT is entered into by Wi-LAN and Ericsson. A767 (Art. VII, § 1); A837 (Art. VII, § 1).

Moreover, the absence of the terms "more favorable rates" and "similarly situated licensee" from the MFL Provision establishes beyond doubt that, unlike the sections that follow it, the Parties did not intend for the MFL Provision to be subject to a similarity analysis. Sections 2

63

and 3 demonstrate that the Parties knew how to impose a similarity requirement if that is what they intended to do. *See Korosh*, 99 A.D.3d at 911. Clearly, for the MFL Provision, they did not.

Further, Article VII, Section 6 of the PCRA states that disputes over whether rates "in any subsequent license with a similarly situated licensee are more favorable than those in any FUTURE AGREEMENT *arising under Section 2"* are to be resolved by arbitration. A768 (Art. VII, § 6); A838 (Art. VII, § 6) (emphasis added). Because the MFL Provision gives Ericsson the unilateral right to pick what it believes is the most-favored license, the dispute resolution provision only addresses disputes arising under Section 2, which requires a similarly situated licensee analysis. Had the Parties intended for there to be a "similarly situated licensee" requirement under the MFL Provision, they naturally would have included that provision in Section 6's discussion of arbitrable issues. Again, they did not. As such, the language in Article VII is clear.

To support its position, Wi-LAN cites to correspondence from an Ericsson attorney to Wi-LAN's counsel. WL at 41-42; A478-79. That extrinsic evidence, however, is not admissible to contradict the clear

and unambiguous language of the MFL Provision. *See Republic Nat'l Bank of New York v. Olshin Woolen Co. Inc.*, 304 A.D.2d 401, 402 (N.Y. App. Div. 2003) ("Where the parties' intent is clear and unambiguous from the language employed on the face of the contract, the court may not resort to parol evidence."). In any event, Wi-LAN overstates the import of the letter, which merely refers to Section 3 in Article VII to identify the type of information that counsel was seeking. *See* A478; A479.

In a further attempt to avoid the plain reading of Article VII, Wi-LAN also concocts the theory that the MFL Provision merely provides Ericsson and Sony with a right to a license that itself contains a most-favored licensee provision. WL at 34-36. In other words, according to Wi-LAN, the MFL Provision requires Wi-LAN, upon request, to provide a license on undefined terms, and that license — whether it is for one dollar or one billion dollars — must contain a most-favored licensee provision. *Id.*

Beyond the obvious unreasonableness of such a position, Wi-LAN's argument suffers from two fatal flaws. First, it ignores the actual language of the MFL Provision. Pursuant to the MFL Provision,

Ericsson and Sony are entitled to a license "*at* most-favored licensee status as compared to any future licensee of Wi-LAN." A767 (Art. VII, § 1); A837 (Art. VII, § 1) (emphasis added). By these clear terms, Ericsson and Sony are entitled to a license containing the terms of Wi-LAN's most-favored licensee. *Id.* The language does not, as Wi-LAN argues, in any way suggest that Ericsson and Sony receive only a license that contains a most-favored licensee provision. *See* WL at 34-39.

Indeed, by so arguing, Wi-LAN effectively asks this Court to rewrite the MFL Provision to read: "Wi-LAN agrees to grant such a license ~~at~~ [with a] most-favored licensee [clause] ~~status as compared to any future licensee of Wi-LAN~~." This Court should not engage in such a dramatic rewriting of the MFL Provision. *See Korosh*, 99 A.D.3d at 911.

Second, Wi-LAN's redrafting of the MFL Provision would render it meaningless. As noted *supra*, Wi-LAN argues that the MFL Provision provides nothing more than the right to a FUTURE AGREEMENT, and that "such license must include a 'most-favored licensee' provision." WL at 35. Sections 2 and 3 of Article VII, however, already provide that

right.  A767-68 (Art. VII, §§ 2, 3); A837-38 (Art. VII, §§ 2, 3).  Those

sections explicitly set forth Ericsson's and Sony's most-favored licensee

rights in a FUTURE AGREEMENT.  *Id.*  As such, under Wi-LAN's

strained contract interpretation, the MFL Provision provides Ericsson

and Sony with nothing.  Under Wi-LAN's theory, Ericsson and Sony end

up with the same bundle of rights whether the MFL Provision exists or

is stricken.  Such a construction is wrong as a matter of law.  *See*

*Corhill Corp.,* 9 N.Y.2d at 599 (rejecting contract interpretation that

would render contractual provision meaningless).

### 4.  The License Granted Under the MFL Provision Is Not Limited to the Texas Patents

In a last effort at re-writing the MFL Provision, Wi-LAN argues

for the first time that the provision is limited only to a license for

patents "which are infringed or alleged to be infringed by UMTS/HSPA

PRODUCTS."  WL at 44.  First, this argument was not raised below

and should not be considered by this Court for the first time on appeal.

*See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed.

Cir. 1997) ("With a few notable exceptions, such as some jurisdictional

matters, appellate courts do not consider a party's new theories, lodged

first on appeal.").

Second, Wi-LAN's argument conflates the conditions triggering

the MFL Provision with Ericsson's and Sony's rights once the provision

is triggered.  The language cited by Wi-LAN — patents "which are

infringed or alleged to be infringed" — refers only to a condition that

must be met for the MFL Provision to trigger.  A767 (Art. VII, § 1);

A837 (Art. VII, § 1).  Once triggered, however, Ericsson's and Sony's

rights are clear.  Ericsson and Sony are entitled to a broad product

license, and one that extends beyond UMTS/HSPA PRODUCTS:

> . . . Wi-LAN will grant to [Ericsson/Sony] and its
> AFFILIATES a non-exclusive license to make, have made,
> use, sell, offer for sale, lease or otherwise dispose of, and
> import *[Ericsson/Sony] PRODUCTS including UMTS/HSPA
> PRODUCTS* . . .

*Id.* (emphasis added).

On its face, the MFL Provision provides for a *product* license for

*all* of Ericsson's and Sony's products, including but not limited to

UMTS/HSPA PRODUCTS.  *Id.*  For Wi-LAN to suggest that the MFL

Provision somehow is limited to UMTS/HSPA technology borders on the

absurd.  WL at 45.

Wi-LAN's implicit claims of an unjust result are equally

unavailing.  *See* WL at 10-11, 18-19, 43-44.  Both the triggering of the

conditions in the MFL Provision, and the terms of any subsequent license, were entirely within Wi-LAN's control. It chose to bring the Texas Litigation, and it chose to enter into the BelAir License. It cannot be heard now to complain about the consequences of its own actions. *See, e.g.*, *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7, 948 N.Y.S.2d 292, 297 (2012) (explaining that "when sophisticated, counseled businesspeople set down their agreement in a clear, complete contract, the contract should be enforced according to its terms"); *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 734 (2d Cir. 1984) (clear contractual language controls dispute and, "[p]articularly where the two sides are sophisticated, their allocation of risk and potential benefit is properly treated as supreme . . . .").

## CONCLUSION

For the foregoing reasons, Ericsson and Sony respectfully request that this Court reverse the Texas Court's denial of Ericsson's and Sony's motions for summary judgment and grant of Wi-LAN's motion for partial summary judgment, and remand the Texas Litigation for a determination of the damages to which Ericsson and Sony are entitled under their breach of contract counterclaims. In addition, Ericsson and

Sony respectfully request that this Court affirm the Florida Court's

award of summary judgment on Ericsson's motion.

February 3, 2014                              Respectfully submitted:

                                             _____/s/ Joshua C. Krumholz_____

Joshua C. Krumholz                           Bruce S. Sostek
Jacob K. Baron                               Richard L. Wynne, Jr.
Holland & Knight LLP                         J. Michael Heinlen
10 St. James Avenue                          Justin S. Cohen
11th Floor                                   Thompson & Knight LLP
Boston, MA 02116                             1722 Routh Street
(617) 523-2700                               Suite 1500
                                             Dallas, TX 75201
                                             (214) 969-1700

*Attorneys for Telefonaktiebolaget*          *Attorneys for*
*LM Ericsson and Ericsson Inc.*              *Telefonaktiebolaget LM*
                                             *Ericsson, Ericsson Inc., Sony*
                                             *Mobile Communications AB and*
                                             *Sony Mobile Communications*
                                             *(USA) Inc.*

                                             Kara F. Stoll
                                             Jason L. Romrell
                                             Finnegan, Henderson, Farabow,
                                             Garrett & Dunner, LLP
                                             901 New York Avenue, N.W.
                                             Washington, DC 20001
                                             (202) 408-4000

                                             *Attorneys for Sony Mobile*
                                             *Communications AB and Sony*
                                             *Mobile Communications (USA)*
                                             *Inc.*

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

*WI-LAN, INC. v. ERICSSON INC.*, 2013-1485, -1566

CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that: Counsel Press was retained by HOLLAND & KNIGHT LLP, Attorneys for Telefonaktiebolaget LM Ericsson and Ericsson Inc. to print this document. I am an employee of Counsel Press.

On **February 3, 2014**, counsel has authorized me to electronically file the foregoing **BRIEF OF DEFENDANTS-APPELLANTS TELEFONAKTIEBOLAGET LM ERICSSON, ERICSSON INC., SONY MOBILE COMMUNICATIONS AB and SONY MOBILE COMMUNICATIONS (USA) INC. and DEFENDANTS-APPELLEES ERICSSON INC. and TELEFONAKTIEBOLAGET LM ERICSSON** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the any of the following counsel registered as CM/ECF users at the time of filing:

David B. Weaver (principal counsel)    Constance S. Huttner
Stephen M. Hash                        Stephanie Donahue
Avelyn M. Ross                         VINSON & ELKINS LLP
Ajeet P. Pai                           666 Fifth Avenue
VINSON & ELKINS LLP                    26th Floor
2801 Via Fortuna Suite 100             New York, NY 10103-0040
Austin, TX 78746-7568                  212.237.0000
512.542.8400                           *Attorneys for Wi-LAN Inc.*
dweaver@velaw.com                      *and Wi-LAN USA, Inc.*
shash@velaw.com                        chuttner@velaw.com
ss@velaw.com                           sdonahue@velaw.com
apai@velaw.com
*Attorneys for Wi-LAN Inc.*
*and Wi-LAN USA, Inc.*

When paper copies are requested by the Court, paper copies will also be mailed to the principal counsel at the address noted above.

Upon acceptance by the Court of the e-filed document, six paper copies will filed with the Court, via Federal Express, within the time provided in the Court's rules.

February 3, 2014                       /s/ Robyn Cocho
                                       Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B).  The brief contains 13,260 words, excluding the parts of the brief exempted by the Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Respectfully submitted,


/s/ Joshua C. Krumholz
Joshua C. Krumholz
Counsel for Appellees

73